**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARLOS FLORES and LAWRENCE BARTLEY, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| -against- | |
| TINA M. STANFORD, as Chairwoman of the New York State Board of Parole; WALTER W. SMITH, as Commissioner of the New York State Board of Parole; SALLY THOMPSON, as Commissioner of the New York State Board of Parole; JOSEPH P. CRANGLE, as Commissioner of the New York State Board of Parole; ELLEN E. ALEXANDER, as Commissioner of the New York State Board of Parole; MARC COPPOLA, as Commissioner of the New York State Board of Parole; EDWARD SHARKEY, as Commissioner of the New York State Board of Parole; TANA AGOSTINI, as Commissioner of the New York State Board of Parole; CHARLES DAVIS, as Commissioner of the New York State Board of Parole; CAROL SHAPIRO, as Commissioner of the New York State Board of Parole; ERIK BERLINER, as Commissioner of the New York State Board of Parole; OTIS CRUSE, as Commissioner of the New York State Board of Parole; TYCEE DRAKE, as Commissioner of the New York State Board of Parole; and CARYNE DEMOSTHENES, as Commissioner of the New York State Board of Parole. | ECF Case No. _____ |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiffs Carlos Flores and Lawrence Bartley (referred to hereinafter as "Named Plaintiffs" or "Plaintiffs"), on behalf of themselves and those similarly situated, by and through their attorneys, as and for their Complaint, allege the following:

## INTRODUCTION

1.       This is an action for declaratory and injunctive relief.  Plaintiffs are individuals who were convicted of crimes committed when they were children under the age of 18 and sentenced to indeterminate life sentences with the possibility of parole.  Plaintiffs have been and continue to be subject to disproportionate punishment and deprived of due process of law by being denied a realistic and meaningful opportunity for release based upon demonstrated maturity and rehabilitation.

2.       Plaintiffs bring this action on behalf of a class consisting of all persons eligible for release to parole supervision who were convicted of crimes committed when they were children under the age of 18 and sentenced to indeterminate life sentences with the possibility of parole in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") (hereinafter referred to as "juvenile lifers" or "Class Members").

3.       Juvenile lifers, including Plaintiffs, have been, continue to be, or will be denied a meaningful opportunity for release based upon demonstrated maturity and rehabilitation, in violation of the cruel and unusual punishments clauses of the Eighth Amendment to the U.S. Constitution and New York Constitution Article I, Section 5.  Juvenile lifers, including Plaintiffs, have also been, continue to be, or will be denied due process of law in the manner in which their parole hearings have been conducted, in violation of the due process clauses of the Fourteenth Amendment to the U.S. Constitution and New York Constitution Article I, Section 6.  Juvenile lifers, including Plaintiffs, have also been, continue to be, or will be denied their right to a trial

by jury because their sentence has been extended by findings of fact made by the Board of

Parole's commissioners, in violation of the Sixth Amendment of the United State Constitution

and New York Constitution Article I, Section 2.

4.      Recognizing that fundamental differences between children and adults are

relevant to assessing proportionality in punishment, the United States Supreme Court has, in a

series of cases, forbidden as unconstitutional life without parole for all juveniles except for the

"rare juvenile whose crimes reflect irreparable corruption", and has held that this substantive

constitutional rule is retroactive.  Montgomery v. Louisiana, 136 S. Ct. 718, 734 (2016) (quoting

Miller v. Alabama, 132 S. Ct. 2455, 2469 (2012)); Graham v. Florida, 560 U.S. 48, 82 (2010).

5.      Taken together, these decisions establish that the Eighth Amendment to the U.S.

Constitution prohibits statutory schemes that fail to provide juvenile lifers with a meaningful and

realistic opportunity for release based upon demonstrated maturity and rehabilitation.  See

Miller, 132 S. Ct. at 2464; Graham, 560 U.S. at 50.

6.      These decisions have both a substantive component, which applies retroactively

to all juvenile lifers in prison today, and a procedural component, which applies at parole

hearings where juvenile lifers face possible life imprisonment if parole is denied.  See

Montgomery, 136 S. Ct. at 734-35.

7.      In New York State, the authority to release any person sentenced to a maximum

term of life prior to the end of his or her natural life lies with the New York State Board of

Parole (hereinafter "Board of Parole" or "Board").  Defendants are each Commissioners of the

Board of Parole, and are sued in their official capacity (hereinafter "Commissioners" or

"Defendants").

8.      Despite clear precedent to the contrary, Defendants have interpreted the New York Executive Law to allow Defendants to deny parole to juvenile lifers without regard to an individual's subsequent demonstrated maturity and rehabilitation, if Defendants determine that release would be "not compatible with the welfare of society" or would "so deprecate the seriousness of his crime as to undermine respect for law". *See* N.Y. Exec. Law § 259-i(2)(c)(A).

9.      Accordingly, Defendants regularly deny parole to juvenile lifers, such as Plaintiffs, who demonstrate unmistakable rehabilitation and reform, and low risk to public safety. Defendants have consistently denied such individuals parole with short conclusory opinions citing only factors present at the time of conviction, such as juvenile criminal history and the nature of the crime of conviction.

10.      The procedures and practices of the Board of Parole, as executed by Defendants, thereby deprive juvenile lifers, including Plaintiffs, of a meaningful opportunity for release based on demonstrated maturity and rehabilitation in violation of the constitutional prohibition against excessive punishment. The formal regulations and regular practices of the Board of Parole, as executed by Defendants, also violate juvenile lifers', including Plaintiffs', Due Process rights, which arise from the liberty interest in parole conferred by the U.S. Supreme Court's Eighth Amendment jurisprudence and by New York State Executive Law and the Board's regulations.

11.      Plaintiffs do not challenge their judgments of conviction and do not seek to invalidate their sentences. Rather, Plaintiffs seek an order that Defendants afford them, and those similarly situated, as persons sentenced to life imprisonment for offenses committed before they were 18 years old, a meaningful opportunity to obtain release based on non-arbitrary criteria that measure their degree of maturity and rehabilitation.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1343(a)(3).  The controversy arises under the Sixth, Eighth and Fourteenth Amendments to the

U.S. Constitution.  The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over

additional claims arising under State law.

13.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2)

because Plaintiffs are incarcerated within the Southern District of New York, and Defendants

have conducted parole hearings and taken other actions leading to the denial of Plaintiffs' rights,

as alleged further herein, within the Southern District of New York.

## PARTIES

### A.  Plaintiffs

i.     Plaintiff Carlos Flores

14.     Plaintiff Carlos Flores is 54 years old and has been incarcerated since he was 17.

He was convicted of felony murder after participating in a robbery in January 1981 that resulted

in an accomplice shooting an individual who drew a gun.

15.     Mr. Flores was convicted of murder in the second degree and sentenced to 21

years to life.  At sentencing, the judge considered, and rejected, a lengthier minimum sentence of

25 years because Mr. Flores had no prior criminal record and was not the shooter.  Mr. Flores

has now been denied parole ten times.  He has been incarcerated for 37 years, *16 years in excess*

of the 21-year minimum set by the judge.

16.     Mr. Flores had a difficult upbringing.  He was a victim of frequent abuse and

dropped out of school to support his family financially by working at a pizzeria.  He was

manipulated into participating in a robbery by a much older man who had significant influence

over him—a man who had shown him friendship and who he had thought was a mentor. During

5

the robbery, in an unplanned act, one of the robbers shot and killed a patron at the bar, Robert

Walsh.  At that time, Mr. Flores was in a separate room at the back of the bar.

17.     Nothing in Mr. Flores's record suggests, nor was any finding ever made, that his

crime reflected that he was among the "rarest of juvenile[s] . . . whose crimes reflects permanent

incorrigibility".

18.     Mr. Flores is presently incarcerated at Otisville Correctional Facility, in Otisville,

New York.  Mr. Flores has an exceptional institutional record while in custody.  His last

disciplinary offense was more than 25 years ago for disobeying an order to keep the mess hall

line moving.

19.     He has low scores across the board in his Correctional Offender Management

Profiling for Alternative Sanctions ("COMPAS").  In addition, his COMPAS report found that if

released he would require the lowest level of supervision.  He has earned outside clearance to

work in the community, a permit DOCCS grants only to the most trustworthy inmates who can

safely work outside the prison with minimal supervision.

20.     Defendants last denied Mr. Flores release on October 24, 2017, on the

unsubstantiated basis that his "discretionary release at this time, would not be compatible with

the welfare of society and would tend to deprecate the seriousness of the Instant Offense and

undermine respect for the law".

21.     Plaintiff Carlos Flores brings this suit on behalf of himself and a class of similarly

situated persons eligible for release to parole supervision who were convicted of crimes

committed when they were children under the age of 18 and sentenced to indeterminate life

sentences with the possibility of parole in the custody of DOCCS.

22.     Mr. Flores has been denied and continues to be denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, and the right to due process, in that (1) Commissioners did not fully consider, read, or attend to Mr. Flores's parole submission; (2) neither Mr. Flores nor his attorneys were permitted access to letters opposing his release; (3) he was denied the right to have an attorney present at his interview and the right to see and confront any evidence against him; (4) his denial is based on a crime he committed decades ago that he cannot change; (5) Commissioners did not base their decision on Mr. Flores's demonstrated maturity and rehabilitation; and (6) he was denied any explanation for what additional steps he must take to be recommended for parole.

ii.     Plaintiff Lawrence Bartley

23.     Plaintiff Lawrence Bartley is 45 years old and has been incarcerated since he was 17.  In December 1990, Mr. Bartley was involved in a gunfight that erupted at a local movie theater.  Twenty shots were exchanged in total, with only one shot fired by Mr. Bartley.  In the midst of the shooting, a bystander was accidentally shot and killed.

24.     Mr. Bartley received an aggregate sentence of 27 and one-third years to life for second degree murder and associated offenses.  He has been imprisoned for 27 years and is presently incarcerated at Sing Sing Correctional Facility in Ossining, New York.

25.     Mr. Bartley grew up in a rough neighborhood surrounded by drug dealers and gang members.  At only 16, he was shot four times in a drive-by shooting.  He began carrying a gun thereafter out of fear for his life.

26.     Nothing in Mr. Bartley's record suggests, nor was any finding ever made, that his crime reflected that he was among the "rarest of juvenile[s] . . . whose crimes reflects permanent incorrigibility".

27.     Mr. Bartley has an exceptional institutional disciplinary record while in custody. His last disciplinary infraction was in 2008, roughly ten years ago.

28.     Mr. Bartley's COMPAS report found him to be at a low risk of reoffending.  Mr. Bartley has received numerous letters of support from corrections officers, including from the superintendent of Sing Sing, noting that Mr. Bartley's behavior "exemplifies DOCCS' mission of rehabilitating its residents to positively re-enter society".

29.     While incarcerated, Mr. Bartley earned a six-month limited credit time allowance ("LCTA") for "significant programmatic accomplishment" and lack of serious disciplinary infractions.  The LCTA award made him eligible for parole release six months before the expiration of his minimum term.

30.     Defendants denied Mr. Bartley release on September 6, 2017.  He was denied release despite ample evidence of his maturation and rehabilitation, including having earned a Master's degree, raised $8,000 for a gun buy-back program, publicly engaged in anti-violence and anti-gun violence programming and secured employment upon release.

31.     In its September 6, 2017 decision, Defendants acknowledged these achievements, writing:  "The Panel applauds your exceptional packet, institutional accomplishments, your overall low COMPAS score and satisfactory case plan. Your release planning, community outreach, use of media, networking and your life as an example exemplifies an extraordinary effort to give back, demonstrates restoration and evidenced change."  The panel then concluded, without any basis, that, "there is a reasonable probability that you would not live and remain at liberty without again violating the law and that your release would be incompatible with the

welfare of society and would so deprecate the serious nature of the crime as to undermine respect for the law."

32.     Mr. Bartley represents himself and a class of similarly situated people eligible for release to parole supervision who were convicted of crimes committed when they were children under the age of 18 and sentenced to indeterminate life sentences with the possibility of parole in the custody of DOCCS.

33.     Mr. Bartley has been denied and continues to be denied a meaningful opportunity for release, in that (1) Commissioners did not meaningfully consider, read, or attend to Mr. Bartley's full parole submission; (2) the denial of release to parole supervision is based on a crime he committed decades ago that he cannot change; (3) he was denied the right to have an attorney present at his interview and the right to see and confront any evidence against him; (4) Commissioners failed to base their decision on Mr. Bartley's demonstrated maturity and rehabilitation since the age of 17; and (5) he was denied any explanation for what additional steps he must take to be recommended for parole.

### B. Defendants

34.     Defendant Tina Stanford is the Chair of the Board of Parole.  Defendant Stanford has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  As Chair, Defendant Stanford is responsible for the administrative functions and daily operations of the Board of Parole and its staff, and exercises ultimate authority—in consultation with the other Commissioners—with respect to the Board's policies, practices, and procedures. Defendant Stanford is sued in her official capacity.

35.     Defendant Walter William Smith is a member of the Board of Parole.  Defendant Smith has authority over the Board of Parole pursuant to New York Executive Law Sections

259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Smith is sued in his official capacity.

36.     Defendant Sally Thompson is a member of the Board of Parole.  Defendant Thompson has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Thompson is sued in her official capacity.

37.     Defendant Joseph P. Crangle is a member of the Board of Parole.  Defendant Crangle has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Crangle is sued in his official capacity.

38.     Defendant Ellen Evans Alexander is a member of the Board of Parole.  Defendant Alexander has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Alexander is sued in her official capacity.

39.     Defendant Marc Coppola is a member of the Board of Parole.  Defendant Coppola has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Coppola is sued in his official capacity.

40.     Defendant Edward Sharkey is a member of the Board of Parole.  Defendant Sharkey has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Sharkey is sued in his official capacity.

41.     Defendant Tana Agostini is a member of the Board of Parole.  Defendant Agostini has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Agostini is sued in her official capacity.

42.     Defendant Charles Davis is a member of the Board of Parole.  Defendant Davis has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Davis is sued in his official capacity.

43.     Defendant Carol Shapiro is a member of the Board of Parole.  Defendant Shapiro has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Shapiro is sued in her official capacity.

44.     Defendant Erik Berliner is a member of the Board of Parole.  Defendant Berliner has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Berliner is sued in his official capacity.

45.     Defendant Otis Cruse is a member of the Board of Parole.  Defendant Cruse has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Cruse is sued in his official capacity.

46.     Defendant Tycee Drake is a member of the Board of Parole.  Defendant Drake has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S

and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for

parole.  Defendant Drake is sued in her official capacity.

47.     Defendant Caryne Demosthenes is a member of the Board of Parole.  Defendant

Demosthenes has authority over the Board of Parole pursuant to New York Executive Law

Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which

prisoners are eligible for parole.  Defendant Demosthenes is sued in her official capacity.

## FACTUAL ALLEGATIONS

**I.  JUVENILES HAVE DIMINISHED CULPABILITY AND GREATER PROSPECTS FOR REFORM THAN ADULTS, AND THE STATE CANNOT, EXCEPT IN THE RAREST OF CASES, CONDEMN JUVENILE OFFENDERS TO DIE IN PRISON WITHOUT A MEANINGFUL OPPORTUNITY FOR RELEASE.**

**A.  The relevant scientific communities have recognized that children are categorically different from adults.**

48.     Scientific and psychological studies confirm that children are fundamentally

different from adults, and as a result, their culpability is diminished.

49.     The first reason that justifies the diminished culpability of juvenile offenders is

their lack of maturity and an underdeveloped sense of responsibility.  See Laurence Steinberg &

Elizabeth Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity Diminished

Responsibility and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1011-14 (2003).

50.     Their lack of maturity often results in impetuous and ill-considered actions and

decisions (i.e., impulsive conduct), which explains why "adolescents are overrepresented

statistically in virtually every category of reckless behavior".  Jeffrey Arnett, Reckless Behavior

in Adolescence: A Developmental Perspective, 12 Developmental Rev. at 339; see also Laurence

Steinberg & Robert G. Schwartz, Developmental Psychology Goes to Court in Youth on Trial: A

Developmental Perspective on Juvenile Justice 9 (Thomas Grisso & Robert Schwartz, eds.,

2000).

51.     Developmental research shows that juveniles engage in impulsive decision-making  because they are unable to perceive risks.  Melinda G. Schmidt *et al.*, Effectiveness of Participation as a Defendant: The Attorney-Juvenile Client Relationship, 21 Behav. Sci. & L. 175, 180 (2003).  Another explanation for their impulsive behavior is that juveniles think more about immediate gains as opposed to long-term consequences, and thus consider the meaning of a potential act differently than adults.  Id.; see also Kristin Henning, Loyalty, Paternalism, and Rights: Client Counseling Theory and the Role of Child's Counsel in Delinquency Cases, 81 Notre Dame L. Rev. 245, 271-72 (2005).

52.     A second area of difference between adults and adolescents is that juveniles are more vulnerable to negative influences and outside pressures, including peer pressure.  Steinberg & Scott, Less Guilty by Reason of Adolescence, 58 Am. Psychologist at 1014.

53.     Their susceptibility to outside pressure is explained, at least in part, by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment.  Id.

54.     It is no surprise, therefore, that psychologists have concluded that juveniles "lack the freedom that adults have to extricate themselves from a criminogenic setting".  Id.

55.     A third area of difference between adults and adolescents is that the character of a juvenile is not as well formed as that of an adult.  Specifically, psychologists and psychoanalysts have recognized that the personality traits of juveniles are more transitory, less fixed.  See generally, Erik Erikson, Identity: Youth and Crisis (1968); see also Steinberg & Scott, Less Guilty by Reason of Adolescence, 58 Am. Psychologist at 1014.

56.     Although these three inherently transitory characteristics of juveniles often leads them to commit crimes, psychologists have recognized that, for most teenagers, their impulsive

and risky behaviors "cease with maturity" as their identities become settled, they learn to consider long-term consequences of potential actions prior to making choices, and they gain the resources and capacities to extricate themselves from negative influences.  Steinberg & Scott, Less Guilty by Reason of Adolescence, 58 Am. Psychologist at 1014.

57.      As adolescents mature into adults, they gain an improved perspective on long-term consequences, become more risk averse and gain the self-regulatory capacities to conform their actions to moral evaluation.  Kristin Henning, Loyalty, Paternalism, and Rights: Client Counseling Theory and the Role of Child's Counsel in Delinquency Cases, 81 Notre Dame L. Rev. at 272.  They "also come to regret decisions they made in earlier years".  Id.

58.      The behavior of adolescents evolves so much as they grow up that studies recognize that "[o]nly a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood".  Steinberg & Scott, Less Guilty by Reason of Adolescence, 58 Am. Psychologist at 1014.

### B. The law has traditionally viewed children differently.

59.      Courts and legislatures have long recognized that children are not fully psychologically and socially developed, are susceptible to persuasion and abuse, and are marked by judgmental inexperience such that it is appropriate to limit their ability as a class to vote, marry, serve on juries, drink alcohol, gamble, leave school and otherwise exercise full autonomy under the law.  See J.D.B. v. North Carolina, 564 U.S. 261, 272-77 (2011).

60.      The inherent characteristics of children have been recognized in the area of punishment in a series of U.S. Supreme Court decisions.  Specifically, the Supreme Court recognized that three distinctive attributes of juveniles mitigate their culpability:  juveniles have transient immaturity; they are vulnerable to external forces; and their character traits are still

being formed.  Montgomery, 136 S. Ct. at 733; Miller, 132 S. Ct. at 2646; Graham, 560 U.S. at 68; Roper v. Simmons, 543 U.S. 551, 569-70 (2005).

61.     By recognizing the psychological and social characteristics of children, these decisions established constitutional limitations on the punishment that can be imposed on children, even for very serious crimes, reasoning that "children are constitutionally different from adults for purposes of sentencing" because they have "diminished culpability and greater prospects for reform".  Montgomery, 136 S. Ct. at 733 (quoting Miller, 132 S. Ct. at 2464 (citing Roper, 543 U.S. at 569-70; Graham, 560 U.S. at 68)).

62.     In Roper v. Simmons, 543 U.S. 551, 572 (2005), the U.S. Supreme Court categorically outlawed the death penalty for juvenile offenders, even those convicted of the most heinous murders, concluding that "neither retribution nor deterrence provides adequate justification for imposing the death penalty on juvenile offenders".

63.     In Graham v. Florida, 560 U.S. 48 (2010), the U.S. Supreme Court held that sentencing a juvenile to life in prison without parole for crimes other than murder violates the Eighth Amendment's ban on cruel and usual punishment, specifically for non-homicide offenses.

64.     In Miller v. Alabama, 132 S. Ct. 2455 (2012), the U.S. Supreme Court held that the Eighth Amendment prohibits a sentencing scheme that requires life in prison without the possibility of parole for juvenile homicide offenders.

65.     In Montgomery v. Louisiana, 136 S. Ct. 718 (2016), the U.S. Supreme Court held that Miller v. Alabama announced a substantive rule which, under the Constitution, is retroactive in cases on state collateral review.

66.     In United States v. Reingold, 731 F.3d 204 (2d Cir. 2013), the Second Circuit reiterated the categorical prohibition of mandatory life sentences without parole for juveniles.

67.     Together, these decisions announce substantive constitutional principles of proportionality governing punishment for juvenile offenders based on their diminished culpability and enhanced capacity for reform.  A clear implication of those principles is that the Eighth Amendment forbids a statutory scheme that (i) imposes life sentences upon minors without appropriate consideration of their distinctive attributes as juveniles, and then (ii) fails to provide them with a meaningful and realistic opportunity for release.  New York law fails this test on both accounts.

### C. Life sentences imposed on children are unconstitutional absent a parole scheme that provides a meaningful and realistic opportunity to obtain release based on demonstrated rehabilitation and reform.

68.     "The Eighth Amendment's prohibition of cruel and unusual punishment guarantees individuals the right not to be subjected to excessive sanctions.  That right … flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense."  Miller, 132 S. Ct. at 2463 (internal quotation marks and citations omitted).

69.     Accordingly, the U.S. Supreme Court has held that "sentencing a child to life without parole is [unconstitutionally] excessive for all but the 'rare juvenile offender whose crime reflects irreparable corruption'".  Montgomery, 136 S. Ct. at 734 (quoting Miller, 132 S. Ct. at 2469).  States "must impose a sentence that provides some meaningful opportunity for release based on demonstrated maturity and rehabilitation".  Graham, 560 U.S. at 50.

70.     That holding has both "substantive" and "procedural component[s]".  Montgomery, 136 S. Ct. at 734-35.  Because of its substantive nature, the Supreme Court has held that this constitutional rule applies retroactively.  Id.

71.     As a matter of "substantive right", it is unconstitutional to imprison for life without parole a juvenile "whose crimes reflect unfortunate yet transient immaturity" rather than

16

"irreparable corruption". <u>Miller</u>, 132 S. Ct. at 2469.  In furtherance of this substantive right, the Supreme Court has recognized that a juvenile's "demonstrated maturity and rehabilitation" is what entitles him to a "meaningful opportunity to obtain release". <u>Id.</u> (citing <u>Graham</u>, 560 U.S. at 75).

72.     As a "procedural" matter, "a sentencer [must] consider a juvenile offender's youth and attendant characteristics before determining that life without parole" is "proportionate" to the offense. <u>Montgomery</u>, 136 S. Ct. at 734.  The sentencer does not have unfettered discretion to treat youth as a mere "factor" and assign said factor the weight it chooses.  Rather, youth is a constitutionally relevant status that makes certain forms of punishment unlawful and that triggers the substantive guarantee that a juvenile not be imprisoned for life for a crime that reflects transient characteristics of youth because to do so would be to impose a disproportionate punishment.

73.     Accordingly, the sentencer must "d[o] more than [merely] consider a juvenile offender's youth before imposing life without parole", <u>id.</u> at 734, and must instead analyze whether the crime reflects transient factors of youth or permanent incorrigibility.  <u>Id.</u>

74.     Proceedings bearing on life sentences for juvenile offenders must, in order to avoid being categorically unconstitutional, afford juvenile lifers who have evolved from a troubled, misguided youth to a model inmate, a meaningful opportunity to demonstrate that children who commit even heinous crimes are capable of change. <u>Id.</u> at 724.

75.     Accordingly, sentencing regimes that subject juvenile offenders to life with the possibility of parole are only constitutional insofar as the state provides a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation". <u>Miller</u>, 132 S. Ct. at 2469 (quoting <u>Graham</u>, 560 U.S. at 75).

76.     Those substantive and procedural rights apply at parole hearings where a person who committed a crime as a child faces possible life imprisonment if parole is denied.  After all, "[a] parole board is no more entitled to subject an offender to the penalty of life in prison in contravention of this rule than is a legislature or a sentencing court".  Hawkins v. N.Y. State Dep't of Corr., 140 A.D.3d 34, 38 (3d Dep't 2016); Putland v. New York State Dep't of Corr., 158 A.D.3d 633 (2d Dep't 2018).

77.     The U.S. Supreme Court allows life with parole sentences only because it understands parole to be "a regular part of the rehabilitative process.  Assuming good behavior, [parole] is the normal expectation in the vast majority of cases."  Solem v. Helm, 463 U.S. 277, 300-01 (1983) (citations omitted).

## II.  NEW YORK SUBJECTS JUVENILE LIFERS TO UNCONSTITUTIONALLY DISPROPORTIONATE PUNISHMENT BY DENYING THEM A MEANINGFUL AND REALISTIC OPPORTUNITY FOR RELEASE BASED ON DEMONSTRATED MATURITY AND REHABILITATION.

### A.  New York sentencing law mandates life with the possibility of parole for juvenile offenders as young as 13.

78.     Under New York sentencing law, children aged 16 and 17 are sentenced to an indeterminate sentence with a mandatory maximum term of life imprisonment if convicted of a class A felony, with the minimum term for a class A-I felony ranging from 15 to 25 years.  N.Y. Penal Law §§ 70.00(2)(a), 70.00(3)(a)(i).  Children as young as 13 years old who are convicted of murder receive an automatic maximum sentence of life in prison with opportunity for parole. N.Y. CPL §§ 1.20(42), 180; N.Y. Penal Law § 70.05(2)(a).

79.     Under the New York Penal Law, a defendant's age and maturity, the transient characteristics attendant to youth, and a defendant's capacity for rehabilitation play no role whatsoever in setting the maximum sentence for those convicted of murder or other class A-I felonies for which the mandatory maximum sentence is *life*.

18

80.     The only mechanism, under New York law, by which the substantive right of juvenile lifers to be provided with a meaningful opportunity for release can be secured is through the Board of Parole.

**B. New York parole law fails to afford juvenile lifers a meaningful and realistic opportunity for release upon rehabilitation.**

81.     The New York parole practices and procedures fail to provide juvenile lifers a "meaningful" or "realistic" opportunity to obtain release based on demonstrated maturity and rehabilitation.

82.     The Board of Parole has interpreted the New York Executive Law to allow it to deny parole to juvenile lifers if Defendants, in their subjective judgment, without regard to the individual's demonstrated maturity and rehabilitation subsequent to the crime, believes that release would be "not compatible with the welfare of society" or would "so deprecate the seriousness of his crime as to undermine respect for law".  See N.Y. Exec. Law § 259-i(2)(c)(A).

83.     Defendant Stanford told the Senate Crime Victims, Crime and Correction Committee on February 15, 2018, that she understands the statutory language "deprecate the seriousness of the offense as to undermine respect for the law" to permit Commissioners to deny parole if they, in their personal opinion, believe that release for particular offenders who committed serious crimes "would so undermine respect for the law in the mind of the community [the offenders] would be going back to".  Defendant Stanford termed this consideration as "community opposition" although it is not statutorily authorized under New York's Executive Law.

84.     As a result, Defendants continue to deny juvenile lifers release to parole supervision based only on the crime committed or juvenile criminal history, despite clear evidence of rehabilitation and maturity.

85.     Defendants' failures are illustrated in their treatment of the Named Plaintiffs.

86.     For example, Defendants have denied parole ten times to Plaintiff Carlos Flores, who has been incarcerated for 37 years, has a "low risk across the board" COMPAS risk assessment and has not had a disciplinary ticket in 25 years.  Despite his impeccable record, on October 24, 2017, Defendants Smith, Crangle and Demosthenes denied Mr. Flores release to parole supervision stating, without substantiation, that "discretionary release is not warranted due to concern for the public safety and welfare" and that "release at this time would not be compatible with the welfare of society and would tend to deprecate the seriousness of the Instant Offense and undermine respect for the law".  The *only* treatment in Defendants' decision given to Mr. Flores's juvenile status at the time of the offense is relegated to the following conclusory, passive voice statement that: "[y]our age at the time of the offense, family situation and lack of maturity is noted."

87.     Defendants also denied parole release to Plaintiff Lawrence Bartley at his Limited Time Credit Allowance interview, which he earned for "significant programmatic accomplishment" and an excellent disciplinary record.  Defendants Cruse and Drake acknowledged Mr. Bartley's "exceptional packet, institutional accomplishments . . . overall low COMPAS score and satisfactory case plan… release planning, community outreach, use of media, networking and your life as an example exemplifies an extraordinary effort to give back, [sic] demonstrates restoration and evidenced change".  On September 6, 2017, they nevertheless concluded, without any basis, that "there is a reasonable probability that you would not live and remain at liberty without again violating the law and that your release would be incompatible with the welfare of society and would so deprecate the serious nature of the crime as to undermine respect for the law".  Defendants Cruse and Drake also cited opposition to

Mr. Bartley's release.  Their decision, however, fails to even mention that Mr. Bartley was a juvenile at the time of the offense or consider the hallmark features of youth as they relate to culpability or the constitutional relevance of the exceptional evidence of maturity and rehabilitation.

88.     As evidenced by their denial of Mr. Flores and Mr. Bartley, Defendants continue to deny juvenile lifers release to parole supervision even after they have demonstrated maturity and rehabilitation.

89.     Defendants' reliance on the nature of a juvenile crime, prior juvenile record, juvenile disciplinary history, and "official", "community" or victim opposition, to deny release deprives juvenile lifers of the opportunity to obtain release based on demonstrated maturity and rehabilitation.  This opportunity is required to bring life with parole sentencing regimes into compliance with the Eighth Amendment's proscription against disproportionate punishment.

**C. The Board of Parole willfully violates the rights of juvenile lifers.**

90.     In 2016, the Third Department of New York State Supreme Court, Appellate Division found the Board of Parole in violation of clearly established law under the Eighth Amendment because, "[t]he Board, as the entity charged with determining whether [Hawkins] will serve a life sentence, was required to consider the significance of [Hawkins'] youth and its attendant circumstances at the time of the commission of the crime before making a parole determination."  Hawkins, 140 A.D.3d 34, 36 (3d Dep't 2016).

91.     In response to the Hawkins decision and the U.S. Supreme Court decision in Montgomery, the Board gave notice of proposed regulations that reflected Defendants' official position regarding their legal obligations under the Eighth Amendment and the Due Process Clause.  Department of Corrections and Community Supervision, Proposed Rulemaking, I.D. No. CCS-39-16-00004-P (Sept. 28, 2016).

92.     Numerous comments pointed out to the Board that the proposed regulations were facially inadequate to ensure that the hundreds of juvenile lifers currently incarcerated in New York DOCCS custody receive a meaningful opportunity for release.

93.     Despite these objections, the Board formally adopted these regulations on September 17, 2017 without curing the constitutional defects in the regulations.  The regulations provide that an inmate's juvenile status at the time of the crime for which he or she is currently serving an indeterminate life sentence is merely one of many factors that Board must "consider" 9 NYCRR 8002.2, and continue to permit Defendants to deny parole based solely on their subjective assessment of the crime of conviction.

94.     Subsequent to the adoption of the new regulations, and demonstrating their inadequacy, Plaintiff Carlos Flores was again denied parole based solely on the nature of his crime and without a meaningful opportunity for release based on demonstrated maturity and rehabilitation.  Defendants Smith, Crangle and Demosthenes failed to give any weight to the ample evidence of Mr. Flores's rehabilitation and maturation.  They ignored the Board's own COMPAS instrument finding Mr. Flores to be low risk for reoffending;  they ignored the fact that he has not had a disciplinary ticket in the past 25 years;  they ignored the fact that he is now a 54-year-old man who has served 16 years beyond the minimum term of imprisonment imposed by the sentencing judge in full light of the facts of the crime.  Instead, Defendants Smith, Crangle and Demosthenes denied Mr. Flores release on the unsubstantiated formulaic "conclusion" that his "discretionary release at this time, would not be compatible with the welfare of society and would tend to deprecate the seriousness of the instant offense and undermine respect for the law".

95.     This decision was appealed administratively on December 15, 2017, with a lengthy submission by counsel for Mr. Flores explaining, yet again, the constitutional standard that the Board must follow when considering the applications for parole by juvenile lifers.

96.     On March 6, 2018, the Board decided the administrative appeal.  The Parole Board Appeals Unit, including Defendant Chairwoman Stanford, ordered a *de novo* interview on the basis that the Board did not explain what "course of conduct, before, during, and after" the crime 36 years ago it found concerning.  Notably, it refused to instruct Commissioners that the Eighth Amendment requires Defendants to release Mr. Flores to parole supervision if he has demonstrated maturity and rehabilitation and instead affirmed the unlawful standard under which it had denied Mr. Flores's release stating, in part, that "the applicable principles and factors were discussed and considered by the Board in reaching its determination".

97.     Defendants showed similar disregard for its obligations under applicable constitutional law in deciding the administrative appeal of Mr. Bartley's September 6, 2017 denial.  On November 7, 2017, counsel submitted a lengthy brief perfecting the appeal identifying the numerous substantive and procedural defects in the Board's consideration that denied Mr. Bartley a meaningful opportunity for release, including the Board's failure to render its decision based on Mr. Bartley's demonstrated maturity and rehabilitation.  In February 2018, the Appeals Unit, including Defendant Chairwoman Stanford, ordered a new hearing on the sole basis that Defendants failed to seek the recommendation of his trial attorney in advance of the interview in violation of N.Y. Exec. Law § 259-i(2)(c)(A)(vii).  The Appeals Unit refused to issue any findings of facts or law that would prevent the same defects from infecting his future interview and the panel's deliberation process.

98.     Since <u>Hawkins</u>, a number of New York State courts have found Defendants in violation of their legal obligation to provide persons serving indeterminate life sentences with a meaningful opportunity for release.  <u>See, e.g.</u>, <u>Martin v. Stanford</u>, 58 Misc. 3d 345 (Sup. Ct., Cayuga County 2017); <u>Darshan v. N.Y. State Dep't of Corrs. & Comm. Super.</u>, No. 652/2017 (Sup. Ct., Dutchess County July 18, 2017); <u>Putland v. New York State Dep't of Corr.</u>, 158 A.D.3d 633 (2d Dep't 2018).

99.     Defendants continue to conduct unlawful hearings and refuse to extend requisite procedural protections necessary to secure Plaintiffs' and Class Members' substantive rights.

### D.  The Board of Parole's procedures violate the law.

100.    The sheer volume of work before Defendants precludes the opportunity for Class Members to be meaningfully heard and to receive decisions rendered based on demonstrated maturity and rehabilitation.

101.    Although the State is authorized to staff the Board of Parole with 19 members, it is currently staffed by 14 Commissioners.  These 14 Commissioners must conduct approximately 12,000 parole interviews annually, in addition to sitting on appeals panels, staffing subcommittees, conducting victim impact interviews, traveling for interviews, and engaging in administrative upkeep.

102.    Interview panels consist of two to three Commissioners.  Each panel is assigned each week somewhere between 40 to 70 interviews, which are usually conducted over only two days—Tuesday and Wednesday—as Mondays are reserved for travel and Fridays for victim interviews.  The majority of interviews are conducted by video conference.  This means each panel interviews between 20 and 35 applicants a day.

103.     Each of these applicants typically submits supporting materials (a "parole packet"), including a personal statement, programmatic achievements, and letters of support, that can include hundreds of pages of material.

104.     Defendant Stanford has testified that these parole files and packets are sometimes delivered by prison staff and Offender Rehabilitation Counselors (ORCs) to the field office where the video conferences take place on Monday, the day before the interviews.  She has also testified that Defendants often do not receive the parole files and packets prior to the morning of the interviews.

105.     Defendant Stanford has testified that Commissioners typically arrive in the city or town where the video conferencing of the interviews will take place on Monday the day or evening before the interviews, which begin at 8 a.m. the following morning.

106.     Once Commissioners arrive in a city on Monday, they check into assigned hotels and, according to Chairwoman Stanford, they may then review parole files, if such have been delivered, "at their leisure" in their hotel rooms.

107.     No regulation or policy *requires* Defendants to read parole materials before conducting an interview and making release decisions, and according to Defendant Stanford, "not everyone does it".

108.     On information and belief, Defendants often see the files for the first time at 8 a.m. on the day of the interviews.

109.     The Board divides the weekly interview caseload by the total seated Commissioners to assign a "lead" Commissioner to each case.  During the interviews, only the

lead Commissioner has a copy of the entire parole file.  The full file may contain hundreds of pages of material documenting rehabilitation and reform, including:

- personal statements composed by the parole applicant;
- detailed release plans;
- vocational accomplishments;
- programming completion;
- educational achievements;
- educational transcripts;
- letters from family members showing support;
- letters from those who have had personal contact with the applicant supporting release and describing the reasons why they feel the applicant is safe to release;
- job offers;
- drug and alcohol treatment completion certificates;
- commendable behavior reports;
- prison work assignment assessments; and
- statements of remorse or essays written by the applicant discussing insight into his or her crime.

110.    Defendant Stanford has testified that the one or two Commissioners other than the lead Commissioner have only what is called a "book copy", which includes only four things:  a condensed version of the Parole Board Report (a one page sheet consisting primarily of checkboxes with basic information such as birth date, crimes of commitment, whether there are sentencing minutes or not, etc.), the COMPAS report, a modified rap sheet and the inmate's disciplinary record.

111.    Defendant Stanford has testified that the "book copy" contains all of the information necessary to the decision and that all other information is "less pertinent".

112.    The "book copy" does not include letters of support, personal statements, commendable behavior reports or any of the most relevant and detailed materials that would demonstrate rehabilitation, remorse, reform and suitability for community reentry.

113.    The lead Commissioner typically asks all of the questions in the interview.

114.    Although Defendant Stanford testified that interviews typically last 20 minutes, on information and belief, inmates often have less than 10 minutes to make their case for release because the bulk of the "interview" consists of the lead Commissioner recounting the details of the crime; longer interviews are usually provided only where the applicant is represented by counsel or if the prior determination was overturned by a reviewing court.

115.    On information and belief, during the interview the other Commissioners are often not listening to the questions and answers during the pending interview, but instead are preparing for the subsequent hearings on which they must take the "lead".

116.    Despite this lack of materials and information or direct engagement from the non-lead Commissioners in a given interview, each Commissioner on the panel has an equal vote to grant or deny release.

117.    On information and belief, outcomes are often predetermined prior to the interview and sometimes decision language is pre-written on a typed form denial.  This is a clear violation of the "guarantee against arbitrary and irrational government action", which includes the "right to a hearing before a fact-finder that has not predetermined the outcome of the hearing".  Duffy v. Evans, No. 11 Civ. 7605 JMF, 2012 WL 4327605, at *10 (S.D.N.Y. Sept. 19, 2012).

27

118.    If not, the "deliberations" typically last between 2 to 5 minutes immediately following the interview and prior to commencing the next interview.  The final decision is then read into the record and transcribed by stenographer.

119.    On any given hearing day, a Board of Parole panel will potentially conduct 20 to 35 interviews in less than eight hours.  Defendants, therefore, lack the time or inclination to read and evaluate the materials presented to them in the information packets, and routinely show up unprepared for the parole interviews (as occurred in Mr. Flores's 2015 and 2017 interviews).

120.    These procedural inadequacies are exacerbated because the Board does not permit counsel to appear or give statements at parole interviews.

       i.    <u>Commissioners have no training on which to base their decisions and do not solicit expert evaluations of the maturation and rehabilitation of juvenile lifers.</u>

121.    On information and belief, twelve of the fourteen Defendants have no substantial training in any discipline—such as child psychology, criminology or social work—that would enable them to competently evaluate whether an underlying crime reflected the transient immaturity or youth or instead permanent incorrigibility.

122.    Commissioners do not seek input from experts competent to attest to the extent of maturation and rehabilitation of juvenile lifers eligible for parole release.

123.    The Board does not make available funds for inmates to retain their own experts—such as psychiatrists, psychologists, social workers or criminologists—who could opine about whether the underlying crime reflected transient immaturity or permanent incorrigibility and whether the inmate has demonstrated maturity and rehabilitation.

124.    The prevalence of mental impairments among juvenile offenders is substantially higher than adolescents who are not involved with the justice system.  <u>See generally</u>, Lee Underwood & Aryssa Washington, <u>Mental Illness and Juvenile Offenders</u>, 13 Int. J. Environ.

28

Res.& Pub. Health 228 (2016).  Lack of access to psychological experts significantly raises the risk that a person serving a life sentence for crimes committed as a juvenile is denied parole based on undiagnosed psychiatric or cogitative impairments, which are often untreated in prison. See id.

       ii.       Commissioners improperly uses risk assessment tools.

125.    Due process requires, at a minimum, that parole release decisions be made based on accurate information.  See, e.g., United States v. Romano, 825 F.2d 725, 728 (2d Cir. 1987) (citing Townsend v. Burke, 334 U.S. 736, 741 (1948)).

126.    The Board relies upon a risk and needs tool, called COMPAS, that does not specifically consider the diminished culpability of juveniles and the hallmark features of youth.

127.    On information and belief, COMPAS fails to incorporate juvenile rehabilitative capacities into its algorithm.

128.    On information and belief, COMPAS sometimes treats youth as an aggravating factor.  For example, it counts as negative not having a job prior to incarceration, not being married, the age of first offense, includes juvenile justice encounters at very young ages in the criminal involvement score, and uses current age to predict risk of felony violence.  Defendants' use of COMPAS thereby disadvantages Class Members who were sentenced as juveniles to serve longer sentences than their adult counterparts.

129.    COMPAS is a commercial product, sold by Northpointe Inc.  On information and belief, the Board has either not asked Northpointe Inc. to disclose its secret algorithms or has acquiesced in the refusal by Northpointe Inc. to do so.  As a result, COMPAS is a black box. Defendants' reliance upon COMPAS, without knowing how or whether COMPAS considers the diminished culpability of juveniles and the hallmark features of youth, fails to comply with Defendants' legal obligations.

130. Defendants have also refused to verify whether the COMPAS tool has been validated for juvenile lifers.

        iii. <u>Commissioners use prior youthful criminal involvement or disciplinary tickets received as a juvenile as reasons for denying parole to juvenile lifers.</u>

131. On information and belief, Defendants have access to and cite to previous involvement in the juvenile justice system and inmates' disciplinary records from their time in Office of Children and Family Services (OCSF) facilities as evidence that applicants are unsuitable for release.

132. For example, in the middle of Mr. Bartley's September 6, 2017 parole hearing, Defendant Cruse indicated that he would consider Mr. Bartley's disciplinary tickets in reaching a release decision, and the subsequent denial decision cited to Mr. Bartley's prior youthful criminal conviction as one of the reasons for denying his release.

133. Defendants fail to account for youth when considering the institutional disciplinary records of juvenile lifers imprisoned when they were still adolescents and not as able as adults to control impulses, plan alternative courses of action, and otherwise moderate their behavior.

134. On information and belief, Defendants have access to and cite to disciplinary tickets issued to juvenile lifers when they were still juveniles being held at OCSF as the basis to deny parole, without considering the hallmark features of youth or undiagnosed or untreated intellectual disabilities, learning disabilities, attention deficit/hyperactivity disorder, autism spectrum disorder, and mental disorders such as post-traumatic-stress disorder, emotional disturbances or childhood depression, all of which are exacerbated in incarcerated youth.

135. All policies, customs, and practices associated with denying juvenile lifers a meaningful and realistic opportunity for parole release reflect the official policy of the Board of

Parole made or acquiesced to by each Defendant. Defendants' actions involved reckless or callous indifference to the rights of Plaintiffs and similarly situated persons serving life sentences for crimes committed as minors.

## CLASS ACTION ALLEGATIONS

136. Named Plaintiffs bring this action on behalf of a class consisting of all persons eligible for release to parole supervision who were convicted of crimes committed when they were children under the age of 18 and sentenced to indeterminate life sentences with the possibility of parole in the custody of the DOCCS.

137. This action meets the requirements of Fed. R. Civ. P. 23(a) as follows:

    i.    The proposed class is so numerous that joinder of all of its members is impracticable. In New York, there are approximately 630 persons currently serving life sentences for offenses they committed between the ages of 13 and 17. (DOCCS Statistics on Under Custody Population as of Jan. 16, 2016, at 1.) Those people are now, or will be in the future, eligible for release to parole supervision. While the exact size of the proposed class may not be known at this time, there can be no doubt that a class action is appropriate to address the systemic issues presented in this case. In addition, joinder of all members of the proposed class is impracticable because membership of the proposed class constantly changes, as additional juveniles receive life sentences with the possibility of parole, some later become parole-eligible, and others are released under parole supervision.

    ii.    The questions of law and fact presented by the Named Plaintiffs are common to other members of the class. Such questions include, generally, whether,

under federal and state law, Defendants provide a meaningful opportunity for release upon demonstrated rehabilitation and maturity.  More specifically:

a. Whether Plaintiffs have been subject to disproportionate punishment and deprived of due process of law by being denied a realistic and meaningful opportunity for release based upon demonstrated maturity and rehabilitation;

b. Whether New York State Executive Law governing parole release violates the Eighth Amendment rights of persons serving indeterminate life sentences for crimes committed as minors to be free of disproportionate punishment;

c. Whether Defendants' policies and practices in conducting parole release interviews and making parole release decisions violate the Eighth Amendment rights of persons serving indeterminate life sentences for crimes committed as minors to be free of disproportionate punishment;

d. Whether Defendants' policies and practices in conducting parole release interviews and making parole release decisions infringe on the Due Process rights of persons serving indeterminate life sentences for crimes committed as minors;

e. Whether Defendants' parole decisions are rendered based on demonstrated maturity and rehabilitation or are based solely on the nature of the crime committed as a juvenile or juvenile history;

f.   Whether the volume of work before the Board precludes the opportunity for Class Members to be meaningfully heard;

g.   Whether Commissioners adequately review the supporting materials in order to enable Class Members to demonstrate maturity and rehabilitation;

h.   Whether Defendants' reliance on the nature of a juvenile crime, prior juvenile record, juvenile disciplinary history, and "official", "community" or victim opposition, to deny release deprives juvenile lifers of the opportunity to obtain release based on demonstrated maturity and rehabilitation;

i.   Whether the limited length of parole hearings conducted by Defendants deprives juvenile lifers a meaningful and realistic opportunity for release;

j.   Whether Commissioners' reliance on a "book copy", rather than an entire parole packet, denies juvenile lifers a meaningful and realistic opportunity for release;

k.   Whether Defendants' reliance on COMPAS, which does not specifically consider the diminished culpability of juveniles and the hallmark features of youth, to deny release deprives juvenile lifers of the opportunity to obtain release based on demonstrated maturity and rehabilitation; and

l.   Whether denying class members the appointment of counsel and opportunity of counsel to be present at hearings deprives juvenile lifers

33

a meaningful and realistic opportunity for release and due process of law.

iii.     The violations alleged by Named Plaintiffs are typical of those suffered by the class.  The entire class will benefit from the relief sought.

iv.     Named plaintiffs will fairly and adequately protect the interests of the class. Named Plaintiffs have no interests adverse to or in conflict with those of the other Class Members.  Plaintiffs' counsel have experience in constitutional litigation.  Attorneys Issa Kohler-Hausmann and Avery Gilbert have extensive knowledge about New York's parole practice and procedure.  Cravath, Swaine & Moore LLP, co-counsel for Plaintiffs, is a private law firm experienced in major class-action litigation.

v.     The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the class.  Fed. R. Civ. P. 23(b)(l)(A).

vi.     Defendants have acted or refused to act on grounds generally applicable to the class, making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole.  Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(For Violation of the Prohibition Against Cruel and Unusual Punishment in the Eighth Amendment to the U.S. Constitution, actionable under 42 U.S.C. § 1983.)

138.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

139.    Defendants, in their official capacity as Commissioners of the Board of Parole, have acted and are acting under color of state law.

140.    The Eighth Amendment to the U.S. Constitution forbids a statutory scheme that mandates life imprisonment for juvenile offenders or permits life sentences without providing them with a realistic and meaningful opportunity for release upon demonstrated maturity and rehabilitation.

141.    Defendants have denied and continue to deny Plaintiffs, and members of the class, a meaningful opportunity for release to Plaintiffs and other members of the class by, among other things, (1) failing to consider the demonstrated maturity and rehabilitation of juvenile lifers who are up for parole; (2) failing to give juvenile lifers any explanation as to what additional steps they must take to be recommended for parole; (3) denying release to parole supervision based upon crimes Plaintiffs committed decades ago that they cannot change; (4) failing to fully consider, read or attend to an inmate's parole submission; (5) denying juvenile lifers the right to have an attorney present at their interviews and the right to see and confront any evidence against them; and (6) using risk assessment tools that discriminate against youth.  With these actions, Defendants have denied Plaintiffs and other members of the class a meaningful and realistic opportunity for release upon their showing of maturity and rehabilitation, in violation of the Eighth Amendment.

142.    Plaintiffs Flores and Bartley, and all others similarly situated, have been injured by Defendants' policies and practices by being denied their rights to meaningful opportunity for release from imprisonment notwithstanding their youth at the time of their offense and despite their demonstration of maturity and rehabilitation, in violation of the prohibition against cruel

and unusual punishments in the Eighth Amendment to the U.S. Constitution, giving rise to their

claims for relief under 42 U.S.C. §1983.

## SECOND CAUSE OF ACTION
(For Violation of the Prohibition Against Cruel and Unusual Punishment in Article I, § 5 of the
New York Constitution.)

143.     The allegations of the preceding paragraphs are incorporated by reference as if

fully set forth herein.

144.     The New York Constitution forbids the infliction of cruel and unusual

punishments.  Accordingly, the New York Constitution should be interpreted to forbid life

imprisonment for juvenile offenders or life sentences without providing them with a realistic and

meaningful opportunity for release upon demonstrated maturity and rehabilitation.  Consistent

with this constitutional requirement, the New York Legislature recently restricted the discretion

of the Board of Parole and now requires that parole release determinations be based on objective,

dynamic and forward-looking considerations.

145.     Defendants have denied and continue to deny Plaintiffs, and members of the class,

a meaningful opportunity for release to Plaintiffs and other members of the class by, among other

things, (1) failing to consider the demonstrated maturity and rehabilitation of juvenile lifers who

are up for parole; (2) failing to deny juvenile lifers any explanation as to what additional steps

they must take to be recommended for parole; (3) denying release to parole supervision based

upon crimes Plaintiffs committed decades ago that they cannot change; (4) failing to fully

consider, read or attend to an inmate's parole submission; (5) denying juvenile lifers the right to

have an attorney present at their interviews and the right to see and confront any evidence against

them; and (6) using risk assessment tools that discriminate against youth.  With these actions,

Defendants have denied Plaintiffs and other members of the class a meaningful and realistic

36

opportunity for release upon their showing of rehabilitation, in violation of Article I, § 5 of the
New York Constitution.

146.   Plaintiffs Flores and Bartley, and all others similarly situated, have been injured
by Defendants' policies and practices by being denied their rights to meaningful opportunity for
release from imprisonment notwithstanding their youth at the time of their offense and despite
their demonstration of rehabilitation, in violation of the prohibition on cruel and unusual
punishment of Article I, § 5 of the New York Constitution.

### THIRD CAUSE OF ACTION
(For Violation of the Due Process Clause in the Fourteenth Amendment to the U.S. Constitution,
actionable under 42 U.S.C. § 1983.)

147.   The allegations of the preceding paragraphs are incorporated by reference as if
fully set forth herein.

148.   Defendants, in their official capacity as Commissioners of the Board of Parole,
have acted and are acting under color of state law.

149.   Under established U.S. Supreme Court case law, the Eighth Amendment of the
U.S. Constitution confers upon juvenile lifers a legitimate expectancy of parole upon a showing
of maturation and rehabilitation.  This is a liberty interest protected by the Due Process Clause.

150.   In 2011, the New York Legislature amended the Executive Law to mandate that
the Board of Parole "establish written procedures" that "shall incorporate risk and needs
principles to measure" the rehabilitation of inmates.  N.Y. Exec. Law § 259-c(4).  The Executive
Law, as amended in 2011, provides prisoners with a legitimate expectancy that if they
demonstrate rehabilitation and a strong likelihood of future compliance with the law, they will be
granted parole.  This is a liberty interest protected by the Due Process Clause.

151.    In 2017, the Board of Parole amended its regulations to require that its decision-making "shall be guided by risk and needs principles".  9 NYCRR § 8002.2(a).  The regulations acknowledge a presumption of release upon rehabilitation (notwithstanding nonbinding disclaimers in the commentary) by requiring Commissioners to provide nonconculsory individualized reasons based in the record for any departure from the conclusions of a validated risk assessment instrument, but only when that departure is denying release.  9 NYCRR § 8002.2(a).  The regulations also require Commissioners to address all statutory factors in each hearing.  Id. § 8002.2(c).  The Board of Parole regulations, as amended in 2017, provide prisoners with a legitimate expectancy that if they demonstrate rehabilitation and a strong likelihood of future compliance with the law, they will be granted parole.  This is a liberty interest protected by the Due Process Clause.

152.    Defendants' conduct and actions – including, *inter alia*, regularly failing to read, review, and consider extensive evidence submitted to the Board of Parole demonstrating low risk to community, rehabilitation and maturity – deny Plaintiffs, and members of the class, the due process of law to secure their limited liberty interest in parole release, in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

153.    Plaintiffs, and members of the class, have been injured and will likely suffer future injury, as a result of Defendants' official policies and regular practices, which fail to adequately distinguish between persons serving life sentences for crimes committed as children and those committed as adults, and Defendants' failure to provide sufficient procedural protections necessary to secure the substantive right to release upon a showing of maturity and reform in violation of the Due Process Clause of the Fourteenth Amendment, giving rise to Plaintiffs' claims for relief under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION
(For Violation of the Due Process Clause of Article I, § 6 of the New York Constitution.)

154.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

155.   Plaintiffs have a liberty interest, under Article I, § 6 of the New York Constitution, in the opportunity to obtain parole release.

156.   Defendants' conduct and actions — including, *inter alia*, interpreting the state statutes to authorize the Board of Parole to deny release based solely on two or three Commissioners' subjective evaluation of the seriousness of the crime conviction irrespective of evidence of maturity and reform — deny Plaintiffs, and members of the class, the due process of law to secure their limited liberty interest in parole release, in violation of the Due Process Clause of Article I, § 6 of the New York Constitution.

157.   Plaintiffs, and members of the class, have been injured and will likely suffer future injury, as a result of Defendants' policies and regular practices, which fail to adequately distinguish between persons serving life sentences for crimes committed as children and those committed as adults, and Defendants' failure to provide sufficient procedural protections necessary to secure the substantive right to release upon a showing of maturity and reform in violation of the Due Process Clause of Article I, § 6 of the New York Constitution.

## FIFTH CAUSE OF ACTION
(For Violation of the Right to a Jury Trial in the Sixth Amendment to the U.S. Constitution, actionable under 42 U.S.C. § 1983.)

158.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

159.   Each Plaintiff was convicted by a jury of a crime, committed while Plaintiffs were juveniles.  Class Members were each similarly convicted by a jury or pleaded guilty.

160.     Any fact that enhances the penalty to which a criminal defendant may lawfully be sentenced must be found by a jury beyond a reasonable doubt or admitted by the criminal defendant.  See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Ring v. Arizona, 536 U.S. 584, 604-05 (2002); Alleyne v. United States, 570 U.S. 99, 114-15 (2013).

161.     A state may impose a life sentence upon a juvenile offender only upon a finding that the defendant is among the "very rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility".  Montgomery, 136 S. Ct. at 734.

162.     The jury at each Plaintiff's criminal trials was not asked to find, and did not find, that Plaintiff's crime reflected that he was among the rarest juveniles whose crime reflects permanent incorrigibility.  Class Members were each similarly convicted by a jury without such a finding or pleaded guilty without pleading to such a fact.

163.     Defendants' conduct and actions — including, *inter alia*, taking into account facts that impose greater punishment on the parole applicant than was authorized by a jury verdict or guilty plea – deny Plaintiffs, and members of the class, their right to have only facts that have been authorized by a jury verdict or guilty plea expose them to punishment, in violation of the jury trial right of the Sixth Amendment of the U.S. Constitution.

164.     Plaintiffs, and members of the class, have been injured and will likely suffer future injury, as a result of Defendants' denial of parole release based on an aggravating factor relating to the crime of conviction that was not an element of the jury verdict or plea convicting Plaintiff at the original criminal trial, in violation of Plaintiffs' right to a jury trial under the Sixth Amendment to the U.S. Constitution, giving rise to Plaintiffs' claims for relief under 42 U.S.C. §1983.

## SIXTH CAUSE OF ACTION

(For Violation of the Right to a Jury Trial in Article I, § 2 of the New York Constitution.)

165.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

166.    The right to a jury trial, under Article I, § 2 of the New York Constitution, protects individuals from an enhancement of the penalty to which a criminal defendant may lawfully be sentenced without a finding by a jury beyond a reasonable doubt or admission by the criminal defendant.

167.    Defendants' conduct and actions — including, *inter alia*, taking into account facts that impose greater punishment on the parole applicant than was authorized by a jury verdict or guilty plea — deny the Plaintiffs, and members of the class, their right to have only facts that have been authorized by a jury verdict or guilty plea expose them to punishment, in violation of the jury trial right of Article I, § 2 of the New York Constitution.

168.    Plaintiffs, and members of the class, have been injured and will likely suffer future injury, as a result of Defendants' denial of parole release based on an aggravating factor relating to the crime of conviction that was not an element of the jury verdict or plea convicting Plaintiff at the original criminal trial, in violation of Plaintiffs' right to a jury trial under Article I, § 2 of the New York Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(a) Certify a plaintiff class pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (b)(2).

(b) Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants have operated, and
    continue to operate, a parole scheme that denies Plaintiffs, and members of the class, a
    meaningful and realistic opportunity for release, in violation of the prohibition against

cruel and unusual punishment in the Eighth Amendment to the U.S. Constitution and the prohibition against cruel and unusual punishment in Article I, § 5 of the New York Constitution;

(c)   Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants must release any and all Plaintiffs, and members of the class, upon demonstration of maturity and rehabilitation;

(d)   Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants must give Plaintiffs, and members of the class, a meaningful and realistic opportunity for release, because otherwise Plaintiffs and other members of the class would be serving *de facto* life without parole sentences pursuant to which they have been afforded no meaningful or realistic opportunity for release, in violation of the prohibition against cruel and unusual punishment in the Eighth Amendment to the U.S. Constitution and the prohibition against cruel and unusual punishment in Article I, § 5 of the New York Constitution;

(e)   Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants' reliance upon risk assessment tools that discriminate against those who were juveniles at the time of offense has denied Plaintiffs and Class Members a meaningful and realistic opportunity for release upon their showing of rehabilitation and the due process of law to secure their limited liberty interest in parole release, in violation of the Eighth Amendment to the U.S. Constitution and Article I, § 5 of the New York Constitution and in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution and Article I, § 6 of the New York Constitution;

(f)   Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants must alter the Board of Parole's operating procedures to enable Defendants to meaningfully analyze the question

of whether maturity and rehabilitation have been demonstrated, including by requiring that:

    i.    The Board provide adequate funds for Class Members to obtain counsel in preparation for all parole interviews, including the first parole interview juvenile lifers are eligible for;

    ii.    The Board permit counsel to be present and make statements at an interview;

    iii.    The Board provide funds for inmates to present testimony from relevant experts, such as psychologists, psychiatrists, criminologists or social workers; and

    iv.    Defendants be given a caseload that permits them sufficient time to read and evaluate the materials presented by class members.

(g) Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants' consideration of facts that impose greater punishment on the parole applicant than was authorized by a jury verdict or guilty plea constitute impermissible fact findings leading to aggravated sentences, in violation of the Sixth Amendment to the U.S. Constitution and Article I, § 2 of the New York Constitution;

(h) Enjoin Defendants immediately to discontinue these practices and to take remedial steps to address their past illegal conduct, by granting Plaintiffs, and members of the class, a meaningful and realistic opportunity to demonstrate their readiness for release and order Defendants to provide new hearings to all class members using a lawful standard and lawful procedures;

(i)  Award Plaintiffs their attorneys' fees and costs incurred in pursuing this action, as

provided in 42 U.S.C. § 1988; and

(j)  Grant such other and further relief as the Court may deem just and proper.

Dated: March 19, 2018
New York, NY                                              Respectfully Submitted,


CRAVATH, SWAINE & MOORE LLP,

By:  /s/ Damaris Hernandez
Issa Kohler-Hausmann                    Antony L. Ryan
Attorney at Law                         Damaris Hernández
127 Wall Street                         Worldwide Plaza
New Haven, CT 06511                      825 Eighth Avenue
(347) 856-6376                          New York, NY 10019
Email: issa.kohler-hausmann@yale.edu    (212) 474-1000
*Does not reflect the views of Yale School, if any   Email: aryan@cravath.com
                                        Email: dhernandez@cravath.com

Avery Gilbert
Attorney at Law
15 Shatzell Avenue                      *Counsel for Plaintiffs*
Suite 232
Rhinecliff, New York 12574
(845) 380-6265
Email: avery@agilbertlaw.com

*Co-counsel for Plaintiffs*