UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CARLOS FLORES, LAWRENCE BARTLEY,      :
EDGARDO LEBRON, ANTONIO ROMAN,        :
DEMETRIUS BENNETT, L'MANI DELIMA,     :
DONTAE QUINONES, and SHAROD           :
LOGAN, on behalf of themselves and all :
others similarly situated,            :
                        Plaintiffs,   :
v.                                    :
                                      :
TINA M. STANFORD, as Chairwoman of the :          **OPINION AND ORDER**
New York State Board of Parole; and WALTER :
W. SMITH, SALLY THOMPSON, JOSEPH P.   :          18 CV 2468 (VB)
CRANGLE, ELLEN E. ALEXANDER, MARC     :
COPPOLA, EDWARD SHARKEY, TANA         :
AGOSTINI, CHARLES DAVIS, CAROL        :
SHAPIRO, ERIK BERLINER, OTIS CRUSE,   :
TYCEE DRAKE, and CARYNE              :
DEMOSTHENES, as Commissioners of the  :
New York State Board of Parole,       :
                        Defendants.   :
-------------------------------------------------------------x

Briccetti, J.:

    Plaintiffs Carlos Flores, Lawrence Bartley, Edgardo Lebron, Antonio Roman, Demetrius

Bennett, L'Mani Delima, Dontae Quinones, and Sharod Logan bring this putative class action

under 42 U.S.C. § 1983 against defendants Tina Stanford, as Chairwoman of the New York State

Board of Parole (the "Parole Board"); and Walter Smith, Sally Thompson, Joseph Crangle, Ellen

Alexander, Marc Coppola, Edward Sharkey, Tana Agostini, Charles Davis, Carol Shapiro, Erik

Berliner, Otis Cruse, Tycee Drake, and Caryne Demosthenes, as Parole Board commissioners.

    Plaintiffs are all individuals who were sentenced to indeterminate sentences of a term of

years to life with the possibility of parole after having committed homicide offenses in New

York when they were under 18 years of age.  They claim defendants have violated and will

continue to violate their Sixth, Eighth, and Fourteenth Amendment rights by denying them a

"realistic and meaningful opportunity for release based on demonstrated maturity and rehabilitation" (Second Amended Complaint ("SAC") ¶ 1), and they seek declaratory and injunctive relief on behalf of a putative class of similarly situated persons, which the second amended complaint refers to as "juvenile lifers" (SAC ¶ 2).

Now before the Court is defendants' motion to dismiss the second amended complaint pursuant to Rules 12(b)(1) and 12(b)(6). (Doc. #114).

For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART. Plaintiffs' Eighth and Fourteenth Amendment claims, insofar as they seek declaratory relief, shall proceed. Their Sixth Amendment claim, and all claims to the extent they seek injunctive relief, are dismissed.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

For the purpose of ruling on the motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the second amended complaint, considers matters properly subject to judicial notice, and draws all reasonable inferences in plaintiffs' favor, as summarized below.[1]

I.    The Plaintiffs

Each plaintiff was convicted by a New York State court of committing homicide as a juvenile. Each received an indeterminate prison sentence up to a maximum term of life with the possibility of parole, to be served in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").

---

[1]    In support of the instant motion, defendants submitted Parole Board records including transcripts of plaintiffs' parole interviews. (Doc. #115). Those materials are extrinsic to the second amended complaint. Accordingly, the Court has not considered them. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

Plaintiff Flores committed felony murder of an off-duty police officer while robbing a bar in 1981, at age 17. Flores's accomplice shot and killed the police officer after the officer drew a gun while trying to stop the robbery. Flores was sentenced to an indeterminate prison term of 21 years to life. He was denied parole ten times before being granted parole on his eleventh application. On June 25, 2018, DOCCS released Flores from custody after he served 37 years in prison.[2] He was 54 when released.

Plaintiff Bartley committed murder and other crimes when he participated in a gunfight at a movie theater during which twenty shots were fired and an innocent bystander was killed. Bartley was 17. He was sentenced to an indeterminate prison term of 27⅓ years to life. Bartley served more than 27 years in custody before being granted parole in April 2018. DOCCS released Bartley to parole supervision in May 2018. He left prison at the age of 45.

Plaintiff Bennett committed felony murder at the age of 15, allegedly "under the direction of a man in his thirties" who fatally shot a police officer during a robbery in which Bennett participated. (SAC ¶ 35). Bennett claims he did not plan the robbery and was in another room tying up a victim when the older man murdered the officer. Bennett was sentenced to an indeterminate prison term of nine years to life. In September 2018, after spending more than 23 years in prison, Bennett was granted parole.

Plaintiff Delima committed murder in 2005, at the age of 13. He claims he was shopping with several older men, including one whom he called his "godfather," when the group got into a fight with an individual who proceeded to slash Delima's godfather in the face. Delima says one

---

[2]      The Court takes judicial notice of plaintiffs' release dates. All plaintiffs were released from prison after this lawsuit began. As the Court previously noted (Doc. #77), the fact that the named plaintiffs have been released does not moot the "inherently transitory" class claims in this case. See Robidoux v. Celani, 987 F.2d 391, 938–39 (2d Cir. 1993).

of the older men in his group then handed Delima a gun that Delima used to shoot the purported assailant five times, killing him. Delima was sentenced to an indeterminate prison term of nine years to life. The Board granted him parole after interviewing him in February 2019. Delima was released from DOCCS custody in April 2019, at the age of 27.

Plaintiff Lebron committed murder and other crimes in 1990, assaulting and stabbing his victim to death. Lebron was 15 at the time. He claims he turned to crime because he wanted to move from New York to Puerto Rico to be with his father, and two acquaintances offered to buy him a plane ticket to Puerto Rico if he helped them commit robberies. Lebron was sentenced to an indeterminate prison term of eight and one-half years to life. He served 28 years in prison before being paroled in August 2018, on his eleventh try. DOCCS released Lebron in October 2018 at the age of 43.

Plaintiff Roman was 17 years old when he committed a murder in 1995. A man Roman met at a party allegedly offered Roman money and a car in return for which Roman would help the man kill the man's father, stepmother, "and anyone else in the[ir] house," because the man believed his father planned to disinherit him. (SAC ¶ 69). Roman shot and killed the stepmother and was sentenced to an indeterminate prison term of 20 years to life. Roman served nearly 24 years in prison and was denied parole three times. In September 2018, the Board granted Roman parole. Two months later, at the age of 41, Roman was released to parole supervision.

Plaintiff Quinones shot and killed a man in January 1993 over a $12 debt. Quinones was 16 years old. He was sentenced to an indeterminate prison term of 15 years to life. In 1994 or 1995, while incarcerated, Quinones was convicted of promoting prison contraband and of an attempted first-degree assault during which he used a razor blade to attack another inmate. These subsequent convictions increased Quinones's aggregate sentence to 21 years to life. After

being denied parole three times, the Board granted him parole in 2019.  Quinones was released to parole supervision at the age of 44.

Plaintiff Logan was 16 years old when he murdered "a random stranger" whom Logan tried to rob on the street in 2001.  (SAC ¶ 94).  He was sentenced to an indeterminate prison term of 16 years to life.  The Parole Board denied Logan parole after a December 19, 2017, parole interview, in part because Logan had received "two Tier-II disciplinary tickets" while incarcerated.  (Id. ¶ 98).  Logan later received parole.  In 2019, he was released at the age of 34 to parole supervision.

II.    Statutory and Regulatory Framework

New York law governs the Parole Board's discretionary parole determinations.  Pursuant to Section 259-i(2)(c)(A) of the New York Executive Law, the Parole Board shall not grant an offender discretionary parole "merely as a reward for" the offender's "good conduct or efficient performance of duties" while incarcerated.  N.Y. Exec. Law § 259-i(2)(c)(A).  Rather, the Board should grant discretionary parole "after considering if there is a reasonable probability that" the offender "will live and remain at liberty without violating the law" if paroled, and that the offender's "release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law."  Id.

The Executive Law states the Parole Board "shall" consider the following factors when making this determination:  (i) the offender's "institutional record"; (ii) the offender's performance "in a temporary release program," if any; (iii) the offender's "release plans"; (iv) "any deportation order" and "recommendation regarding deportation"; (v) any statement to the Parole Board by the offender's victim or, in certain circumstances, the victim's representative; (vi) if applicable, the determinate sentence the offender would have received for

his conviction under certain specified circumstances; (vii) "the seriousness of the offense," including the type and length of the offender's sentence, the recommendations of the sentencing court, prosecutor, and the offender's attorney, the offender's pre-sentence probation report, "any mitigating and aggravating factors," and the offender's "activities following arrest prior to confinement"; and (viii) the offender's prior criminal record. N.Y. Exec. Law § 259-i(2)(c)(A).

The Parole Board has promulgated regulations implementing this statutory directive. Among other things, the regulations require the Parole Board to make parole determinations "guided by risk and needs principles, including the [offender's] risk and needs scores as generated by a periodically-validated risk assessment instrument." 9 N.Y.C.R.R. § 8002.2(a). The regulations also reiterate in substance the eight statutory factors listed above. Id. § 8000.2(d).

In addition, and as particularly relevant here, the Parole Board has enacted a regulatory provision governing parole determinations for juvenile offenders. This rule requires the Parole Board to consider "(i) [t]he diminished culpability of youth; and (ii) [g]rowth and maturity since the time of the commitment offense." 9 N.Y.C.R.R. § 8002.2(c)(1). The rule further provides,

> Information presented that the hallmark features of youth were causative of, or contributing factors to, a minor offender's commitment offense, should not, in itself, be construed to demonstrate lack of insight or minimization of the minor offender's role in the commitment offense. The hallmark features of youth include immaturity, impetuosity, a failure to appreciate risks and consequences, and susceptibility to peer and familial pressures.

Id. § 8002.2(c)(2).

III.     Procedural Allegations

According to the second amended complaint, the Parole Board's fourteen commissioners conduct approximately 12,000 parole interviews each year and also perform other duties including hearing appeals, interviewing crime victims, traveling, serving on subcommittees, and

performing administrative tasks.  This workload allegedly results in defendants frequently hearing and deciding juvenile lifers' parole applications with minimal consideration and without reviewing the offenders' files.

Plaintiffs allege a juvenile seeking parole from a maximum prison sentence of life is assessed by an interview panel of two or three commissioners.  A panel allegedly conducts approximately 40 to 70 interviews per week, typically spread over two eight-hour days.  Before his or her interview, each offender submits materials to the panel, including a personal statement, "programmatic achievements," and letters supporting the offender's parole application.  (SAC ¶ 186).  Commissioners "sometimes" receive an interviewee's parole materials the day before the interview, and "often" receive them the morning of the interview.  (Id. ¶ 187).  Plaintiffs claim no regulation or policy requires commissioners to read an offender's parole materials before interviewing the offender and deciding whether to grant the offender discretionary parole. According to plaintiffs, Chairwoman Stanford has acknowledged that "not everyone does it." (Id. ¶ 190).

The Board assigns a "lead" commissioner for each parole interview.  (SAC ¶ 192). According to plaintiffs, during an offender's interview, only that lead commissioner has a complete copy of the offender's parole file, which may contain hundreds of pages.  Non-lead commissioners allegedly receive only a partial, "book copy" of the offender's file, comprising a one-page "condensed version of the Parole Board Report," the offender's "modified rap sheet," the offender's disciplinary record, and the offender's "COMPAS report"—a report applying Correctional Offender Management Profiling for Alternative Sanctions ("COMPAS"), which DOCCS allegedly uses as a predictive risk assessment tool.  (Id. ¶ 193).

A typical parole interview allegedly lasts approximately twenty minutes. According to the second amended complaint, the lead commissioner often spends most of that time recounting the details of the offender's crime. Plaintiffs assert that non-lead commissioners often do not listen to the lead commissioner's questions or the offender's answers, focusing instead on preparing for subsequent interviews for which they are assigned as lead. Plaintiffs claim each panel member nonetheless "has an equal vote to grant or deny release." (SAC ¶ 199). According to plaintiffs, panels often predetermine parole outcomes and prepare written denials before conducting interviews. When the panel does not predetermine an outcome, it allegedly decides whether to grant or deny discretionary parole during post-interview deliberations that "typically" last from two to five minutes per offender. (Id. ¶ 201).

Plaintiffs allege that twelve of the Parole Board's fourteen commissioners "have no substantial training in any discipline—such as child psychology, criminology or social work— that would enable them to competently evaluate whether an underlying crime reflected the [offender's] transient immaturity or youth[,] or instead permanent incorrigibility." (SAC ¶ 204). Commissioners allegedly do not seek the input of experts, pay for offenders to retain their own experts, or pay for an attorney to represent an offender at his or her parole interview. The second amended complaint also asserts juvenile offenders suffer mental impairments at a "substantially higher" rate than adolescents "not involved with the justice system," allegedly raising the risk that commissioners unaided by a psychological expert may unwittingly deny parole based on an offender's undiagnosed or untreated psychiatric or cognitive impairment. (Id. ¶ 207).

A juvenile offender's COMPAS score allegedly serves as one factor commissioners consider when deciding whether to grant the offender discretionary parole. According to plaintiffs, COMPAS is a commercial product sold by a private company, comprising "secret

algorithms" unknown to the Parole Board and its commissioners; "[a]s a result, COMPAS is a black box." (SAC ¶ 213). Plaintiffs claim defendants rely on COMPAS "without knowing how or whether COMPAS considers the diminished culpability of juveniles and the hallmark features of youth." (Id.). Indeed, plaintiffs believe COMPAS holds young offenders' ages against them by "sometimes treat[ing] youth as an aggravating factor" in various ways. (Id. ¶ 211). Plaintiffs claim the Parole Board's reliance on an algorithm of which the Parole Board and its commissioners lack knowledge or understanding deprives juvenile offenders sentenced to a maximum prison term of life of the individualized assessments to which they are constitutionally entitled.

Finally, commissioners allegedly point to juvenile offenders' "previous involvement in the juvenile justice system" (SAC ¶ 217) and their juvenile inmate disciplinary records as reasons to deny parole, without assessing whether that prior conduct is attributable to "the hallmark features of youth" (id. ¶ 220) or to an undiagnosed or untreated medical, emotional, or psychiatric condition.

In addition to these general procedural allegations, each individual plaintiff alleges defendants violated his constitutional rights by doing at least five of the following: (i) failing to fully read or consider the plaintiff's parole submissions; (ii) denying the plaintiff and his attorney access to letters allegedly opposing his release; (iii) denying the plaintiff the rights to have an attorney present at his parole interview and to confront evidence against his release; (iv) denying the plaintiff the chance to "inspect and challenge the method of calculating his COMPAS score"; (v) denying the plaintiff parole based solely on the nature of his crimes; (vi) denying the plaintiff parole without regard to the plaintiff's demonstrated maturity and rehabilitation while

incarcerated; and (vii) not explaining to the plaintiff "what additional steps he must take to be recommended for parole."[3]  (See SAC ¶¶ 23, 34, 46, 55, 67, 77, 91, 102).

IV.     Substantive Allegations

Plaintiffs also claim defendants interpret and apply the law governing discretionary parole determinations for juveniles serving a maximum prison term of life in a manner that violates those offenders' substantive Eighth Amendment right to be free from cruel and unusual punishment.

Namely, plaintiffs allege defendants "have denied, and continue to deny" parole to those offenders "based only on the crime committed or juvenile criminal history, despite clear evidence of rehabilitation and maturity."  (SAC ¶ 153; see id. ¶ 166 ("Defendants continue to deny juvenile lifers release to parole supervision even after they have demonstrated maturity and rehabilitation.").  According to the second amended complaint, defendants interpret the Constitution and the New York Executive Law as permitting them to deny parole to a juvenile offender serving a maximum life term—even if the offender has matured and been rehabilitated—if defendants believe releasing the offender "would be 'not compatible with the welfare of society' or would 'so deprecate the seriousness of [the] crime as to undermine respect for law."  (Id. ¶ 151 (quoting N.Y. Exec. Law § 259-i(2)(c)(A); see id. ¶¶ 158, 160–61, 163–65, 173, 180).

_____

[3]     Plaintiffs allege defendants engaged in different combinations of these actions in each plaintiff's individual case.  Plaintiff Logan also alleges defendants violated his constitutional rights by denying him parole "based on 'official opposition' that Mr. Logan did not have an opportunity to inspect and controvert."  (SAC ¶ 102).

**DISCUSSION**

I.      Legal Standards

      A.      Rule 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009).[4]  A cause of action "is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it," Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011).  The party invoking the Court's jurisdiction bears the burden to establish that jurisdiction exists.  Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009).

When deciding whether subject matter jurisdiction exists at the pleading stage, the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." Conyers v. Rossides, 558 F.3d at 143.  "However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn." Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992).

When a defendant moves to dismiss for lack of subject matter jurisdiction and on other grounds, the court typically should consider the Rule 12(b)(1) challenge first.  Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

---

[4]      Unless otherwise indicated, case quotations omit all citations, internal quotation marks, footnotes, and alterations.

B.    Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative

complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v.

Iqbal, 556 U.S. 662, 679 (2009).  First, a plaintiff's legal conclusions and "[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements," are not entitled

to the assumption of truth and are thus not sufficient to withstand a motion to dismiss.  Id. at 678;

Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded

factual allegations, a court should assume their veracity and then determine whether they

plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the complaint's allegations must meet a standard of

"plausibility."  Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544,

564 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  Ashcroft v. Iqbal, 556 U.S. at 678.  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully."  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

II.    Pullman Abstention

Defendants urge the Court to abstain from addressing plaintiffs' claims pursuant to the

Pullman abstention doctrine.

The Court declines to do so.

The Pullman doctrine enables "federal courts to abstain from decision when difficult and

unsettled questions of state law must be resolved before a substantial federal constitutional

question can be decided."  Vt. Right to Life Comm., Inc. v. Sorrell, 221 F.3d 376, 384 (2d Cir.

2000).  "Abstention under the <u>Pullman</u> doctrine may be appropriate when three conditions are met:  (1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the interpretation of the state law; and (3) the law is susceptible to an interpretation by a state court that would avoid or modify the federal constitutional issue."  <u>Id</u>. at 385.  The doctrine "involves a discretionary exercise of a court's equity powers" in light of "a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction."  <u>Id</u>.  Put another way, <u>Pullman</u> abstention "should be utilized with strict circumspection."  <u>Id</u>.

Here, none of the relevant factors weighs in favor of abstention.  First, the pertinent state statute and regulations are not unclear.  Second, plaintiffs' federal constitutional claims do not depend on an interpretation of New York State law—rather, they depend on an interpretation and application of federal Eighth Amendment jurisprudence.  And third, the state laws and regulations implicated here may not be reasonably interpreted so as to avoid the constitutional issues plaintiffs' claims present.

Thus, exercising its discretion, the Court declines to abstain.[5]

III.     <u>Absolute Immunity</u>

Defendants argue absolute immunity shields them from plaintiffs' claims.

The Court agrees to the extent plaintiffs seek injunctive relief but disagrees to the extent they seek declaratory relief.

---

[5]     Defendants argue collateral estoppel and <u>res judicata</u> preclude plaintiffs' claims.  (Defs' Br. at 23 n.12).  Defendants forfeited this argument by raising it in a footnote.  <u>See</u>, <u>e.g.</u>, <u>United States v. Greenfield</u>, 831 F.3d 106, 118 n.9 (2d Cir. 2016).  The Court declines to address it.

A.     Injunctive Relief

Parole board officials enjoy absolute judicial immunity from claims against them for damages arising from their "quasi-adjudicative function in deciding whether to grant, deny or revoke parole." Montero v. Travis, 171 F.3d 757, 761 (2d Cir. 1999). Pursuant to Section 1983, this immunity also extends to claims for injunctive relief against a parole board official arising from the official's quasi-adjudicative function, see id., "unless a declaratory decree was violated or declaratory relief was unavailable" to the plaintiff, 42 U.S.C. § 1983.

Plaintiffs' second amended complaint does not allege any defendant violated a declaratory decree or that declaratory relief was unavailable to plaintiffs when they commenced this action. Accordingly, insofar as plaintiffs seek injunctive relief, their claims must be dismissed on grounds of absolute immunity. See Montero v. Travis, 171 F.3d at 761.

B.     Declaratory Relief

Defendants also invoke absolute immunity from declaratory relief. In support, defendants argue the second amended complaint "attempt[s] to frame injunctive relief as declaratory relief." (Doc. #116 ("Defs' Br.") at 10; Doc. #126 at 3). Defendants offer no further explanation. The Court declines to engage with this undeveloped argument. See, e.g., Chase v. Nodine's Smokehouse, Inc., 360 F. Supp. 3d 98, 121 n.6 (D. Conn. 2019) (declining to address cursory one-sentence argument). In any case, Section 1983's text explicitly contemplates the availability of declaratory relief against a government official acting in his or her official capacity, see 42 U.S.C. § 1983, and plaintiffs take the position that a declaratory judgment, if

ultimately awarded, could provide them all the relief they seek without the need for an injunction.[6]

Judicial immunity therefore does not preclude plaintiffs' claims to the extent they seek declaratory relief.[7]

IV.    Eighth Amendment Claim

Defendants contend plaintiffs fail adequately to plead defendants violate the Eighth Amendment rights of juvenile offenders serving maximum terms of life in prison.

The Court disagrees.

A.    Legal Standard

The Supreme Court has held in a line of three cases—Graham v. Florida, 560 U.S. 48 (2010), Miller v. Alabama, 567 U.S. 460 (2012), and Montgomery v. Louisiana, 136 S. Ct. 718 (2016)—that the Eighth Amendment prohibits sentencing a juvenile convicted of homicide to a mandatory life sentence without parole.[8]  Concluding "that a lifetime in prison is a disproportionate sentence for all but the rarest of children," Montgomery v. Louisiana, 136 S. Ct. at 726 (quoting Miller v. Alabama, 567 U.S. at 479–80), the Supreme Court has directed that a judge may sentence a juvenile murderer to mandatory life without parole only if the juvenile

---

[6]    At this stage of the case, the Court takes no position on the proper scope or substance of declaratory relief, if any, in this matter.

[7]    Defendants also note that the Second Circuit dismissed in Guerin v. Higgins, 8 F. App'x 31 (2d Cir. 2001) (summary order), a declaratory claim filed under Section 1983 against a judge, on grounds of absolute immunity from declaratory relief.  Id. at 32.  The Court declines to follow that summary order.  It both is non-binding and does not appear to stand for the proposition that a government official sued under Section 1983 is immune from declaratory relief.  See id. (holding that Congress "effectively overruled" a specific Supreme Court opinion by amending Section 1983).

[8]    The Constitution also prohibits sentencing to life without parole "a juvenile offender who did not commit homicide."  Graham v. Florida, 560 U.S. at 82.

"exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified," id. at 733.

Accordingly, the Constitution requires a sentencing judge to consider a juvenile murderer's "'diminished culpability and heightened capacity for change' before condemning him or her to die in prison." Montgomery v. Louisiana, 136 S. Ct. at 726 (quoting Miller v. Alabama, 567 U.S. at 471). The state "is not required to guarantee" eventual release from prison to parole for a juvenile offender serving life. Miller v. Alabama, 567 U.S. at 479 (quoting Graham v. Florida, 560 U.S. at 75). However, the Constitution demands that the state afford such a juvenile "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id. (quoting Graham v. Florida, 560 U.S. at 75).

In Montgomery v Louisiana, the Supreme Court held that this substantive constitutional requirement applies retroactively. Montgomery v. Louisiana, 136 S. Ct. at 732–36. The Montgomery Court further stated that its holding "does not require States to relitigate sentences" of juvenile life without parole, because "[a] State may remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." Id. at 736. The Court explained that rendering Miller-effected juveniles parole-eligible "ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." Id. Thus, "[t]hose prisoners who have shown an inability to reform will continue to serve life sentences," while "[t]he opportunity for release will be afforded to those who demonstrate . . . that children who commit even heinous crimes are capable of change." Id.

The Appellate Division, Third Department, of the New York State Supreme Court has held that Graham, Miller, and Montgomery's holdings extend to discretionary parole

determinations in New York.  <u>Hawkins v. N.Y. State Dep't of Corr. & Cmty. Supervision</u>, 140

A.D.3d 34 (3d Dep't 2016).  Thus, the Parole Board, "as the entity charged with determining

whether" a juvenile offender convicted of homicide "will serve a life sentence, . . . [must]

consider the significance of [the offender's] youth and its attendant circumstances at the time of

the commission of the crime before making a parole determination."  <u>Id</u>. at 36.  The Appellate

Division described this as "the minimal procedural requirement necessary" to protect the

substantive Eighth Amendment rights of juvenile homicide offenders sentenced to a maximum

term of life imprisonment.  <u>Id</u>.

      B.      <u>Application</u>

           1.      <u>The Eighth Amendment Applies to Parole Proceedings</u>

As an initial matter, the Court holds that the constitutional protections recognized by

<u>Graham</u>, <u>Miller</u>, and <u>Montgomery</u> apply to parole proceedings for juvenile offenders serving a

maximum term of life imprisonment.

Neither the Supreme Court nor the Second Circuit has addressed whether <u>Graham</u>,

<u>Miller</u>, and <u>Montgomery</u>'s reach extends beyond sentencing and to parole.[9]  Federal courts are

divided on this question.  <u>Compare</u>, <u>e.g.</u>, <u>Brown v. Precythe</u>, 2018 WL 4956519, at *5–7 (W.D.

Mo. Oct 12, 2018) (collecting cases) (applying <u>Graham</u>, <u>Miller</u>, and <u>Montgomery</u> to parole

determinations), <u>with</u> <u>Bowling v. Dir., Va. Dep't of Corr.</u>, 920 F.3d 192, 197–99 (4th Cir. 2019)

("[W]e are satisfied that th[e] protections [recognized in <u>Graham</u>, <u>Miller</u>, and <u>Montgomery</u>] have

not yet reached a juvenile offender who has and will continue to receive parole consideration.").

---

[9]     Nor has either court resolved whether <u>Graham</u>, <u>Miller</u>, and <u>Montgomery</u>'s holdings apply
to (i) juveniles sentenced to discretionary life without parole sentences, or (ii) juveniles
sentenced to life with parole.  The Supreme Court recently granted certiorari in a case presenting
the former question.  <u>Mathena v. Malvo</u>, No. 18-217, 139 S. Ct. 1317 (2019) (Mem.).

The Court finds more persuasive those decisions holding that the Eighth Amendment right in question attaches at the parole stage.

In arguing to the contrary, defendants emphasize that the relevant Supreme Court cases address factors properly considered by a judge at the time a juvenile offender is sentenced—not by a parole board deciding whether to grant a juvenile offender parole. True enough. Nonetheless, parole boards are uniquely empowered to deliver a juvenile lifer's "categorical entitlement to 'demonstrate maturity and reform,' to show that 'he is fit to rejoin society,' and to have a 'meaningful opportunity for release.'" Greiman v. Hodges, 79 F. Supp. 3d 933, 945 (S.D. Iowa 2015) (quoting Graham, 560 U.S. at 79). In other words, a parole board is the vehicle through which the rights recognized in Graham, Miller, and Montgomery are delivered. As such, a parole board must make parole determinations in a constitutional manner for juveniles to whom Graham, Miller, and Montgomery apply, "in the sense that the board . . . [must] take[] into account the offender's status as a child when the crime was committed." Diatchenko v. Dist. Attorney for Suffolk Dist., 27 N.E.3d 349, 368 (Mass. 2015) (analyzing claims brought under the Eighth Amendment and the Massachusetts Declaration of Rights). Numerous courts have so held. See, e.g., Brown v. Precythe, 2018 WL 4956519, at *7 (collecting cases); Hawkins v. N.Y. State Dep't of Corr. & Cmty. Supervision, 140 A.D.3d at 36. The Court agrees with this authority and likewise holds that Graham, Miller, and Montgomery vest in juvenile offenders sentenced to a maximum term of life imprisonment an Eighth Amendment right that attaches to those offenders' parole proceedings, which the Constitution mandates must amount to a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Miller v. Alabama, 567 U.S. at 479 (quoting Graham, 560 U.S. at 75).

2.     Plaintiffs Plausibly Allege an Eighth Amendment Violation

The next question is whether plaintiffs adequately plead that the manner in which defendants make discretionary parole determinations for juvenile offenders serving a maximum term of life violates the Eighth Amendment.

The Court holds that they do.

Defendants assert plaintiffs are wrong to suggest the Eighth Amendment requires that such determinations be based on the offenders' demonstrated growth and maturity only, "to the exclusion of other relevant factors and principles." (Defs' Br. at 16, 18). But this argument misconstrues plaintiffs' arguments and allegations. Plaintiffs do not contend the Eighth Amendment forbids a Parole Board from considering any factors except growth and maturity. Rather, plaintiffs argue defendants may properly consider any applicable statutory and regulatory factor, so long as they ultimately "base their parole determinations on Plaintiffs' current maturity and rehabilitation." (Doc. #119 ("Pls' Opp. Br.") at 12). According to the second amended complaint, that is not the opportunity plaintiffs received: Instead of basing parole determinations on juvenile lifers' demonstrated maturity and rehabilitation, defendants allegedly "have denied, and continue to deny, juvenile lifers release to parole supervision based only on the crime committed or juvenile criminal history," and "despite clear evidence of rehabilitation and maturity" (SAC ¶ 153 (emphases added)). At this stage of the proceedings, the Court must accept this allegation as true; and if true, that contravenes Montgomery. Thus, plaintiffs plausibly allege that the manner in which defendants adjudicate juvenile lifers' parole applications violates the Eighth Amendment.

The Court therefore declines to dismiss plaintiffs' Eighth Amendment claim.

V.    Fourteenth Amendment Claim

Defendants assert plaintiffs' Fourteenth Amendment due process claim fails because plaintiffs have no liberty interest in parole.  In their reply brief, defendants also urge the Court to find that the procedures the Parole Board affords juvenile homicide offenders sentenced to potential life terms satisfy the Constitution's due process guarantee.

The Court disagrees that plaintiffs have no liberty interest in parole, and declines to rule on the procedural adequacy of plaintiffs' parole proceedings at this early stage of the case.

A.    Liberty Interest in Parole

First, juvenile offenders serving a maximum term of life have a cognizable liberty interest in obtaining parole upon demonstrating maturity and rehabilitation.

"[T]o have a protectable liberty interest" in parole, "a prisoner must have more than a hope or a unilateral expectation of release.  He must, instead, have a legitimate claim of entitlement to it." Victory v. Pataki, 814 F.3d 47, 59 (2d Cir. 2016).  Accordingly, for a typical prisoner "who has not been granted parole, neither the mere possibility of release, nor a statistical probability of release, gives rise to" a cognizable liberty interest in parole. Id. at 60. Before Graham, Miller, and Montgomery, courts therefore commonly recognized the general proposition that prisoners ordinarily "have no liberty interest in parole, and the protections of the Due Process Clause are inapplicable."  Barna v. Travis, 239 F.3d 169, 171 (2d Cir. 2001).

But Graham, Miller, and Montgomery changed that with respect to juvenile offenders serving a maximum prison term of life.   Pursuant to the Supreme Court's holdings in those cases, "[i]f [a parole b]oard determines that a juvenile offender has demonstrated maturity and rehabilitation, parole or work release is required as a matter of law."  Bonilla v. Iowa Bd. of Parole, 930 N.W.2d 751, 777 (Iowa 2019) (citing Montgomery v. Louisiana, 136 S. Ct. at 736;

Graham v. Florida, 560 U.S. at 75). Thus, "although Graham stops short of guaranteeing parole, it does provide the juvenile offender with substantially more than a possibility of parole or a mere hope of parole; it creates a categorical entitlement to demonstrate maturity and reform, to show that he is fit to rejoin society, and to have a meaningful opportunity for release." Greiman v. Hodges, 79 F. Supp. 3d at 945. Graham, Miller, and Montgomery therefore confer on juvenile offenders a constitutionally protected "liberty interest in a meaningful parole review." Brown v. Precythe, 2017 WL 4980872, at *12 (W.D. Mo. Oct. 31, 2017).[10]

Accordingly, the Court declines to dismiss plaintiffs' due process claim on the ground that juvenile offenders serving potential life prison terms lack a liberty interest in parole.

B.     Adequacy of Procedures

Second, the Court cannot find at this stage of the case that the procedures the Parole Board affords juvenile lifers satisfy procedural due process as a matter of law.

"Due process is flexible and calls for such procedural protections as the particular situation demands. A fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Brown v. Precythe, 2017 WL 4980872, at *12. To pass constitutional muster, the parole procedures defendants provide to juvenile offenders to whom Graham, Miller, and Montgomery apply must satisfy the balancing test established in Mathews v. Eldridge, 424 U.S. 319 (1976). That well-known test calls for balancing the

---

[10]     Accord Bonilla v. Iowa Bd. of Parole, 930 N.W.2d at 777; Hawkins v. N.Y. State Dep't of Corr. & Cmty. Supervision, 140 A.D.3d at 38–40; Hill v. Whitmer, 2019 WL 3067977, at *5 (E.D. Mich. July 12, 2019); Hayden v. Keller, 134 F. Supp. 3d 1000, 1010–11 (E.D.N.C. 2015); Greiman v. Hodges, 79 F. Supp. 3d at 945.

Some federal district courts have held to the contrary in summary fashion. See Lewis v. Okla. Pardon & Parole Bd., 2019 WL 2612666, at *2 (W.D. Okla. Feb. 6, 2019), report and recommendation adopted, 2019 WL 1500671 (W.D. Okla. Apr. 5, 2019); Hill v. Snyder, 2011 WL 2788205, at *6 (E.D. Mich. July 15, 2011).

plaintiff's interests against those of the state.  <u>See</u>, <u>e.g.</u>, <u>Bonilla v. Iowa Bd. of Parole</u>, 930 N.W.2d at 775.

Assuming plaintiffs' factual allegations are true and drawing all reasonable inferences in their favor, the Court finds plausible plaintiffs' claim that the parole procedures for juveniles serving potential life terms do not satisfy due process.  According to plaintiffs, Parole Board commissioners commonly do not even read such offenders' files before conducting parole interviews or making parole determinations; make parole determinations based at least in part on a risk assessment algorithm the workings of which no defendant knows or understands; predetermine parole outcomes before conducting parole interviews; and pay no attention to other commissioners' questions and offenders' answers during interviews.  Plaintiffs further allege defendants did these things in plaintiffs' individual cases.  Taken together, these and the second amended complaint's other procedural allegations plausibly evidence that the Parole Board does not afford juvenile homicide offenders serving potential life terms a procedurally adequate "meaningful opportunity" for release.  <u>Miller v. Alabama</u>, 567 U.S. at 479 (quoting <u>Graham v. Florida</u>, 560 U.S. at 75); <u>see</u>, <u>e.g.</u>, <u>Brown v. Precythe</u>, 2017 WL 4980872, at *12 & n.7.

The Court consequently declines to find that plaintiffs' procedural due process claim fails as a matter of law.

VI.     <u>Sixth Amendment Claim</u>

Lastly, defendants contend plaintiffs' Sixth Amendment allegations fail to state a viable constitutional claim.

The Court agrees.

Plaintiffs' Sixth Amendment claim arises from the Supreme Court's decision in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), and the line of cases that followed.  In <u>Apprendi</u>, the

Supreme Court held that under the Sixth and Fourteenth Amendments, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. This "constitutional rule" applies only when a criminal defendant's sentence is "greater than the prescribed statutory maximum for the offense of conviction." United States v. Thomas, 274 F.3d 655, 664 (2d Cir. 2001).

Here, each plaintiff was sentenced to a maximum term of life imprisonment with the possibility of parole. That sentence is not alleged to exceed any plaintiff's "prescribed statutory maximum" sentence. United States v. Thomas, 274 F.3d at 664. Because this necessary condition is not satisfied as to any plaintiff, the instant case falls outside Apprendi's reach. See King v. Landreman, 2019 WL 2355545, at *2 (W.D. Wis. June 4, 2019).

Plaintiffs' principal arguments to the contrary rest on the premise that the Parole Board's denials of juvenile lifers' parole applications "amount to" the imposition of de facto sentences of life without the possibility of parole—a sentence plaintiffs say does exceed their statutory maxima. (Pls. Opp. Br. at 29). But this premise does not hold up: Every named plaintiff has now been released from custody, belying the dubious notion that an offender who has been denied parole in the past necessarily will never be granted parole in the future. Indeed, all plaintiffs except Flores and Delima were in their low- or mid-40's when released from prison— Flores was 54, and Delima was 27. It simply cannot be that DOCCS imposed on any of these paroled offenders "de facto life without parole." (Id. at 2).

To be sure, some courts have recognized that a juvenile offender can receive a de facto sentence of life without parole, triggering Graham, Miller, and Montgomery's protections even though the sentence imposed does not bear the formal "life without parole" title. However, those

courts have done so respecting prison terms the minimum length of which comes close to or exceeds the offender's life expectancy. See, e.g., Bowling v. Dir., Va. Dep't of Corr., 920 F.3d at 197–98 (collecting federal cases); Starks v. Easterling, 659 F. App'x 277, 283 (6th Cir. 2016) (unpublished opinion) (White, J., concurring) (collecting state cases). No plaintiff's minimum sentence comes anywhere near his life expectancy, nor does the second amended complaint allege otherwise. Thus, the concept of a de facto life without parole sentence has no application here.

The Court also rejects plaintiffs' argument that defendants violate Apprendi by denying parole to juvenile offenders serving potential life terms "based on new fact-finding" that plaintiffs say must be performed by a jury. (Doc. #132 at 1). Miller "did not impose a formal factfinding requirement." Montgomery v. Louisiana, 136 S. Ct. at 735. Further, Montgomery instructs that a state can "remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." Id. at 736. Parole Board commissioners therefore may evaluate whether a juvenile offender meets the proper criteria for discretionary release, even if the fact finder did not address those criteria in the offender's underlying criminal proceedings.

For all these reasons, the Court dismisses plaintiffs' Sixth Amendment claim.

## CONCLUSION

The motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiffs' Eighth and Fourteenth Amendment claims, to the extent they seek declaratory relief, shall proceed. Their Sixth Amendment Claim, and all claims to the extent they seek injunctive relief, are dismissed.

The Court will schedule an initial pretrial conference by separate Order.

The Clerk is instructed to terminate the motion. (Doc. #114).

Dated: September 20, 2019
     White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge

25