## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CARLOS FLORES, LAWRENCE BARTLEY,
DEMETRIUS BENNETT, ANTONIO ROMAN,
VINTARRA MARTIN and TERRANCE
ANDERSON on behalf of themselves and all
others similarly situated,

                                    Plaintiffs,

                    -against-

TINA M. STANFORD, as Chairwoman of the
New York State Board of Parole; WALTER W.
SMITH, as Commissioner of the New York State
Board of Parole; JOSEPH P. CRANGLE, as
Commissioner of the New York State Board of
Parole; MARC COPPOLA, as Commissioner of
the New York State Board of Parole; TANA
AGOSTINI, as Commissioner of the New York
State Board of Parole; CHARLES DAVIS, as
Commissioner of the New York State Board of
Parole; ERIK BERLINER, as Commissioner of
the New York State Board of Parole; OTIS
CRUSE, as Commissioner of the New York State
Board of Parole; TYECE DRAKE, as
Commissioner of the New York State Board of
Parole; CARYNE DEMOSTHENES, as
Commissioner of the New York State Board of
Parole; MICHAEL CORLEY, as Commissioner
of the New York State Board of Parole;
CHANWOO LEE, as Commissioner of the New
York State Board of Parole; SHEILA SAMUELS,
as Commissioner of the New York State Board of
Parole; ELSIE SEGARRA, as Commissioner of
the New York State Board of Parole; and
CARLTON MITCHELL, as Commissioner of the
New York State Board of Parole,

                                    Defendants.

No. 18-CV-02468 (VB)

## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs Carlos Flores, Lawrence Bartley, Demetrius Bennett, Antonio Roman, Vintarra Martin and Terrance Anderson (referred to hereinafter as "Named Plaintiffs" or "Plaintiffs"), on behalf of themselves and those similarly situated, by and through their attorneys, as and for their Third Amended Complaint, allege the following:

## INTRODUCTION

1.      This is an action for declaratory and injunctive relief.  Plaintiffs are individuals who were convicted of crimes committed when they were children under the age of 18 and sentenced to indeterminate life sentences with the possibility of parole.  Plaintiffs have been, continue to be, or will be subject to disproportionate punishment and deprived of due process of law by being denied a realistic and meaningful opportunity for release based upon demonstrated maturity and rehabilitation.

2.      Plaintiffs bring this action on behalf of a class consisting of all persons eligible for release to parole supervision who were convicted of crimes committed when they were children under the age of 18 and sentenced to indeterminate life sentences with the possibility of parole in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") (hereinafter referred to as "juvenile lifers" or "Class Members").

3.      Juvenile lifers, including Plaintiffs, have been, continue to be, or will be denied a meaningful opportunity for release based upon demonstrated maturity and rehabilitation, in violation of the cruel and unusual punishments clause of the Eighth Amendment to the U.S. Constitution.  Juvenile lifers, including Plaintiffs, have also been, continue to be, or will be denied due process of law in the manner in which their parole hearings have been conducted, in violation of the due process clause of the Fourteenth Amendment to the U.S. Constitution. Juvenile lifers, including Plaintiffs, have also been, continue to be, or will be denied their right to

a trial by jury and their right to due process because their sentences have been extended by findings of fact made by the Board of Parole's Commissioners, in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution.

4.      Recognizing that fundamental differences between children and adults are relevant to assessing proportionality in punishment, the U.S. Supreme Court has, in a series of cases, forbidden as unconstitutional life without parole for all juveniles, even those who commit heinous crimes, except for the "rare juvenile offender whose crime reflects irreparable corruption", and has held that this substantive constitutional rule is retroactive.  Montgomery v. Louisiana, 136 S. Ct. 718, 734 (2016) (quoting Miller v. Alabama, 567 U.S. 460, 479-80 (2012)); Graham v. Florida, 560 U.S. 48, 82 (2010).

5.      Taken together, these decisions establish that the Eighth Amendment to the U.S. Constitution prohibits statutory schemes that fail to provide juvenile lifers with a meaningful and realistic opportunity for release based upon demonstrated maturity and rehabilitation.  See Miller, 567 U.S. at 470-80; Graham, 560 U.S. at 50.

6.      These decisions have both a substantive component, which applies retroactively to all juvenile lifers in prison today, and a procedural component, which applies at parole hearings where juvenile lifers face possible life imprisonment if parole is denied.  See Montgomery, 136 S. Ct. at 734-35.

7.      In New York State, the authority to release any person sentenced to a maximum term of life prior to the end of his or her natural life lies with the New York State Board of Parole (hereinafter "Board of Parole" or "Board").  Defendants are each Commissioners of the Board of Parole and are sued in their official capacity (hereinafter "Commissioners" or "Defendants").

8.      Despite clear precedent to the contrary, Defendants have interpreted the New York Executive Law to allow Defendants to deny parole to juvenile lifers without regard to an individual's subsequent demonstrated maturity and rehabilitation, if Defendants determine that release would be "not compatible with the welfare of society" or would "so deprecate the seriousness of his crime as to undermine respect for law".  See N.Y. Exec. Law § 259-i(2)(c)(A).

9.      Accordingly, Defendants regularly deny parole to juvenile lifers who demonstrate unmistakable rehabilitation and reform, and low risk to public safety.  Defendants have consistently denied such individuals parole with short conclusory opinions citing only factors present at the time of conviction, such as juvenile criminal history and the nature of the crime of conviction.

10.     The procedures and practices of the Board of Parole, as executed by Defendants, thereby deprive juvenile lifers, including Plaintiffs, of a meaningful opportunity for release based on demonstrated maturity and rehabilitation in violation of the constitutional prohibition against excessive punishment.  The formal regulations and regular practices of the Board of Parole, as executed by Defendants, also violate juvenile lifers', including Plaintiffs', Due Process rights, which arise from the liberty interest in parole conferred by the U.S. Supreme Court's Eighth Amendment jurisprudence and by New York State Executive Law and the Board's regulations.

11.     Plaintiffs do not challenge their judgments of conviction and do not seek to invalidate their sentences.  Plaintiffs do not seek an order of release from this Court.  Rather, Plaintiffs seek an order that Defendants must afford them, and those similarly situated, as persons sentenced to life imprisonment for offenses committed before they were 18 years old, a meaningful opportunity to obtain release based on non-arbitrary criteria that measure their degree of maturity and rehabilitation.

12.     Plaintiffs do not maintain that all Class Members are necessarily entitled to immediate release under the constitutionally mandated standard for release.  Through this action, Plaintiffs seek to ensure that Defendants apply the constitutionally mandated standard at parole release hearings for Plaintiffs and all Class Members.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  The controversy arises under the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

14.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a majority of Plaintiffs are or were incarcerated within the Southern District of New York, and Defendants have conducted parole hearings and taken other actions leading to the denial of Plaintiffs' rights, as alleged further herein, within the Southern District of New York.

## PARTIES

### A.  Plaintiffs

#### i.     Plaintiff Carlos Flores

15.     Plaintiff Carlos Flores is 58 years old and until his release in 2018, had been incarcerated since he was 17.  He was convicted of felony murder after participating in a robbery in January 1981 that resulted in an accomplice shooting an off-duty police officer who was a patron in the bar and drew a gun.

16.     Mr. Flores was convicted of murder in the second degree and was sentenced to 21 years to life.  At sentencing, the judge considered, and rejected, a lengthier minimum sentence of 25 years because Mr. Flores had no prior criminal record and was not the shooter.  Mr. Flores was denied parole ten times.  By the time he ultimately was granted parole on his eleventh try,

after the original complaint in this lawsuit was filed, he had already been incarcerated for 37 years, *16 years in excess* of the 21-year minimum set by the judge.

17.     Mr. Flores had a difficult upbringing.  He was a victim of frequent abuse and dropped out of school to support his family financially by working at a pizzeria.  He was manipulated into participating in a robbery by a much older man who had significant influence over him—a man who had shown him friendship and who he had thought was a mentor.  During the robbery, in an unplanned act, one of the robbers shot and killed a patron of the bar, Robert Walsh, an off-duty police officer.  At that time, Mr. Flores was in a separate room at the back of the bar.

18.     Nothing in Mr. Flores's record suggests, nor was any finding ever made, that his crime reflected that he was among the "rarest of juvenile[s] . . . whose crime[] reflects permanent incorrigibility".

19.     Before Mr. Flores was released on June 25, 2018, he was incarcerated at Otisville Correctional Facility in Otisville, New York.  Mr. Flores had an exceptional institutional record while in custody.  His last disciplinary offense was more than 25 years before his release for disobeying an order to keep the mess hall line moving.

20.     He had low (favorable) scores across the board in his Correctional Offender Management Profiling for Alternative Sanctions ("COMPAS").  In addition, his COMPAS report found that if released he would require the lowest level of supervision.  He had earned outside clearance to work in the community, a permit DOCCS grants only to the most trustworthy inmates who can safely work outside the prison with minimal supervision.  He successfully completed all of the terms of parole and was discharged from parole supervision on June 25, 2021.

21.     Defendants last denied Mr. Flores release on October 24, 2017, on the unsubstantiated basis that his "discretionary release at this time, would not be compatible with the welfare of society and would tend to deprecate the seriousness of the Instant Offense and undermine respect for the law".

22.     Plaintiff Carlos Flores brings this suit on behalf of himself and a class of similarly situated persons eligible for release to parole supervision who were convicted of crimes committed when they were children under the age of 18 and sentenced to indeterminate life sentences with the possibility of parole in the custody of DOCCS.

23.     Mr. Flores was denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, and the right to due process, in that:

(1) Commissioners did not fully consider, read or attend to Mr. Flores's parole submission;

(2) neither Mr. Flores nor his attorneys were permitted access to letters opposing his release;

(3) he was denied the right to have an attorney present at his interview and the right to see and confront any evidence against him; (4) his denial was based on a crime he committed decades ago that he could not change; (5) Commissioners did not base their decision on Mr. Flores's demonstrated maturity and rehabilitation; and (6) he was denied any explanation for what additional steps he must take to be recommended for parole.

ii.     Plaintiff Lawrence Bartley

24.     Plaintiff Lawrence Bartley is 49 years old and until his release in 2018, had been incarcerated since he was 17.  In December 1990, Mr. Bartley was involved in a gunfight that erupted at a local movie theater.  Twenty shots were exchanged in total, with only one shot fired by Mr. Bartley.  In the midst of the shooting, a bystander, Tremain Hall, was accidentally shot and killed.

25.     Mr. Bartley received an aggregate sentence of 27 and one-third years to life for second degree murder and associated offenses.  By the time he ultimately was released on parole in May 2018, after the original complaint in this lawsuit was filed, he had already been imprisoned for 27 years and was incarcerated at Sing Sing Correctional Facility in Ossining, New York.

26.     Mr. Bartley grew up in a rough neighborhood surrounded by drug dealers and gang members.  At just 16 years of age, he was shot four times in a drive-by shooting.  He began carrying a gun thereafter out of fear for his life.

27.     Nothing in Mr. Bartley's record suggests, nor was any finding ever made, that his crime reflected that he was among the "rarest of juvenile[s] . . . whose crime[] reflects permanent incorrigibility".

28.     Mr. Bartley had an exceptional institutional disciplinary record while in custody. His last disciplinary infraction was in 2008, roughly ten years before his release.

29.     Mr. Bartley's COMPAS report found him to be at a low risk of reoffending.  Mr. Bartley had received numerous letters of support from corrections officers, including from the superintendent of Sing Sing, noting that Mr. Bartley's behavior "exemplifies DOCCS'[s] mission of rehabilitating its residents to positively re-enter society".

30.     While incarcerated, Mr. Bartley earned a six-month limited credit time allowance ("LCTA") for "significant programmatic accomplishment" and lack of serious disciplinary infractions.  The LCTA award made him eligible for parole release six months before the expiration of his minimum term.  He successfully completed all of the terms of parole and was discharged from parole on August 31, 2021.

31.     Defendants last denied Mr. Bartley release on September 6, 2017.  He was denied release despite ample evidence of his maturation and rehabilitation, including having earned a Master's degree, raised $8,000 for a gun buy-back program, publicly engaged in anti-violence and anti-gun violence programming and secured employment upon release.

32.     In their September 6, 2017 decision, Defendants acknowledged these achievements, writing:  "The Panel applauds your exceptional packet, institutional accomplishments, your overall low COMPAS score and satisfactory case plan.  Your release planning, community outreach, use of media, networking and your life as an example exemplifies an extraordinary effort to give back, demonstrates restoration and evidenced change."  The panel then concluded, without any basis, that "there is a reasonable probability that you would not live and remain at liberty without again violating the law and that your release would be incompatible with the welfare of society and would so deprecate the serious nature of the crime as to undermine respect for the law".

33.     Mr. Bartley represents himself and a class of similarly situated people eligible for release to parole supervision who were convicted of crimes committed when they were children under the age of 18 and sentenced to indeterminate life sentences with the possibility of parole in the custody of DOCCS.

34.     Mr. Bartley was denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, and the right to due process, in that:  (1) Commissioners did not meaningfully consider, read or attend to Mr. Bartley's full parole submission; (2) the denial of release to parole supervision was based on a crime he committed decades ago that he could not change; (3) he was denied the right to have an attorney present at his interview and the right to see and confront any evidence against him; (4) he was denied the

right to inspect and challenge the method of calculating his COMPAS scores; (5) Commissioners failed to base their decision on Mr. Bartley's demonstrated maturity and rehabilitation since the age of 17; and (6) he was denied any explanation for what additional steps he must take to be recommended for parole.

        iii.    <u>Demetrius Bennett</u>

35.     Plaintiff Demetrius Bennett is 43 years old and until his release in 2018, had been incarcerated since he was 15.  He was convicted of felony murder when, at 15 years old and under the direction of a man in his thirties, Mr. Bennett participated in robbing a bicycle shop. During the robbery, the older man shot and killed a police officer.

36.     Prior to the bicycle shop robbery, Mr. Bennett had no criminal record.  He did not plan the robbery, was not carrying a weapon, was not the shooter and was not in the room when the shooting occurred.  After a trial, Mr. Bennett was convicted of murder in the second degree and robbery and was sentenced to nine years to life.  By the time he was ultimately released on parole in October 2018, after the amended complaint in this lawsuit was filed, he had already been denied parole eight times and had been incarcerated for over 23 years—*14 years in excess* of the nine-year minimum sentence set by the judge.

37.     Prior to the crime, Mr. Bennett, a 15-year-old child, had no family support. Mr. Bennett's mother passed away when he was 13 years old and his father was only intermittently present during his childhood and was not performing a parenting role.  After his mother's death, Mr. Bennett lived on the streets and stayed on friends' couches.  His oldest sister and younger brother went to live with his aunt, and his other sister went to foster care.  Mr. Bennett earned a meager living on the streets, pumping gas and helping people to their cars with their groceries to earn money.  He stopped attending school out of frustration because he did not know how to read or do math.

38.     Prior to the crime, Karen Young, the mother of one of Mr. Bennett's friends, took Mr. Bennett in off the streets even though they were not related, and Mr. Bennett returned to school.

39.     At the time of the crime, Mr. Bennett was high on marijuana.  He and his co-defendants, Lavonne Smith and Vernon Smith, ages 16 and 17 years old respectively, were persuaded to rob a bicycle shop by his co-defendants' uncle, Richard Larrier, who was in his thirties.  Mr. Bennett was directed to tie up the owners of the store in the back room.  During the robbery, the police entered the store and Mr. Larrier shot and killed a police officer, Raymond Cannon.  Mr. Larrier was subsequently shot and killed.

40.     Nothing in Mr. Bennett's record suggests, nor was any finding ever made, that his crime reflected that he was among the "rarest of juvenile[s] . . . whose crime[] reflects permanent incorrigibility".

41.     While incarcerated, Mr. Bennett earned his General Equivalency Diploma ("GED") after multiple attempts, demonstrating perseverance and a commitment to his future. He completed numerous programs and has an extensive work history.  He has been described as an "asset" in an Inmate Progress Report for his work on the maintenance and paint crew.  He was also described in that report as a humble leader and respectful to all staff and his peers.  He successfully completed all of the terms of parole and was discharged from parole supervision on October 24, 2021.

42.     For the most part, Mr. Bennett had low (favorable) scores on his COMPAS, except for "Prison Misconduct", "ReEntry Substance Abuse" and "ReEntry Financial", which are "high", "probable" and "probable", respectively.  As alleged below, Mr. Bennett lacks

knowledge and was denied information about how his COMPAS scores—favorable or
unfavorable—were calculated.

43.     His disciplinary record demonstrates his growth over the years, and in his
September 2017 decision Defendants noted that his "disciplinary record reflects some violent
conduct over the years but none in nearly five years".

44.     Defendants last denied Mr. Bennett release at his September 13, 2017 hearing.
Aside from recounting the tragic loss of life caused by his crime, the Commissioners' decision
contains all positive factors demonstrating rehabilitation and reform, noting that while in
custody, Mr. Bennett had "performed well in [his] programs, satisfying all requirements".
Nonetheless, without citing to any support in the record, the Board concluded that the "panel is
not convinced that if released you would live at liberty without once again violating the law or
that your release would not so deprecate the offense as to undermine respect for the law".

45.     Plaintiff Demetrius Bennett brings this suit on behalf of himself and a class of
similarly situated persons eligible for release to parole supervision who were convicted of crimes
committed when they were children under the age of 18 and sentenced to indeterminate life
sentences with the possibility of parole in the custody of DOCCS.

46.     Mr. Bennett was denied a meaningful opportunity for release based on
demonstrated maturity and rehabilitation, and the right to due process, in that:

(1) Commissioners did not meaningfully consider, read or attend to Mr. Bennett's full parole
submission; (2) he was denied the right to have an attorney present at his interview and the right
to see and confront any evidence against him; (3) he was denied the right to inspect and
challenge the method of calculating his COMPAS scores; (4) he was not permitted access to
letters opposing his release; (5) his denial was based on a crime he committed decades ago that

he cannot change; (6) Commissioners did not base their decision on Mr. Bennett's demonstrated maturity and rehabilitation; and (7) he was denied any explanation for what additional steps he must take to be recommended for parole.

        iv.    <u>Antonio Roman</u>

47.    Plaintiff Antonio Roman is 44 years old and until his release in 2018, had been incarcerated for almost 24 years for a crime committed when he was 17 years old.

48.    Mr. Roman was abandoned in infancy by both of his parents.  His mother left after he was born and his father was absent.  He was raised by his grandmother, but she also abandoned him and moved to Puerto Rico when he was 16 years old, leaving Mr. Roman struggling to support himself on his own.  Mr. Roman became a teen parent and did not have a way to support himself or provide for his daughter.  Mr. Roman was desperate.  He met an older man, co-defendant Ralph "Tony" Ambert, at a party.  Mr. Ambert offered Mr. Roman money and a car to help him shoot his father, stepmother and anyone else in the house, because Mr. Ambert believed that his father was going to remove him from his will.  Under the direction of his older co-defendant, Mr. Roman shot and killed Mr. Ambert's stepmother, Patricia Ambert.  Mr. Roman did not know the victim prior to the crime.  He took a plea and was convicted of murder in the second degree for a crime that occurred in January 1995 when he was 17 years old.

49.    Nothing in Mr. Roman's record suggests, nor was any finding ever made, that his crime reflected that he was among the "rarest of juvenile[s] . . . whose crime[] reflects permanent incorrigibility".

50.    Mr. Roman received a sentence of 20 years to life.  By the time he was ultimately released on parole from Fishkill Correctional Facility in Beacon, New York on November 8, 2018, after the amended complaint in this lawsuit was filed, he had served almost 24 years in

prison and had been denied parole three times despite significant evidence of rehabilitation and an exceptional disciplinary record.

51.     Mr. Roman had an exceptional disciplinary record while in custody.  His last disciplinary infraction was in 2003, roughly 15 years before his release.  Furthermore, his COMPAS scores were low (favorable) across the board.

52.     While incarcerated, Mr. Roman received his GED and earned multiple college credits.  He participated in several programs for HIV awareness and treatment.  He also completed a 16-week training program for food handling and sanitation practices.  He received numerous commendable behavior reports from corrections officers recommending him for parole.  He successfully completed all of the terms of parole and was discharged from parole supervision on November 8, 2021.

53.     Defendants last denied Mr. Roman parole release on September 20, 2016 despite significant evidence of his maturity and rehabilitation.  Defendants "commend[ed] [his] personal growth and productive use of time".  However, Defendants denied release on the unsubstantiated basis that "if released at this time, [his] release would be incompatible with the welfare of society and would so deprecate the serious nature of the crime . . . as to undermine respect for the law".  Defendants merely noted that they had "considered [his] age at the time of the crime and diminished culpability at the time".  Defendants concluded, however, that "discretionary release [was] not presently warranted as [his] release would trivialize the tragic loss of life that [he] caused".

54.     Plaintiff Antonio Roman brings this suit on behalf of himself and a class of similarly situated persons eligible for release to parole supervision who were convicted of crimes

committed when they were children under the age of 18 and sentenced to indeterminate life sentences with the possibility of parole in the custody of DOCCS.

55. Mr. Roman was denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, and the right to due process, in that: (1) Commissioners did not meaningfully consider, read or attend to Mr. Roman's full parole submission; (2) Mr. Roman was not permitted access to letters opposing his release; (3) he was denied the right to have an attorney present at his interview and the right to see and confront any evidence against him; (4) his denial was based on a crime he committed decades ago that he cannot change; (5) Commissioners did not base their decision on Mr. Roman's demonstrated maturity and rehabilitation; and (6) he was denied any explanation for what additional steps he must take to be recommended for parole.

   v. <u>Vintarra Martin</u>

56. Plaintiff Vintarra Martin is 32 years old and has been incarcerated since she was 16 years old.

57. Ms. Martin grew up in a physically and emotionally abusive household. Her mother suffered severe and regular beatings from her father. After he left, her mother, Ms. Taylor, inflicted the same sort of physical abuse on Ms. Martin. When Ms. Martin was 15 years old, she began dating Damasoh Kelly. He was 23 years old at the time. Mr. Kelly treated Ms. Martin similarly to how her father had treated her mother; his beatings were severe and frequent. Unable to leave the relationship without suffering extreme consequences, she lived in fear of him.

58. On September 2, 2006, after finding her daughter's positive pregnancy test, Ms. Taylor confronted Mr. Kelly. She threatened to call the police on him for statutory rape, and a violent fight ensued. Mr. Kelly verbally threatened Ms. Martin, saying he would kill her unless

she stabbed her mother.  Ms. Martin took the knife from him and proceeded to stab her mother, resulting in Ms. Taylor's death.  Ms. Martin took a plea and was convicted of murder in the second degree.  To date, she has been incarcerated for 16 years.  She has been denied parole two times.

59.     Nothing in Ms. Martin's records suggests, nor was any finding ever made, that her crime reflected that she was among the "rarest of juvenile[s] . . . whose crime[] reflects permanent incorrigibility".

60.     Ms. Martin is presently incarcerated at Taconic Correctional Facility in Bedford Hills, New York.  She earned her GED and has completed two years of college programming.  During her incarceration, she has obtained vocational training in food service, sighted guide techniques and medical services.  She has completed numerous programs and has an extensive work history.  Her work as a mobility aide and sighted guide have each earned her multiple glowing reviews in Inmate Progress Reports.

61.     Despite the nature of her crime, she maintains strong relationships with her family members, speaking to many of them on a daily basis.  Her brother Tyvie Lafrance wrote a letter pledging to support Ms. Martin emotionally and financially should she be released on parole.

62.     Due to her accomplishments and disciplinary record while incarcerated, Ms. Martin was awarded a LCTA by DOCCS, allowing her to be considered for release to parole supervision six months earlier than her parole eligibility date.  This award can only be given if an incarcerated person did not commit a "serious" disciplinary infraction while in custody and does not have a "poor" institutional record.

63.     Ms. Martin's October 6, 2020 COMPAS scored her as a "Low" "Risk of Felony

Violence" but a "Medium" "History of Violence".  Ms. Martin lacks knowledge and has been

denied information about how her COMPAS scores—favorable or unfavorable—are calculated.

64.     Commissioner Smith and Commissioner Crangle denied Ms. Martin release at her

Limited Credit Time Interview in February 2021, stating that an "aggravating factor" was that

the victim was her "mother" and that "[i]t can't get any worse" in terms of heinousness than

"killing your mother".

65.     Commissioner Crangle and Commissioner Berliner again denied Ms. Martin

release on April 27, 2021, commending her "personal growth and productive use of time" but

concluding that her "release would be incompatible with the welfare of society and would so

deprecate the seriousness of [the] crime as to undermine respect for the law" due, again, to the

fact that the victim was her mother and also due to the Commissioners' findings and conclusions

regarding an unspecified "ongoing course of conduct, before, during, and after the commission

of the offense".

66.     Plaintiff Vintarra Martin brings this suit on behalf of herself and a class of

similarly situated persons eligible for release to parole supervision who were convicted of crimes

committed when they were children under the age of 18 and sentenced to indeterminate life

sentences with the possibility of parole in the custody of DOCCS.

67.     Ms. Martin was denied and continues to be denied a meaningful opportunity for

release based on demonstrated maturity and rehabilitation, and the right to due process, in that:

(1) Commissioners did not fully consider, read or attend to Ms. Martin's parole submission;

(2) she was denied the right to have an attorney present at her interview and the right to see and

confront any evidence against her; (3) she was denied the right to inspect and challenge the

method of calculating her COMPAS scores; (4) her denial was based on a crime she committed as a child that she could not change and facts about that crime that Defendant Commissioners believed require more punishment than that established by the legislature and sentencing judge; (5) she was denied based on Defendant Commissioners' findings and conclusions about her "course of conduct before during and after the commission of the crime", the facts of which were not proved beyond a reasonable doubt; and (6) Commissioners failed to fully consider Ms. Martin's crime in the context of youth and did not base their decision on Ms. Martin's demonstrated maturity and rehabilitation.

> ### vi.   Terrance Anderson

68.     Plaintiff Terrance Anderson is 39 years old.  Until his release on April 20, 2022, he had been incarcerated for over 22 years, more than two years past his minimum sentence.

69.     Mr. Anderson had a tumultuous childhood.  Neither his stepfather nor his mother was present at home, and his mother was often out using drugs.  When they were around, his mother and stepfather were physically abusive to each other and Mr. Anderson, increasingly so as his older siblings moved out of the house.  Prior to being incarcerated, he had met his father only twice in his life.  His mother encouraged him to leave home as often as he could, and he spent much of his childhood bouncing between relatives', friends' and at times strangers' homes.

70.     At age 16, Mr. Anderson was staying with a 39-year-old friend who introduced him to victim Louis Sansivero, who was 49 years old at the time.  Mr. Sansivero would have Mr. Anderson wash his car and run errands for him, and ultimately got him involved in dealing drugs for him.

71.     On August 27, 1999, Mr. Sansivero came to collect the balance of $5,000 that Mr. Anderson owed him in relation to drug sales.  Mutual friends warned Mr. Anderson that Mr. Sansivero would hurt Mr. Anderson if he did not give Mr. Sansivero the full balance.

Mr. Anderson asked Mr. Sansivero for more time to pay him, but Mr. Sansivero demanded that he be given the full amount that same day.  To buy time, Mr. Anderson said he would get the money from a nearby house and instead retrieved the gun that Mr. Sansivero had given him to guard the drugs.  He asked Mr. Sansivero again for additional time to pay him.  Mr. Sansivero responded by standing up from the couch where he was sitting, which Mr. Anderson saw as a threat.  Out of fear, Mr. Anderson started shooting.  Mr. Sansivero died from gunshot wounds to the chest.  Mr. Anderson took a plea and was convicted of murder in the second degree for a crime that occurred when he was 16 years old.  He has been denied parole two times.

72.     Nothing in Mr. Anderson's record suggests nor was any finding ever made, that his crime reflected that he was among the "rarest of juvenile[s] . . . whose crime[] reflects permanent incorrigibility".

73.     Prior to his release in April 2022, Mr. Anderson was incarcerated at Orleans Correctional Facility in Albion, New York.  When he was first incarcerated, he had a substantial disciplinary history, although even then, few of the violations were violent.  In recent years, his disciplinary record substantially improved, which demonstrates his growth and maturation over the years.  In his April 2021 hearing, Defendants noted with regards to his disciplinary record that Mr. Anderson had "bumps in the road but since 2018 things have been better".

74.     With the exception of "Prison Misconduct" and "Reentry Substance Abuse", which were "High" and "Probable" respectively, his December 22, 2020 COMPAS scores were low (favorable) across the board.  In addition, "Prison Misconduct" and "Reentry Substance Abuse" are "Needs", as opposed to "Risk", scores and do not purport to predict risk of recidivism or violence.  As alleged below, Mr. Anderson lacks knowledge and has been denied information about how his COMPAS scores—favorable or unfavorable—are calculated.

75.     While incarcerated, Mr. Anderson obtained his GED, an associate's degree in business management and 21 credits towards a second associate's degree in liberal arts from SUNY Genesee Community College, where he consistently made the Dean's List.  He also completed vocational training in over seven areas, including legal research and law library management, business management and medical services.  Mr. Anderson further completed multiple therapeutic and rehabilitative programs, including Alternatives to Violence, Alcohol and Substance Abuse Treatment, Innovative Therapeutic Program, Healing Communities and Parenting Plus.  Mr. Anderson consistently held jobs and leadership positions while incarcerated, including Group Leader for Laundry and Medical Services.

76.     On April 24, 2019, Defendants denied Mr. Anderson release stating that he had been "adjudicated as a juvenile delinquent" prior to the crime, that the "victim's account through the sentencing minutes is compelling" and that "strong language featured in the official opposition to [his] release underscores that . . . discretionary release is not warranted".

77.     Defendants last denied Mr. Anderson release on April 20, 2021, stating that there "continues to be consistent opposition to [his] release" and that there were "strong statements at [his] sentencing . . . by the victim's family and the judge".  Despite noting Mr. Anderson's "personal growth and productive use of time", "positive programming and educational achievements", "low [COMPAS] scores" and "thorough parole packets containing . . . letters of support and multiple certificates", the Board concluded that releasing Mr. Anderson "would be incompatible with the welfare of society and would so deprecate the seriousness of [the] crime as to undermine respect for the law".  Mr. Anderson appealed this decision and was granted parole at his de novo hearing on March 16, 2022.

78.     Plaintiff Terrance Anderson brings this suit on behalf of himself and a class of similarly situated persons eligible for release to parole supervision who were convicted of crimes committed when they were children under the age of 18 and sentenced to indeterminate life sentences with the possibility of parole in the custody of DOCCS.

79.     Mr. Anderson was denied a meaningful opportunity for release based on demonstrated maturity and rehabilitation, and the right to due process, in that: (1) Commissioners did not fully consider, read or attend to Mr. Anderson's parole submission; (2) neither Mr. Anderson nor his attorneys were permitted access to letters opposing his release; (3) he was denied the right to have an attorney present at his interview and the right to see and confront any evidence against him; (4) his denial was based on a crime he committed decades ago that he could not change and facts about that crime that were not proved beyond a reasonable doubt; (5) he was denied the right to inspect and challenge the method of calculating his COMPAS scores; (6) Commissioners did not base their decision on Mr. Anderson's demonstrated maturity and rehabilitation; and (7) he was denied any explanation for what additional steps he must take to be recommended for parole.

### B.  Defendants

80.     Defendant Tina Stanford is the Chairwoman of the Board of Parole.  Defendant Stanford has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  As Chairwoman, Defendant Stanford is responsible for the administrative functions and daily operations of the Board of Parole and its staff, and exercises ultimate authority—in consultation with the other Commissioners—with respect to the Board's policies, practices and procedures.  Defendant Stanford is sued in her official capacity.

81.     Defendant Joseph P. Crangle is a member of the Board of Parole.  Defendant Crangle has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Crangle is sued in his official capacity.

82.     Defendant Marc Coppola is a member of the Board of Parole.  Defendant Coppola has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Coppola is sued in his official capacity.

83.     Defendant Tana Agostini is a member of the Board of Parole.  Defendant Agostini has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Agostini is sued in her official capacity.

84.     Defendant Charles Davis is a member of the Board of Parole.  Defendant Davis has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Davis is sued in his official capacity.

85.     Defendant Erik Berliner is a member of the Board of Parole.  Defendant Berliner has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole. Defendant Berliner is sued in his official capacity.

86.     Defendant Otis Cruse is a member of the Board of Parole.  Defendant Cruse has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and

9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Cruse is sued in his official capacity.

87.     Defendant Tyece Drake is a member of the Board of Parole.  Defendant Drake has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Drake is sued in her official capacity.

88.     Defendant Caryne Demosthenes is a member of the Board of Parole.  Defendant Demosthenes has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Demosthenes is sued in her official capacity.

89.     Defendant Michael Corley is a member of the Board of Parole.  Defendant Corley has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Corley is sued in his official capacity.

90.     Defendant Chanwoo Lee is a member of the Board of Parole.  Defendant Lee has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Lee is sued in her official capacity.

91.     Defendant Sheila Samuels is a member of the Board of Parole.  Defendant Samuels has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Samuels is sued in her official capacity.

92.     Defendant Elsie Segarra is a member of the Board of Parole.  Defendant Segarra has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Segarra is sued in her official capacity.

93.     Defendant Carlton Mitchell is a member of the Board of Parole.  Defendant Mitchell has authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Mitchell is sued in his official capacity.

94.     Defendant Walter William Smith was a member of the Board of Parole. Defendant Smith had authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Defendant Smith was a Commissioner at the time of filing of the Second Amended Complaint, in which he was named as a Defendant in his official capacity. He was deposed on August 18, 2021.  On information and belief, Defendant Smith retired in July 2021, during the pendency of this action, but his term has not yet expired.  He is maintained as a defendant in his official capacity so that his successor, once named, will automatically be substituted as a party in his stead pursuant to Fed. R. Civ. P. 25(d).

95.     Ellen Evans Alexander was a member of the Board of Parole.  Ms. Alexander had authority over the Board of Parole pursuant to New York Executive Law Sections 259-259S and 9 NYCRR, Subtitle CC, Parts 8000-8011, which determines which prisoners are eligible for parole.  Ms. Alexander was a Commissioner at the time of filing of the Second Amended Complaint, in which she was named as a Defendant in her official capacity.  She was deposed on October 15, 2021.  On information and belief, Ms. Alexander retired in March 2022, during the

pendency of this action.  Due to the expiration of her term, Plaintiffs no longer include her as a

Defendant.

96.     New York law authorizes the appointment of 19 commissioners of the Board of

Parole.  N.Y. Exec. Law § 259-b(1).  At the time of filing of this Third Amended Complaint, the

Board of Parole has only 14 commissioners in office.  Plaintiffs expressly reserve the right to add

or substitute any commissioners named during the pendency of this action as defendants in their

official capacity pursuant to Fed. R. Civ. P. 25(d).

## FACTUAL ALLEGATIONS

**I.  JUVENILES HAVE DIMINISHED CULPABILITY AND GREATER PROSPECTS FOR REFORM THAN ADULTS, AND THE STATE CANNOT, EXCEPT IN THE RAREST OF CASES, CONDEMN JUVENILE OFFENDERS TO DIE IN PRISON WITHOUT A MEANINGFUL OPPORTUNITY FOR RELEASE.**

**A.  The relevant scientific communities have recognized that children are categorically different from adults.**

97.     Scientific and psychological studies confirm that children are fundamentally

different from adults, and as a result, their culpability is diminished.

98.     The first reason that justifies the diminished culpability of juvenile offenders is

their lack of maturity and an underdeveloped sense of responsibility.  See Laurence Steinberg &

Elizabeth S. Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity,

Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1011-14

(2003).

99.     Their lack of maturity often results in impetuous and ill-considered actions and

decisions (i.e., impulsive conduct), which explains why "adolescents are overrepresented

statistically in virtually every category of reckless behavior".  Jeffrey Arnett, Reckless Behavior

in Adolescence: A Developmental Perspective, 12 Developmental Rev. 339, 339 (1992); see also

Laurence Steinberg & Robert G. Schwartz, Developmental Psychology Goes to Court in Youth

on Trial: A Developmental Perspective on Juvenile Justice 9 (Thomas Grisso & Robert G.

Schwartz, eds. 2000).

100.     Developmental research shows that juveniles engage in impulsive decision-

making because they are unable to perceive risks.  Melinda G. Schmidt, et al., Effectiveness of

Participation as a Defendant: The Attorney-Juvenile Client Relationship, 21 Behav. Sci. & L.

175, 180 (2003).  Another explanation for their impulsive behavior is that juveniles think more

about immediate gains as opposed to long-term consequences, and thus consider the meaning of

a potential act differently than adults.  Id.; see also Kristin N. Henning, Loyalty, Paternalism, and

Rights: Client Counseling Theory and the Role of Child's Counsel in Delinquency Cases, 81

Notre Dame L. Rev. 245, 271-72 (2005).

101.     A second area of difference between adults and adolescents is that juveniles are

more vulnerable to negative influences and outside pressures, including peer pressure.  Steinberg

& Scott, supra, at 1014.

102.     Their susceptibility to outside pressure is explained, at least in part, by the

prevailing circumstance that juveniles have less control, or less experience with control, over

their own environment.  Id.

103.     It is no surprise, therefore, that psychologists have concluded that juveniles "lack

the freedom that adults have to extricate themselves from a criminogenic setting".  Id.

104.     A third area of difference between adults and adolescents is that the character of a

juvenile is not as well formed as that of an adult.  Specifically, psychologists and psychoanalysts

have recognized that the personality traits of juveniles are more transitory, less fixed.  See

generally, Erik H. Erikson, Identity: Youth and Crisis (1968); see also Steinberg & Scott, supra,

at 1014.

105.     Although these three inherently transitory characteristics of juveniles often lead them to commit crimes, psychologists have recognized that, for most teenagers, their impulsive and risky behaviors "cease with maturity" as their identities become settled, they learn to consider long-term consequences of potential actions prior to making choices, and they gain the resources and capacities to extricate themselves from negative influences.  Steinberg & Scott, supra, at 1014.

106.     As adolescents mature into adults, they gain an improved perspective on long-term consequences, become more risk-averse and gain the self-regulatory capacities to conform their actions to moral evaluation.  Kristin Henning, supra, at 272.  They "also come to regret decisions they made in earlier years".  Id.

107.     The behavior of adolescents evolves so much as they grow up that studies recognize that "[o]nly a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood".  Steinberg & Scott, supra, at 1014 (citations omitted).

**B.  The law has traditionally viewed children differently.**

108.     Courts and legislatures have long recognized that children are not fully psychologically and socially developed, are susceptible to persuasion and abuse, and are marked by judgmental inexperience such that it is appropriate to limit their ability as a class to vote, marry, serve on juries, drink alcohol, gamble, leave school and otherwise exercise full autonomy under the law.  See J.D.B. v. North Carolina, 564 U.S. 261, 272-77 (2011).

109.     The inherent characteristics of children have been recognized in the area of punishment in a series of U.S. Supreme Court decisions.  Specifically, the U.S. Supreme Court recognized that three distinctive attributes of juveniles mitigate their culpability:  juveniles have transient immaturity; they are vulnerable to external forces; and their character traits are still

being formed.  Montgomery, 136 S. Ct. at 733; Miller, 567 U.S. at 470-71; Graham, 560 U.S. at

68; Roper v. Simmons, 543 U.S. 551, 569-70 (2005).

110.    By recognizing the psychological and social characteristics of children, these

decisions established constitutional limitations on the punishment that can be imposed on

children, even for very serious crimes, reasoning that "children are constitutionally different

from adults for purposes of sentencing" because they have "diminished culpability and greater

prospects for reform".  Montgomery, 136 S. Ct. at 733 (quoting Miller, 567 U.S. at 471 (citing

Roper, 543 U.S. at 569-70; Graham, 560 U.S. at 68)).

111.    In Roper v. Simmons, 543 U.S. 551, 572 (2005), the U.S. Supreme Court

categorically outlawed the death penalty for juvenile offenders, even those convicted of the most

heinous murders, concluding that "neither retribution nor deterrence provides adequate

justification for imposing the death penalty on juvenile offenders".

112.    In Graham v. Florida, 560 U.S. 48 (2010), the U.S. Supreme Court held that

sentencing a juvenile to life in prison without parole for crimes other than murder violates the

Eighth Amendment's ban on cruel and unusual punishment, specifically for non-homicide

offenses.

113.    In Miller v. Alabama, 567 U.S. 460 (2012), the U.S. Supreme Court held that the

Eighth Amendment prohibits a sentencing scheme that requires life in prison without the

possibility of parole for juvenile homicide offenders.

114.    In Montgomery v. Louisiana, 136 S. Ct. 718 (2016), the U.S. Supreme Court held

that Miller v. Alabama announced a substantive rule which, under the Constitution, is retroactive

in cases on state collateral review.

115.     In <u>United States v. Reingold</u>, 731 F.3d 204 (2d Cir. 2013), the Second Circuit

reiterated the categorical prohibition of mandatory life sentences without parole for juveniles.

116.     These cases hold that the Eighth Amendment forbids a statutory scheme that (i)

imposes life sentences upon minors who are not the rarest of irredeemable juveniles whose

crimes reflects permanent incorrigibility, and (ii) fails to provide those whose crimes reflect

unfortunate yet transient immaturity with a meaningful and realistic opportunity for release.

New York law fails this test on both accounts.  This rule is based on substantive constitutional

principles of proportionality governing punishment for juvenile lifers based on their diminished

culpability and enhanced capacity for reform.

**C.  Life sentences imposed on children are unconstitutional absent a parole scheme that provides a meaningful and realistic opportunity to obtain release based on demonstrated rehabilitation and reform.**

117.     "The Eighth Amendment's prohibition of cruel and unusual punishment

guarantees individuals the right not to be subjected to excessive sanctions.  That right . . . flows

from the basic precept of justice that punishment for crime should be graduated and proportioned

to both the offender and the offense."  <u>Miller</u>, 567 U.S. at 469 (internal quotation marks and

citations omitted).

118.     Accordingly, the U.S. Supreme Court has held that "sentencing a child to life

without parole is [unconstitutionally] excessive for all but the 'rare juvenile offender whose

crime reflects irreparable corruption'".  <u>Montgomery</u>, 136 S. Ct. at 734 (<u>quoting Miller</u>, 567 U.S.

at 479-80).  States "must impose a sentence that provides some meaningful opportunity for

release based on demonstrated maturity and rehabilitation".  <u>Graham</u>, 560 U.S. at 50.

119.     That holding has both "substantive" and "procedural component[s]".

<u>Montgomery</u>, 136 S. Ct. at 734-35.  Because of its substantive nature, the U.S. Supreme Court

has held that this constitutional rule applies retroactively.  <u>Id.</u>

120. As a matter of "substantive right", it is unconstitutional to imprison for life without parole a juvenile "whose crimes reflect unfortunate yet transient immaturity" rather than "irreparable corruption". Miller, 567 U.S. at 479-80. In furtherance of this substantive right, the U.S. Supreme Court has recognized that a juvenile's "demonstrated maturity and rehabilitation" is what entitles him to a "meaningful opportunity to obtain release". Id. at 479 (citing Graham, 560 U.S. at 75).

121. As a "procedural" matter, "a sentencer [must] consider a juvenile offender's youth and attendant characteristics before determining that life without parole" is "proportionate" to the offense. Montgomery, 136 S. Ct. at 734. The sentencer does not have unfettered discretion to treat youth as a mere "factor" and assign said factor the weight he or she chooses. Rather, youth is a constitutionally relevant status that makes certain forms of punishment unlawful. The status of youth triggers the substantive guarantee that a juvenile not be imprisoned for life for a crime that reflects transient characteristics of youth because to do so would be to impose a disproportionate punishment.

122. Accordingly, the sentencer must "d[o] more than [merely] *consider* a juvenile offender's youth before imposing life without parole", id. at 734 (emphasis added), and must instead analyze whether the crime reflects transient factors of youth or permanent incorrigibility. Id.

123. Proceedings bearing on life sentences for juvenile offenders must, in order to avoid being categorically unconstitutional, afford juvenile lifers who have evolved from a troubled, misguided youth to a model inmate, a meaningful opportunity to demonstrate that children who commit even heinous crimes are capable of change. Id. at 724.

124.     Accordingly, sentencing regimes that subject juvenile offenders to life with the possibility of parole are only constitutional insofar as the state provides a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation".  Miller, 567 U.S. at 479 (quoting Graham, 560 U.S. at 75).

125.     Those substantive and procedural rights apply at parole hearings where a person who committed a crime as a child faces possible life imprisonment if parole is denied.  After all, "[a] parole board is no more entitled to subject an offender to the penalty of life in prison in contravention of this rule than is a legislature or a sentencing court".  Hawkins v. New York State Dep't of Corr. & Cmty. Supervision, 140 A.D.3d 34, 38 (3d Dep't 2016); Putland v. New York State Dep't of Corr. & Cmty. Supervision, 158 A.D.3d 633 (2d Dep't 2018).

126.     The U.S. Supreme Court allows life *with* parole sentences only because it understands parole to be "a regular part of the rehabilitative process.  Assuming good behavior, [parole] is the normal expectation in the vast majority of cases."  Solem v. Helm, 463 U.S. 277, 300-01 (1983) (citations omitted).

## II.  NEW YORK SUBJECTS JUVENILE LIFERS TO UNCONSTITUTIONALLY DISPROPORTIONATE PUNISHMENT BY DENYING THEM A MEANINGFUL AND REALISTIC OPPORTUNITY FOR RELEASE BASED ON DEMONSTRATED MATURITY AND REHABILITATION.

### A.  New York sentencing law mandates life with the possibility of parole for juvenile offenders as young as 13 years old.

127.     Under New York sentencing law, children aged 16 and 17 are sentenced to an indeterminate sentence with a mandatory maximum term of life imprisonment if convicted of a class A felony, with the minimum term for a class A-I felony ranging from 15 to 25 years.  N.Y. Penal Law §§ 70.00(2)(a), 70.00(3)(a)(i).  Children as young as 13 years old who are convicted of murder receive an automatic maximum sentence of life in prison with opportunity for parole. N.Y. CPL §§ 1.20(42), 180; N.Y. Penal Law § 70.05(2)(a).

128.     Under the New York Penal Law, a defendant's age and maturity, the transient

characteristics attendant to youth, and a defendant's capacity for rehabilitation play no role

whatsoever in setting the maximum sentence for those convicted of murder or other class A-I

felonies for which the mandatory maximum sentence is *life*.

129.     The only mechanism, under New York law, by which the substantive right of

juvenile lifers to be provided with a meaningful opportunity for release can be secured is through

the Board of Parole.

**B. New York parole law fails to afford juvenile lifers a meaningful and realistic
   opportunity for release upon rehabilitation.**

130.     The New York parole practices and procedures fail to provide juvenile lifers a

"meaningful" or "realistic" opportunity to obtain release based on demonstrated maturity and

rehabilitation.

131.     The Board of Parole has interpreted the New York Executive Law to allow it to

deny parole to juvenile lifers if Defendants, in their subjective judgment, without regard to the

individual's demonstrated maturity and rehabilitation subsequent to the crime, believe that

release would be "not compatible with the welfare of society" or would "so deprecate the

seriousness of his crime as to undermine respect for law".  See N.Y. Exec. Law § 259-i(2)(c)(A).

132.     Defendant Stanford told the Senate Crime Victims, Crime and Correction

Committee on February 15, 2018, that she understands the statutory language "deprecate the

seriousness of the offense as to undermine respect for the law" to permit Commissioners to deny

parole if they, in their personal opinion, believe that release for particular offenders who

committed serious crimes "would so undermine respect for the law in the mind of the community

[the offenders] would be going back to".  Defendant Stanford termed this consideration as

"community opposition" although it is not statutorily authorized under New York's Executive Law.

133.    As a result, Defendants have denied, and continue to deny, juvenile lifers release to parole supervision based only on the crime committed or juvenile criminal history, despite clear evidence of rehabilitation and maturity.

134.    Defendants' failures are illustrated in their treatment of the Named Plaintiffs.

135.    Defendants denied parole ten times to Plaintiff Carlos Flores, who had been incarcerated for 37 years, had a "low risk across the board" COMPAS risk assessment and had not had a disciplinary ticket in 25 years.

136.    Despite Mr. Flores's impeccable record, on October 24, 2017, Defendants Smith, Crangle and Demosthenes denied Mr. Flores release to parole supervision stating, without substantiation, that "discretionary release is not warranted due to concern for the public safety and welfare" and that "release at this time would not be compatible with the welfare of society and would tend to deprecate the seriousness of the Instant Offense and undermine respect for the law". The *only* treatment in Defendants' decision given to Mr. Flores's juvenile status at the time of the offense was relegated to the following conclusory, passive voice statement:  "[y]our age at the time of the offense, family situation and lack of maturity is noted".

137.    On May 23, 2018—after Mr. Flores's fourth hearing in just over two-and-a-half years—he was granted parole release on the basis of the following factors:  "In prison you have participated in all recommended programs, have earned a Bachelor's Degree, have put together a solid release plan, gained insight and exhibited remorse for the victim's family.  Your record features a clean disciplinary record for over twenty-five years, and your overall low risk and need scores is noted."  Tellingly, the "factors" cited to approve release were identical to the

factors present at Mr. Flores's prior hearings but were dismissed as insufficient to warrant release out of concern for the welfare of society three times in the prior years.  The panel also noted in its grant decision that Mr. Flores's release "should not be interpreted as mitigating or discounting [his] participation in the felony murder of an off-duty police officer".  The only new factor was his status as a named representative in this lawsuit.

138.    Defendants also denied parole release to Plaintiff Lawrence Bartley at his LCTA interview, which he earned for "significant programmatic accomplishment" and an excellent disciplinary record.  Defendants Cruse and Drake acknowledged Mr. Bartley's "exceptional packet, institutional accomplishments . . . overall low COMPAS score and satisfactory case plan. . . release planning, community outreach, use of media, networking and your life as an example exemplifies an extraordinary effort to give back, [sic] demonstrates restoration and evidenced change".  On September 6, 2017, they nevertheless concluded, without any basis, that "there is a reasonable probability that you would not live and remain at liberty without again violating the law and that your release would be incompatible with the welfare of society and would so deprecate the serious nature of the crime as to undermine respect for the law".  Defendants Cruse and Drake also cited opposition to Mr. Bartley's release.  Their decision, however, failed to even mention that Mr. Bartley was a juvenile at the time of the offense or consider the hallmark features of youth as they relate to culpability or the constitutional relevance of the exceptional evidence of maturity and rehabilitation.

139.    On April 9, 2018, Mr. Bartley was granted parole.  The factors cited in support of his release include "your age of 17 at the time of the offense including the diminished culpability of youth and the growth and maturity since the time of the offense; your low risk assessment scores; your efforts toward rehabilitation including your receipt of LCTA; your expression of

remorse for the victim as well as his family and your efforts to apologize to your victims; your release plans, letters of support and reasonable assurance from your family members, official letters including your attorney's letter; letters from facility personnel, prospective employers and others; commendable behavior reports and letters of commendation received; your parole packet; sentencing minutes; your programs completions throughout your sentence; good disciplinary and institutional record".

140.     These factors were identical to the factors present seven months previously when Defendants concluded in September 2017 that parole should be denied because "there is reasonable probability that you would not live and remain at liberty without again violating the law and that your release would be incompatible with the welfare of society and would so deprecate the serious nature of the crime as to undermine respect for the law".  In April 2018, Defendants affirmed that Mr. Bartley's "release should in no way be interpreted as mitigating or discounting the seriousness of [his] actions and the terrible loss of life [he] caused".  The only new factor in April 2018 was his status as a named representative in this lawsuit.

141.     By the time he was granted release in September 2018, Defendants had denied parole release eight times to Demetrius Bennett, who had been incarcerated 14 years beyond his minimum sentence and had demonstrated growth over his 23 years of incarceration.  On September 13, 2017, Defendants Agostini and Davis and former Defendant Thompson denied Mr. Bennett release to parole supervision stating, without substantiation, that the "panel is not convinced that if released you would live at liberty without once again violating the law or that your release would not so deprecate the offense as to undermine respect for the law".  The decision's consideration of youth was to note in passing that Mr. Bennett was "15 years old at the time and [was] following the lead of [his] friends and their uncle".

142.     In addition, by the time he was granted release in September 2018, Defendants had denied parole release to Plaintiff Antonio Roman three times despite significant evidence of rehabilitation and maturity.  The decision from Mr. Roman's September 20, 2016 hearing focused substantially on the nature of the crime of conviction, rather than his youth at the time of the crime.  The Commissioners noted that they had "considered [his] age at the time of the crime and diminished culpability at the time", but nonetheless ultimately denied release, stating that Mr. Roman's "release would be incompatible with the welfare of society and would so deprecate the serious nature of the crime . . . as to undermine respect for the law".

143.     Defendants have denied parole release to Plaintiff Vintarra Martin two times, despite substantial evidence of her growth and rehabilitation.  The decision from her April 27, 2021 Hearing commends her "well-organized parole packet, release plans [and] multiple letters of support" as well as her "positive programming in the college program and several programs that [she] completed".  Despite this, the panel denied her release to parole, citing that she "brutally killed [her] mother" and that "[her] actions were heinous and [showed] a total disregard for human life".  The decision states that the panel was "concerned with the extreme violent nature of [her] actions as well as [her] ongoing course of conduct . . . before, during and after the commission of [the] offense" and that "release would be incompatible with the welfare of society and would so deprecate the seriousness of [Ms. Martin's] crime as to undermine respect for the law".

144.     Defendants have also twice denied parole release to Plaintiff Terrance Anderson despite his growth and rehabilitation.  While the denial decision for Anderson's April 24, 2019 hearing states that the panel "considered" factors such as "youth, relationships at home, [and] development within the family", the panel's reasoning for the denial focused exclusively on the

instant offense and Mr. Anderson's juvenile record.  The denial decision did not acknowledge even once any of Mr. Anderson's educational accomplishments, vocational certificates, rehabilitative and therapeutic programs, release plan, letters of support and reasonable assurance, or any other evidence demonstrating his growth during incarceration.  Instead, it concludes that "the victim's account throughout the sentencing minutes is compelling, leaving the Panel to sense the impact [Mr. Anderson's] behavior has caused and ultimately the strong language featured in the official opposition to [his] release underscores that which the Panel concurs, discretionary release is not warranted".  The victim's account and opposition letters were not once mentioned during his April 2019 parole hearing.

145.     As evidenced by their denial of release to the Named Plaintiffs, Defendants continue to deny juvenile lifers release to parole supervision even after they have demonstrated maturity and rehabilitation.

146.     Defendants' reliance on the nature of a juvenile crime, prior juvenile record, juvenile disciplinary history, and "official", "community" or victim opposition to deny release deprives juvenile lifers of the opportunity to obtain release based on demonstrated maturity and rehabilitation.  This opportunity is required to bring life with parole sentencing regimes into compliance with the Eighth Amendment's proscription against disproportionate punishment.

### C. The Board of Parole willfully violates the rights of juvenile lifers.

147.     In 2016, the Third Department of New York State Supreme Court, Appellate Division found the Board of Parole in violation of clearly established law under the Eighth Amendment because, "[t]he Board, as the entity charged with determining whether [Hawkins] will serve a life sentence, was required to consider the significance of [Hawkins's] youth and its attendant circumstances at the time of the commission of the crime before making a parole determination."  Hawkins, 140 A.D.3d 34, 36 (3d Dep't 2016).

148.     In response to the Hawkins decision and the U.S. Supreme Court decision in

Montgomery, the Board eventually gave notice of proposed regulations that reflected

Defendants' official position regarding their legal obligations under the Eighth Amendment and

the Due Process Clause.  Department of Corrections and Community Supervision, Proposed

Rulemaking, I.D. No. CCS-39-16-00004-P (Sept. 28, 2016).

149.     The proposed regulations provided that an inmate's juvenile status at the time of

the crime for which he or she is currently serving an indeterminate life sentence is merely *one of*

*many factors* that the Board must "consider", and continued to permit Defendants to deny parole

based solely on their subjective assessment of the crime of conviction.  Dep't of Corrections and

Community Supervision, Proposed Rulemaking, I.D. No. CCS-39-16-00004-P (Sept. 28, 2016).

Numerous comments pointed out to the Board that the proposed regulations were facially

inadequate to ensure that the hundreds of juvenile lifers currently incarcerated in DOCCS

custody receive a meaningful opportunity for release because the regulations did not require the

Board to base its release determination on demonstrated maturity and rehabilitation.

150.     Even after the Hawkins decision and the notice of the proposed regulations, but

prior to the adoption of the proposed regulations, the Board continued to interpret its power in a

manner inconsistent with the constitutional rule.  In Mr. Roman's February 2017 administrative

appeal decision, the Appeals Unit affirmed the Board's September 2016 denial decision and

rejected Mr. Roman's argument that the Board ignored that he was only 17 years old at the time

of the crime.  The Appeals Unit held that "the Board interview and decision was very much

aware of this mandated factor and discussed and reviewed it thoroughly".  However, the only

discussion of Mr. Roman's age at the time of the crime during the September 2016 interview was

the following:  "We recognize that 17-year-olds have somewhat of a diminished capacity

compared to adults."  The parole denial decision merely states that "the panel has considered

your young age at the time of the crime and diminished culpability".  Furthermore, in

Mr. Roman's administrative appeal decision, the Appeals Unit stated the following:  "Nothing in

the due process clause requires the Parole Board to specify the particular evidence on which rests

the discretionary determination an inmate is not ready for conditional release. . . . There is no due

process requirement that the Parole Board disclose its release criteria".  The Appeals Unit also

stated that "[t]he Board may deny parole release without the existence of any aggravating

factors, no matter how exemplary the institutional record is".

151.    Despite the objections to the proposed regulations, the Board formally adopted

these regulations, which became effective on September 27, 2017, without substantive changes

and without curing the constitutional defects in them.

152.    Subsequent to the adoption of the new regulations, and demonstrating their

inadequacy, Plaintiff Carlos Flores was again denied parole based solely on the nature of his

crime and without a meaningful opportunity for release based on demonstrated maturity and

rehabilitation.  Defendants Smith, Crangle and Demosthenes failed to apply the constitutionally

mandated standard to the ample evidence of Mr. Flores's rehabilitation and maturation.  They

ignored the Board's own COMPAS instrument finding Mr. Flores to be a low risk for

reoffending; they ignored the fact that he had not had a disciplinary ticket in the past 25 years;

and they ignored the fact that he was a 54-year-old man who had served 16 years beyond the

minimum term of imprisonment imposed by the sentencing judge in full light of the facts of the

crime.  Instead, Defendants Smith, Crangle and Demosthenes denied Mr. Flores release on the

unsubstantiated formulaic "conclusion" that his "discretionary release at this time, would not be

compatible with the welfare of society and would tend to deprecate the seriousness of the instant offense and undermine respect for the law".

153.    This decision was administratively appealed on December 15, 2017, with a lengthy submission by counsel for Mr. Flores explaining, yet again, the constitutional standard that the Board must follow when considering the applications for parole by juvenile lifers.

154.    On March 6, 2018, the Board decided the administrative appeal.  The Parole Board Appeals Unit, including Defendant Chairwoman Stanford, ordered a *de novo* interview on the basis that Commissioners did not explain what "course of conduct, before, during, and after" the crime 36 years ago it found concerning.  Notably, it refused to instruct Commissioners that the Eighth Amendment requires Defendants to release Mr. Flores to parole supervision if he has demonstrated maturity and rehabilitation and instead affirmed the unlawful standard under which it had denied Mr. Flores's release stating, in part, that "the applicable principles and factors were discussed and considered by the Board in reaching its determination".

155.    Defendants showed similar disregard for their obligations under applicable constitutional law in deciding the administrative appeal of Mr. Bartley's September 6, 2017 denial.  On November 7, 2017, counsel submitted a lengthy brief perfecting the appeal identifying the numerous substantive and procedural defects in Defendants' consideration that denied Mr. Bartley a meaningful opportunity for release, including Defendants' failure to render their decision based on Mr. Bartley's demonstrated maturity and rehabilitation.  In February 2018, the Appeals Unit, including Defendant Chairwoman Stanford, ordered a new hearing on the sole basis that Defendants failed to seek the recommendation of his trial attorney in advance of the interview in violation of N.Y. Exec. Law § 259-i(2)(c)(A)(vii).  The Appeals Unit refused

to issue any findings of fact or law that would prevent the same defects from infecting his future interview and the panel's deliberation process.

156.     Since Hawkins, a number of New York State courts have found Defendants in violation of their legal obligation to provide persons serving indeterminate life sentences with a meaningful opportunity for release.  See, e.g., Martin v. Stanford, 58 Misc. 3d 345 (N.Y. Sup. Ct., Cayuga County 2017); Darshan v. New York State Dep't of Corrs. & Cmty. Supervision, No. 652/2017 (N.Y. Sup. Ct., Dutchess County July 18, 2017); Putland v. New York State Dep't of Corr. & Cmty. Supervision, 158 A.D.3d 633 (2d Dep't 2018); Ruiz v. New York State Div. of Parole, No. 2310-2017 (N.Y. Sup. Ct., Dutchess County Apr. 5, 2018).  The plaintiffs in these cases were all released after the court decisions, one after serving decades beyond his minimum sentence.

157.     Defendants continue to conduct unlawful hearings and refuse to extend requisite procedural protections necessary to secure Plaintiffs' and Class Members' substantive rights.

### D.  The Board of Parole's procedures violate the law.

158.     The sheer volume of work before Defendants precludes the opportunity for Class Members to be meaningfully heard and to receive decisions rendered based on demonstrated maturity and rehabilitation.

159.     Although the State is authorized to staff the Board of Parole with 19 members, it is currently staffed by 14 Commissioners.  These 14 Commissioners must conduct upwards of 10,000 parole interviews annually, in addition to sitting on appeals panels, staffing subcommittees, conducting victim impact interviews, traveling for interviews and engaging in administrative upkeep.

160.     Interview panels consist of two to three Commissioners.  Each week, each panel is assigned approximately 40 to 70 interviews, which are usually conducted over only two

days—Tuesday and Wednesday—as Mondays are reserved for travel and Fridays are reserved for victim interviews.  The majority of interviews are conducted by video conference.  This means each panel interviews between 20 and 35 applicants a day.

161.   Each of these applicants typically submits supporting materials (a "parole packet"), which include a personal statement, programmatic achievements and letters of support. The parole packet may contain hundreds of pages of material.

162.   Defendant Stanford has testified that these parole files and packets are sometimes delivered by prison staff and Offender Rehabilitation Counselors ("ORCs") to the field office where the video conferences take place on Monday, the day before the interviews.  She has also testified that Defendants often do not receive the parole files and packets prior to the morning of the interviews.

163.   Defendant Stanford has testified that Commissioners typically arrive in the city or town where the video conferencing of the interviews will take place on Monday the day or evening before the interviews, which begin at 8 a.m. the following morning.

164.   Once Commissioners arrive in a city on Monday, they check into assigned hotels and, according to Defendant Chairwoman Stanford, they may then review parole files if the files have been delivered, in their hotel rooms, "at their leisure".

165.   No regulation or policy *requires* Defendants to read parole materials before conducting an interview and making release decisions, and, according to Defendant Stanford, "not everyone does it".

166.   On information and belief, Defendants often see the files for the first time at 8 a.m. on the day of the interviews.

167.     The Board divides the weekly interview caseload by the total seated

Commissioners to assign a "lead" Commissioner to each case.  During the interviews, only the

lead Commissioner has a copy of the entire parole file.  The full file may contain hundreds of

pages of material documenting rehabilitation and reform, including:

- personal statements composed by the parole applicant;

- detailed release plans;

- vocational accomplishments;

- programming completion;

- educational achievements;

- educational transcripts;

- letters from family members showing support;

- letters from those who have had personal contact with the applicant supporting release and describing the reasons why they feel the applicant is safe to release;

- job offers;

- drug and alcohol treatment completion certificates;

- commendable behavior reports;

- prison work assignment assessments; and

- statements of remorse or essays written by the applicant discussing insight into his or her crime.

168.     Defendant Stanford has testified that the one or two Commissioners other than the

lead Commissioner have only what is called a "book copy", which includes only four things:  a

condensed version of the Parole Board Report (a one-page sheet consisting primarily of

checkboxes with basic information such as the applicant's birth date, crimes of commitment,

whether there are sentencing minutes or not, etc.), the COMPAS report, a modified rap sheet and the applicant's disciplinary record.

169.   Defendant Stanford has testified that the "book copy" contains all of the information necessary to make the decision and that all other information is "less pertinent".

170.   Notably, the "book copy" does not include letters of support, personal statements, commendable behavior reports or any of the most relevant and detailed materials that would demonstrate rehabilitation, remorse, reform and suitability for community reentry.

171.   The lead Commissioner typically asks all of the questions in the interview.

172.   Although Defendant Stanford testified that interviews typically last 20 minutes, on information and belief, inmates often have less than 10 minutes to make their case for release because the bulk of the "interview" consists of the lead Commissioner recounting the details of the crime; longer interviews are usually provided only where the applicant is represented by counsel or if the prior determination was overturned by a reviewing court.

173.   On information and belief, during the interview the other Commissioners are often not listening to the questions and answers during the pending interview, but instead are preparing for subsequent hearings on which they must take the "lead".

174.   Despite this lack of materials and information or direct engagement from the non-lead Commissioners in a given interview, each Commissioner on the panel has an equal vote to grant or deny release.

175.   On information and belief, outcomes are often predetermined prior to the interview and sometimes decision language is pre-written on a typed form denial.  This is a clear violation of the "guarantee against arbitrary and irrational government action", which includes the "right to a hearing before a fact-finder that has not predetermined the outcome of the

hearing".  Duffy v. Evans, No. 11 Civ. 7605 JMF, 2012 WL 4327605, at *10 (S.D.N.Y. Sept. 19, 2012).

176.    To the extent the decision was not predetermined, the "deliberations" typically last between two to five minutes immediately following the interview and prior to commencing the next interview.  The final decision is then read into the record and transcribed by the stenographer.

177.    On any given hearing day, a Board of Parole panel will potentially conduct 20 to 35 interviews in less than eight hours.  Defendants, therefore, lack the time or inclination to read and evaluate the materials presented to them in the information packets, and routinely show up unprepared for the parole interviews (as occurred in many of the most recent interviews of the Named Plaintiffs).

178.    These procedural inadequacies are exacerbated because the Board does not permit counsel to appear or give statements at parole interviews.

     i.    Commissioners have no training on which to base their decisions and do not solicit expert evaluations of the maturation and rehabilitation of juvenile lifers.

179.    On information and belief, 12 of the 16 Defendants have no substantial training in any discipline—such as child psychology, criminology or social work—that would enable them to competently evaluate whether an underlying crime reflected the transient immaturity of youth or instead permanent incorrigibility.

180.    Commissioners do not seek input from experts competent to attest to the extent of maturation and rehabilitation of juvenile lifers eligible for parole release.

181.    The Board does not make available funds for inmates to retain their own experts—such as psychiatrists, psychologists, social workers or criminologists—who could

opine on whether the underlying crime reflected transient immaturity or permanent incorrigibility and whether the inmate has demonstrated maturity and rehabilitation.

182.     The prevalence of mental impairments among juvenile offenders is substantially higher than among adolescents who are not involved with the justice system.  See generally, Lee Underwood & Aryssa Washington, Mental Illness and Juvenile Offenders, 13 Int. J. Environ. Res. & Pub. Health 228 (2016).  Lack of access to psychological experts significantly raises the risk that a person serving a life sentence for crimes committed as a juvenile is denied parole based on undiagnosed psychiatric or cognitive impairments, which are often untreated in prison. See id.

         ii.     Commissioners improperly use risk assessment tools.

183.     Due process requires, at a minimum, that parole release decisions be made based on accurate information.  See, e.g., United States v. Romano, 825 F.2d 725, 728 (2d Cir. 1987) (citing Townsend v. Burke, 334 U.S. 736, 741 (1948)).

184.     The Board relies upon a risk and needs tool, called COMPAS, that does not specifically consider the diminished culpability of juveniles and the hallmark features of youth.

185.     On information and belief, COMPAS fails to incorporate juvenile rehabilitative capacities into its algorithm.

186.     On information and belief, COMPAS sometimes treats youth as an aggravating factor.  For example, it counts as negative not having a job prior to incarceration, not being married and the age of first offense, includes juvenile justice encounters at very young ages in the criminal involvement score and uses Plaintiffs' current age to predict risk of felony violence. Defendants' use of COMPAS thereby disadvantages Plaintiffs and Class Members who were sentenced as juveniles to serve longer sentences than their adult counterparts.

187.    For example, Mr. Bennett was only 15 years old at the time of his crime and had a medium "risk of felony violence" score on his 2013 COMPAS by virtue of his youth.  On information and belief, Mr. Bennett's medium "risk of felony violence" score relied on criminological actuarial tables that classify individuals within a group and assess risk based on certain shared characteristics with others in that group.  On information and belief, one of the most important determinants of this particular score is the inmate's current age.  Therefore, young juvenile offenders, such as Mr. Bennett, who have served their minimum sentences and become parole-eligible in their twenties or thirties, are statistically predicted to have higher risk for felony violence and will be denied parole irrespective of their rehabilitation and reform.

188.    COMPAS is a commercial product sold by Northpointe Inc.  On information and belief, Defendants either have not asked Northpointe to disclose its secret algorithms or have acquiesced in the refusal by Northpointe to do so.  As a result, COMPAS is a black box. Defendants' reliance upon COMPAS, without knowing how or whether COMPAS considers the diminished culpability of juveniles and the hallmark features of youth, fails to comply with Defendants' legal obligations.

189.    Plaintiffs and Class Members lack knowledge and are denied information about how their COMPAS scores are calculated, what variables enter into the scores, how variables are weighted in the algorithmic prediction, how the scores can be improved through rehabilitative efforts and whether there is any way to challenge the inclusion of erroneous information. Plaintiffs and Class Members also have no way of knowing or contesting if impermissible factors—such as age, race, family, poverty or sex—function as aggregating variables in the predictive instrument.  On information and belief, Plaintiffs and Class Members are denied a meaningful opportunity for release based on individualized information and personal

rehabilitation and reform because the scores are based on statistical facts about membership in a supposed statistical group.

190.    On information and belief, Commissioners do not know or understand how the scores are generated because Northpointe considers COMPAS a proprietary instrument and a trade secret.

191.    Defendants have also refused to verify whether the COMPAS tool has been validated for youth or for developmental or mental disabilities, which are both overrepresented in the population of serious juvenile offenders.

      iii.   <u>Commissioners use prior youthful criminal involvement or disciplinary tickets received as a juvenile as reasons for denying parole to juvenile lifers.</u>

192.    On information and belief, Defendants have access to and cite to previous involvement in the juvenile justice system and inmates' disciplinary records from their time in Office of Children and Family Services ("OCFS") facilities as evidence that applicants are unsuitable for release.

193.    For example, in the middle of Mr. Bartley's September 6, 2017 parole hearing, Defendant Cruse indicated that he would consider Mr. Bartley's disciplinary tickets in reaching a release decision, and the subsequent denial decision cited to Mr. Bartley's prior youthful criminal conviction as one of the reasons for denying his release.  The Board's April 24, 2019 decision denying Mr. Anderson release to parole likewise cited to Mr. Anderson's prior adjudication as a juvenile delinquent and Persons in Need of Supervision ("PINS") petition. That decision was affirmed by the Appeals Unit.

194.    Defendants fail to account for youth when considering the institutional disciplinary records of juvenile lifers imprisoned when they were still adolescents and not as able

as adults to control impulses, plan alternative courses of action and otherwise moderate their behavior.

195.    On information and belief, Defendants have access to and cite to disciplinary tickets issued to juvenile lifers when they were still juveniles being held at OCFS as the basis to deny parole, without considering the hallmark features of youth or undiagnosed or untreated intellectual disabilities, learning disabilities, attention deficit/hyperactivity disorder, autism spectrum disorder and mental disorders such as post-traumatic-stress disorder, emotional disturbances or childhood depression, all of which are exacerbated in incarcerated youth.

196.    All policies, customs and practices associated with denying juvenile lifers a meaningful and realistic opportunity for parole release reflect the official policy of the Board made or acquiesced to by each Defendant.  Defendants' actions involve reckless or callous indifference to the rights of Plaintiffs and similarly situated persons serving life sentences for crimes committed as minors.

## CLASS ACTION ALLEGATIONS

197.    Named Plaintiffs bring this action on behalf of a class consisting of all persons eligible for release to parole supervision who were convicted of crimes committed when they were children under the age of 18 and sentenced to indeterminate life sentences with the possibility of parole in the custody of DOCCS.

198.    This action meets the requirements of Fed. R. Civ. P. 23(a) as follows:

　　　i.    The proposed class is so numerous that joinder of all of its members is impracticable.  In New York, there are approximately 630 persons currently serving life sentences for offenses they committed between the ages of 13 and 17.  (DOCCS Statistics on Under Custody Population as of Jan. 16, 2016, at 1.)  Those people are now, or will be in the future,

eligible for release to parole supervision.  While the exact size of the
proposed class may not be known at this time, there can be no doubt that a
class action is appropriate to address the systemic issues presented in this
case.  In addition, joinder of all members of the proposed class is
impracticable because membership of the proposed class constantly
changes, as additional juveniles receive life sentences with the possibility
of parole, some later become parole-eligible and others are released under
parole supervision.

ii.   The questions of law and fact presented by the Named Plaintiffs are
common to other members of the class.  Such questions include, generally,
whether, under federal law, Defendants provide a meaningful opportunity
for release upon demonstrated rehabilitation and maturity.  More
specifically:

a.   Whether Plaintiffs have been subject to disproportionate
punishment and deprived of due process of law by being denied
a meaningful and realistic opportunity for release based on
demonstrated maturity and rehabilitation;

b.   Whether New York State Executive Law governing parole
release violates the Eighth Amendment rights of Class Members
to be free of disproportionate punishment;

c.   Whether Defendants' policies and practices in conducting parole
release interviews and making parole release decisions violate

the Eighth Amendment rights of Class Members to be free of disproportionate punishment;

d.    Whether Defendants' policies and practices in conducting parole release interviews and making parole release decisions infringe on the Due Process rights of Class Members;

e.    Whether Defendants' parole decisions are rendered based on demonstrated maturity and rehabilitation or are based solely on the nature of a Class Member's crime committed as a juvenile or a Class Member's juvenile history;

f.    Whether the volume of work before the Board precludes the opportunity for Class Members to be meaningfully heard;

g.    Whether Defendants adequately review the supporting materials in order to enable Class Members to demonstrate maturity and rehabilitation;

h.    Whether the limited length of parole interviews conducted by Defendants deprives Class Members of a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation;

i.    Whether denying Class Members the appointment of counsel and opportunity of counsel to be present at interviews deprives Class Members of a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation and due process of law;

j.  Whether denying Class Members the right to see and confront evidence against them deprives Class Members of a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation and due process of law;

k.  Whether Defendants' failure to give Class Members any explanation as to what additional steps they must take to be granted parole deprives Class Members of a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation;

l.  Whether Defendants' reliance on the nature of a juvenile crime, prior juvenile record, juvenile disciplinary history, and "official", "community" or victim opposition to deny release deprives Class Members of a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation;

m.  Whether Defendants' reliance on a "book copy", rather than an entire parole packet, deprives Class Members of a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation;

n.  Whether Defendants' reliance on COMPAS, which does not specifically consider the diminished culpability of juveniles and the hallmark features of youth, and indeed sometimes treats youth as an aggravating factor, to deny release deprives Class

Members of a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation; and

o.   Whether Defendants deny parole based on an aggravating factor relating to the crime of conviction that was not an element of the jury verdict, judicial finding or guilty plea convicting Class Members at their original criminal trials.

iii.   The violations alleged by Named Plaintiffs are typical of those suffered by the class.  The entire class will benefit from the relief sought.

iv.   Named Plaintiffs will fairly and adequately protect the interests of the class.  Named Plaintiffs have no interests adverse to or in conflict with those of the other Class Members.  Plaintiffs' counsel have experience in constitutional litigation.  Attorneys Issa Kohler-Hausmann and Avery Gilbert have extensive knowledge about New York's parole practice and procedure.  Cravath, Swaine & Moore LLP, co-counsel for Plaintiffs, is a private law firm experienced in major class-action litigation.

v.   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class.  Fed. R. Civ. P. 23(b)(l)(A).

vi.   Defendants have acted or refused to act on grounds generally applicable to the class, making appropriate declaratory or injunctive relief with respect to the class as a whole.  Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

(For Violation of the Prohibition Against Cruel and Unusual Punishment in the Eighth Amendment to the U.S. Constitution, actionable under 42 U.S.C. § 1983.)

199.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

200.    Defendants, in their official capacity as Commissioners of the Board of Parole, have acted and are acting under color of state law.

201.    The Eighth Amendment to the U.S. Constitution forbids a statutory scheme that mandates life imprisonment for juvenile offenders or permits life sentences without providing them with a realistic and meaningful opportunity for release upon demonstrated maturity and rehabilitation.

202.    Defendants have denied and continue to deny Plaintiffs, and members of the class, a meaningful opportunity for release by, among other things:  (1) failing to base their parole determinations on the demonstrated maturity and rehabilitation of juvenile lifers who are eligible for parole; (2) failing to give juvenile lifers any explanation as to what additional steps they must take to be recommended for parole; (3) denying release to parole supervision based upon crimes juvenile lifers committed decades ago that they cannot change; (4) failing to fully consider, read or attend to an inmate's parole submission; (5) denying juvenile lifers the right to have an attorney present at their interviews and the right to see and confront any evidence against them; and (6) using risk assessment tools that discriminate against youth.  With these actions, Defendants have denied Plaintiffs and other members of the class a meaningful and realistic opportunity for release upon their showing of maturity and rehabilitation, in violation of the Eighth Amendment.

203.     Plaintiffs Carlos Flores, Lawrence Bartley, Demetrius Bennett, Antonio Roman, Vintarra Martin and Terrance Anderson, and members of the class, have been injured and will likely suffer future injury by Defendants' policies and practices by being denied their rights to meaningful opportunity for release from imprisonment notwithstanding their youth at the time of their offense and despite their demonstration of maturity and rehabilitation, in violation of the prohibition against cruel and unusual punishments in the Eighth Amendment to the U.S. Constitution, giving rise to Plaintiffs' and Class Members' claims for relief under 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION
(For Violation of the Due Process Clause in the Fourteenth Amendment to the U.S. Constitution, actionable under 42 U.S.C. § 1983.)

204.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

205.     Defendants, in their official capacity as Commissioners of the Board of Parole, have acted and are acting under color of state law.

206.     Under established U.S. Supreme Court case law, the Eighth Amendment to the U.S. Constitution confers upon juvenile lifers a legitimate expectancy of parole upon a showing of maturation and rehabilitation.  This is a liberty interest protected by the Due Process Clause.

207.     In 2011, the New York Legislature amended the Executive Law to mandate that the Board of Parole "establish written procedures" that "shall incorporate risk and needs principles to measure" the rehabilitation of inmates.  N.Y. Exec. Law § 259-c(4).  The Executive Law, as amended in 2011, provides prisoners with a legitimate expectancy that if they demonstrate rehabilitation and a strong likelihood of future compliance with the law, they will be granted parole.  This is a liberty interest protected by the Due Process Clause.

208.     In 2017, the Board of Parole amended its regulations to require that its decision-making "shall be guided by risk and needs principles".  9 NYCRR § 8002.2(a).  The regulations acknowledge a presumption of release upon rehabilitation (notwithstanding nonbinding disclaimers in the commentary) by requiring Commissioners to provide nonconclusory individualized reasons based in the record for any departure from the conclusions of a validated risk assessment instrument, but only when that departure is denying release.  Id.  The regulations also require Commissioners to address all statutory factors in each hearing.  Id. § 8002.2(c).  The Board of Parole regulations, as amended in 2017, provide prisoners with a legitimate expectation that if they demonstrate rehabilitation and a strong likelihood of future compliance with the law, they will be granted parole.  This is a liberty interest protected by the Due Process Clause.

209.     Defendants' conduct and actions—including, *inter alia,* regularly failing to read, review and consider extensive evidence submitted to the Board demonstrating low risk to community, rehabilitation and maturity—deny Plaintiffs, and members of the class, due process of law to secure their liberty interest in parole release, in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

210.     Plaintiffs Carlos Flores, Lawrence Bartley, Demetrius Bennett, Antonio Roman, Vintarra Martin and Terrance Anderson, and members of the class, have been injured and will likely suffer future injury, as a result of Defendants' official policies and regular practices, which fail to adequately distinguish between persons serving life sentences for crimes committed as children and those committed as adults, and Defendants' failure to provide sufficient procedural protections necessary to secure the substantive right to release upon a showing of maturity and reform in violation of the Due Process Clause of the Fourteenth Amendment, giving rise to Plaintiffs' and Class Members' claims for relief under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION

(For Violation of the Right to a Jury Trial in the Sixth Amendment and the Right to Due Process in the Fourteenth Amendment to the U.S. Constitution, actionable under 42 U.S.C. § 1983.)[1]

211.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

212.    Defendants, in their official capacity as Commissioners of the Board of Parole, have acted and are acting under color of state law.

213.    Each Plaintiff was, and Class Members were, convicted of, or pleaded guilty to, a crime committed while he or she was a juvenile.

214.    Any fact that enhances the penalty to which a criminal defendant may lawfully be sentenced must be found beyond a reasonable doubt or admitted by the criminal defendant.  See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Ring v. Arizona, 536 U.S. 584, 604-05 (2002); Blakely v. Washington, 542 U.S. 296, 303-05 (2004); Alleyne v. United States, 570 U.S. 99, 114-15 (2013).

215.    A state may impose a life sentence upon a juvenile offender only upon a finding that the defendant is among the "very rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility".  Montgomery, 136 S. Ct. at 734.

---

[1] In its September 20, 2019 Opinion and Order, the Court dismissed the portion of Count III that asserted a Sixth Amendment claim against Defendants for their practice of making novel findings of fact, in violation of the jury trial right of the Sixth Amendment.  (ECF 137, at 22-25.)  Plaintiffs maintain that ruling to be error and maintain the existing pleading here to avoid any potential implication of waiver.  Because Defendants' motion to dismiss and the September 20, 2019 Opinion and Order did not address the separate Due Process Clause right requiring a person to be found guilty beyond a reasonable doubt of facts that would, if true, subject a person to criminal punishment, Plaintiffs continue to assert their Fourteenth Amendment Due Process claim against Defendants for the practice of making administrative novel findings of fact, in violation of the Due Process right requiring a person to be found guilty beyond a reasonable doubt of facts that would, if true, subject a person to criminal punishment.  See Sullivan v. Louisiana, 508 U.S. 275 (1993); In re Winship, 397 U.S. 358, 364 (1970).

216.    Each Plaintiff was, and Class Members were, either convicted without a finding that, or pleaded guilty without pleading to a fact that, Plaintiff's and Class Members' crimes reflected that they were among the rarest juveniles whose crimes reflect permanent incorrigibility.

217.    Nor can Defendants deny parole release to juvenile lifers who have demonstrated unmistakable rehabilitation and have completed the statutory minimum term of imprisonment selected by the sentencing judge—a judge with full knowledge of the facts of the offense imposing a sentence within the range set by the legislature—on the basis of a fact about the crime of commission that was not found beyond a reasonable doubt or admitted by the criminal defendant.

218.    Defendants' conduct and actions—including, *inter alia,* taking into account facts that impose greater punishment on the parole applicant than was authorized by a jury verdict, judicial finding or guilty plea—deny Plaintiffs, and members of the class, their right to have only facts found beyond a reasonable doubt or admitted by the criminal defendants expose them to punishment, in violation of the jury trial right of the Sixth Amendment and their right to due process of the Fourteenth Amendment to the U.S. Constitution.

219.    Plaintiffs Carlos Flores, Lawrence Bartley, Demetrius Bennett, Antonio Roman, Vintarra Martin and Terrance Anderson, and members of the class, have been injured and will likely suffer future injury, as a result of Defendants' denial of parole release based on an aggravating factor relating to the crime of conviction that was not an element proved beyond a reasonable doubt or admitted by the criminal defendants at their original criminal trial, in violation of their right to a jury trial under the Sixth Amendment and their right to due process

under the Fourteenth Amendment to the U.S. Constitution, giving rise to Plaintiffs' and Class

Members' claims for relief under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(a)     Certify a plaintiff class pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (b)(2);

(b)     Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants are operating a

parole scheme that denies Plaintiffs, and members of the class, a meaningful and

realistic opportunity for release, in violation of the prohibition against cruel and

unusual punishment in the Eighth Amendment to the U.S. Constitution;

(c)     Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants are operating a

parole scheme that denies Plaintiffs, and members of the class, a meaningful and

realistic opportunity for release, in violation of the Due Process Clause in the

Fourteenth Amendment to the U.S. Constitution;

(d)     Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants are operating a

parole scheme that denies Plaintiffs, and members of the class, a meaningful and

realistic opportunity for release, in violation of the right to a jury trial in the Sixth

Amendment and the right to due process in the Fourteenth Amendment to the

U.S. Constitution;

(e)     Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants must give

Plaintiffs, and members of the class, a meaningful and realistic opportunity for

release, because otherwise Plaintiffs and members of the class would be serving

*de facto* life without parole sentences pursuant to which they have been afforded

no meaningful or realistic opportunity for release, in violation of the prohibition

against cruel and unusual punishment in the Eighth Amendment to the U.S.

Constitution;

(f)     Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants' reliance upon risk

assessment tools that discriminate against those who were juveniles at the time of

offense has denied Plaintiffs, and members of the class, a meaningful and realistic

opportunity for release upon their showing of rehabilitation and the due process of

law to secure their liberty interest in parole release, in violation of the Eighth

Amendment to the U.S. Constitution and in violation of the Due Process Clause

of the Fourteenth Amendment to the U.S. Constitution;

(g)     Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants must alter the

Board of Parole's operating procedures to enable Defendants to meaningfully

analyze the question of whether maturity and rehabilitation have been

demonstrated, including by requiring that:

i.      The Board provide Class Members with an opportunity to see and

confront any evidence used against them;

ii.     The Board provide adequate funds for Class Members to obtain counsel in

preparation for all parole interviews, including the first parole interview

for which juvenile lifers are eligible;

iii.    The Board permit counsel to be present and make statements at parole

interviews;

iv.     The Board provide funds for inmates to present testimony from relevant

experts, such as psychologists, psychiatrists, criminologists and/or social

workers;

     v.     The Board provide explanation as to what additional steps Class Members must take to be recommended for parole; and

     vi.     Defendants be given a caseload that permits them sufficient time to read and evaluate the materials presented by Class Members;

(h)     Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants' consideration of facts that impose greater punishment on the parole applicant than was authorized by the factfinder at trial or guilty plea constitutes impermissible fact-finding leading to aggravated sentences, in violation of the right to a jury trial in the Sixth Amendment and the right to due process in the Fourteenth Amendment to the U.S. Constitution;

(i)     Enter appropriate injunctive relief to effectuate the declaratory relief sought above, including enjoining Defendants immediately to discontinue these practices and to take remedial steps to address their past illegal conduct, by granting Plaintiffs, and members of the class, a meaningful and realistic opportunity to demonstrate their readiness for release;[2]

(j)     Declare, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants must provide new hearings to all class members using a lawful standard and lawful procedures;

(k)     Award Plaintiffs their attorneys' fees and costs incurred in pursuing this action, as provided in 42 U.S.C. § 1988; and

(l)     Grant such other and further relief as the Court may deem just and proper.

---

[2] In its September 20, 2019 Opinion and Order, the Court dismissed the claims to the extent they seek injunctive relief, based on the defense of absolute judicial immunity.  (ECF 137, at 13-14.)  Plaintiffs maintain that ruling to be error and maintain the existing prayer for relief here to avoid any potential implication of waiver.  The Court held that judicial immunity does not preclude Plaintiffs' claims to the extent they seek declaratory relief.  (ECF 137, at 14-15.)

Dated:  May 30, 2022                                     Respectfully Submitted,
New York, NY

                                                        CRAVATH, SWAINE & MOORE LLP

                                                        By:     */s/ Antony L. Ryan*
Issa Kohler-Hausmann                                    Antony L. Ryan
Attorney at Law                                         Damaris Hernandez
127 Wall Street New                                     Worldwide Plaza
Haven, CT 06511                                         825 Eighth Avenue
(347) 856-6376                                          New York, NY 10019
Email: issa.kohler-hausmann@yale.edu*                   (212) 474-1000
*Does not reflect the views of Yale Law School, if any  Email: aryan@cravath.com
                                                        Email: dhernandez@cravath.com

Avery Gilbert                                           *Counsel for Plaintiffs*
Attorney at Law
15 Shatzell Avenue
Suite 232
Rhinecliff, New York 12574
(845) 380-6265
Email: avery@agilbertlaw.com

*Co-counsel for Plaintiffs*