# EXHIBIT 1

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   Case No. 18-CV-02458(VB)(JCM)
     - - - - - - - - - - - - - - - - - -x
 4   CARLOS FLORES, LAWRENCE BARTLEY,
     DEMETRIUS BENNETT, L'MANI DELIMA,
 5   EDGARDO LEBRON, ANTONIO ROMAN,
     DONTAE QUINONES and SHAROD LOGAN,
 6   on behalf of themselves and all
     others similarly situated,
 7                          Plaintiffs,
            -against-
 8                                   Oct. 29, 2021
     TINA M. STANFORD, as Chairwoman of    TANA AGOSTINI
 9   the New York State Board of Parole;
     WALTER W. SMITH, as Commissioner of
10   the New York State Board of Parole;
     JOSEPH P. CRANGLE, as Commissioner of
11   the New York State Board of Parole;
     ELLEN E. ALEXANDER, as Commissioner of
12   the New York State Board of Parole;
     MARC COPPOLA, as Commissioner of
13   the New York State Board of Parole;
     TANA AGOSTINI, as Commissioner of
14   the New York State Board of Parole;
     CHARLES DAVIS, as Commissioner of
15   the New York State Board of Parole;
     ERIK BERLINER, as Commissioner of
16   the New York State Board of Parole;
     OTIS CRUSE, as Commissioner of
17   the New York State Board of Parole;
     TYECE DRAKE, as Commissioner of
18   the New York State Board of Parole;
     CARYNE DEMOSTHENES, as Commissioner of
19   the New York State Board of Parole;
     MICHAEL CORLEY, as Commissioner of
20   the New York State Board of Parole;
     CHANWOO LEE, as Commissioner of
21   the New York State Board of Parole;
     SHEILA SAMUELS, as Commissioner of
22   the New York State Board of Parole;
     ELSIE SEGARRA, as Commissioner of
23   the New York State Board of Parole;
     and CARLTON MITCHELL, as Commissioner
24   of the New York State Board of Parole;
                          Defendants.
25   - - - - - - - - - - - - - - - - - -x
```

Page 2

1

2                    October 29, 2021

3                    9:46 a.m.

4

5              Video-recorded deposition of

6    TANA AGOSTINI, taken by attorneys for Plaintiffs

7    via Zoom, before Helen Mitchell, a Registered

8    Professional Reporter and Notary Public.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                        Page 25
  1                       Agostini
  2           think Kathryn is showing it on the
  3           screen for ease.  If she's scrolling
  4           too fast, we can slow down for you.
  5                   THE WITNESS:  No, it's fine.  I
  6           just think I did lose that exhibit
  7           program; I don't know where it went.
  8                   MS. HERNANDEZ:  Can we just go
  9           off the record?
 10                   THE VIDEOGRAPHER:  Going off
 11           the record 10:07.
 12               (Pause)
 13                   THE VIDEOGRAPHER:  Back on
 14           record 10:09 a.m., continuing on media
 15           number one.
 16   BY MS. HERNANDEZ:
 17           Q       So have you had a chance to
 18   review Exhibits 1 and 2, Commissioner Agostini?
 19           A       Yes.
 20           Q       And do you recognize these
 21   documents?
 22           A       Yes.
 23           Q       Did you receive these documents
 24   when you were nominated to the Board of Parole?
 25           A       I think I got the Board of
```

```
                                             Page 26
 1                      Agostini
 2    Parole Q and A when I was nominated.
 3          Q        And did someone walk you
 4    through these or did you just read them on your
 5    own in preparation for the Senate hearing?
 6          A        I honestly don't remember.  It
 7    was four and a half years ago.
 8          Q        Are these the type of documents
 9    that once you became or were appointed to the
10    Board of Parole you would have referenced when
11    making parole decisions?
12          A        Not so much.
13          Q        I think you mentioned earlier
14    that once you were appointed you received
15    additional training.  Is that correct?
16          A        Yes.
17          Q        Okay.
18                   What type of training did you
19    receive after you were appointed?
20          A        I received a variety of
21    trainings, from reviewing the language in 259-i,
22    medical parole statute.  Those are the ones that
23    come off the top of my head.
24                   We received training on...
25          Q        With respect to the training
```

```
 1                    Agostini
 2   you just mentioned regarding the Executive Law
 3   259-i, were those trainings in person?
 4            A       Yes.
 5            Q       And who conducted those
 6   trainings?
 7            A       Those trainings were generally
 8   led by counsel's office, but we also had some
 9   doctors come in for training with medical
10   parole, who were not from the agency.
11            Q       And what were the doctors --
12   what topics were the doctors training you on?
13            A       We spoke about the language
14   that is used in the Comprehensive Medical
15   Summary for medical conditions that incarcerated
16   people might be diagnosed with and have on their
17   conference of medical summaries that are in our
18   files, and to answer questions about what those
19   mean, make sure that we understood some of
20   the -- the medical terminology; to ambulate, if
21   somebody can ambulate or not, for example.  So
22   we went through the different language that's
23   used in the Comprehensive Medical Summary.
24            Q       Did any doctors speak on the
25   neurological development of the human brain?
```

```
                                    Page 28
 1                     Agostini
 2          A          Not that I recall, no.
 3          Q          Did any doctor speak about
 4   childhood psychology?
 5          A          Not that I recall, no.  That
 6   particular training was about the Comprehensive
 7   Medical Summary.
 8          Q          In your --
 9          A          We've had training with OMH
10   also.
11          Q          And the training that you had
12   with OMH, did those cover the neurobiological
13   development of the human brain?
14          A          I don't recall discussion about
15   the neurological development of the human brain.
16          Q          What about childhood
17   psychology?
18          A          I don't recall childhood
19   psychology.
20          Q          In addition to the training
21   you've mentioned regarding the New York
22   Executive Law, did you also receive what I
23   believe is called the commissioner binder?
24          A          We received a commissioner
25   binder maybe a couple years later.  We didn't
```

```
                                          Page 33

 1                        Agostini
 2            Q        And did anyone walk you through
 3    the materials that are listed in the index?
 4            A        I don't believe I was walked
 5    through the materials that are in the index at
 6    the time I was given the book.
 7            Q        Since the time you received the
 8    book, have any of these sections been reviewed
 9    with you or explained to you?
10            A        Well, I don't believe since the
11    time of the book, but we had Sex Offender
12    Registration Act training prior to being given
13    the book.  So many of the materials that we
14    received in the trainings are what is in this
15    book.
16            Q        Okay.  Are there -- if we look
17    at the index, are there any materials listed on
18    the index that you regularly refer to when
19    making parole decisions?
20                     You said that, you know, you
21    take your binder with you or you keep it in the
22    office as a reference material.  Are there any
23    materials listed on the index that you regularly
24    refer to when making parole decisions?
25            A        Well, I use the regulation and
```

```
                                        Page 34
 1                        Agostini
 2     I use the statute.
 3             Q        So those would be listed as 14
 4     and 15 on the index?
 5             A        They are listed here.  I just
 6     look directly at the statute and at the
 7     regulations.  I don't use -- go to the book to
 8     get them, I have them already.  But, yes, they
 9     are 14 and 15 here.
10             Q        Okay.
11                     If we look at the index, by 32
12     there's something that says, "COMPAS and Case
13     Plan."  Do you refer to that when you're making
14     parole decisions?
15             A        Not while I'm making the
16     decisions.  We've already received the training
17     on it, so I don't refer to it for each decision,
18     go back to the book.
19             Q        But if you have any questions
20     do you refer to it?
21             A        If I have questions, I can
22     refer to it, or I can ask counsel's office for
23     guidance, I can go to the chairperson for
24     guidance, or I can ask for help if I feel like I
25     need help or have a question about the COMPAS or
```

Page 35

```
 1                    Agostini
 2    the case plan.
 3            Q       Do you often ask counsel for
 4    guidance?
 5            A       I have at times asked for
 6    guidance.  I don't know about I would qualify it
 7    as "often," but I've certainly asked.
 8            Q       There are other sections here,
 9    33, which says "Minor Offenders," and 35, which
10    says "Board Interviews and Decisions."  Are
11    those materials that you review in conjunction
12    with your work as the commissioner making parole
13    decisions?
14            A       Yes, I review these in
15    conjunction with making decisions.
16            Q       In fulfilling your duties as a
17    Board of Parole commissioner, do you try to
18    follow the advice that's set forth in these
19    materials?
20            A       Yes.
21            Q       And do you recall any instances
22    where you may have disagreed with any of the
23    advice that's set forth in these materials?
24            A       I don't recall an instance
25    currently.
```

                         Agostini
1
2         Q         How often -- I know that you
3    said that you've received training on how to
4    interpret the applicable law, specifically
5    259-i, when governing release decisions, but how
6    often do you receive training on how to -- of
7    the Executive Law and the regulations?  Is that
8    something you just get once and done, or is it
9    periodically refreshed?
10                    MR. HARBEN:  Object to form.
11                    You may answer.
12                    THE WITNESS:  I may answer?
13                    MR. HARBEN:  If you understand
14        the question.
15        A         I believe that we have had the
16   opportunity for additional training; it isn't
17   only one time and that's it.
18        Q         Is it your impression that at
19   these trainings counsel wants to make sure that
20   a consistent interpretation of the Executive Law
21   and the regulations is done by all
22   commissioners, or understood by all
23   commissioners?
24                    MR. HARBEN:  Object to the
25        extent this calls for any

Page 40

1                          Agostini
2          A        I like to -- I definitely like
3     to hear what the judges have to say; I certainly
4     find their opinions interesting.  Some judges
5     more so than others.  You get to know some of
6     their names as the years go on.  So I do like to
7     read what they have to say.  If it was one of my
8     cases and the judge found in favor of the
9     petitioner, I certainly want to learn what
10    happened.  Maybe another case that I wasn't on
11    but that I'm interested in.  So I do read most
12    of them.
13         Q        And do you discuss them with
14    board counsel after you read them?
15         A        Only if I have a question.
16         Q        Okay.
17                  And do you use these cases as
18    guidance for your work as commissioner?
19         A        I have, yes.
20         Q        Since you said you like to read
21    cases, I'm just -- are you familiar with the
22    Hawkins case?
23         A        Yes.
24         Q        And how did you come to learn
25    about the Hawkins case?

1                          Agostini

2          A          I think from counsel at the

3    Assembly.  I think that decision occurred while

4    I was still employed at the Assembly, and I

5    learned of it in connection with my employment

6    there, because we received decisions all the

7    time.

8          Q          And what is your understanding

9    of what Hawkins requires of commissioners when

10   they're rendering decisions of potential

11   release?

12         A          Well, essentially that we are

13   considering that they were youthful, and what

14   that means.  So people who have committed

15   offenses where they received a life sentence --

16   so Hawkins is for lifers under the age of 18 at

17   the time of the offense -- and we consider the

18   hallmark characteristics, such as their maturity

19   at that time, their growth and maturity since

20   that time of the offense, and other

21   characteristics that they likely possessed at

22   that time, not in possession of consequential

23   thinking of what might happen as a result of

24   their actions, that they are maybe more easily

25   influenced by their peers or family pressures,

```
                                      Page 42
 1                   Agostini
 2   for example, that they may be impulsive, more
 3   impulsive as a youth than adults are.
 4                        And during the interviews I try
 5   to get to know who that person was when they
 6   were younger, and talk about their life growing
 7   up, and where they were at the time of the
 8   offense, where they were at school, where they
 9   were emotionally, how things were with their
10   family, and try to get an understanding and a
11   picture of what was going on in their lives at
12   that point.
13          Q      So you mentioned that your
14   initial understanding of what Hawkins
15   required -- the first time you heard about
16   Hawkins was while you were still at the
17   Assembly.  Once you became a commissioner, did
18   you get additional training or guidance on how
19   you should consider the issues you just raised
20   about Hawkins?
21          A      Yes.  Yes, we did receive such
22   training.
23          Q      And was that provided by
24   Miss Kiley?
25          A      Yes, counsel's office; Kiley
```

```
                                              Page 43

 1                      Agostini
 2   and her staff provided us the trainings.
 3          Q        And did that training in any
 4   way change what you had already learned or
 5   understood when you first heard about Hawkins at
 6   the Assembly's office?
 7          A        Yes.
 8                   MR. HARBEN:  Object to the
 9           extent it calls for attorney-client
10           communications, but --
11                   MS. HERNANDEZ:  It was a yes or
12           no question, Jeb, but okay.
13          A        Yes.
14          Q        And do you follow the advice
15   that you received from board counsel's office to
16   the best of your ability when you're rendering
17   parole decisions?
18          A        We do.
19          Q        Do you recall if you've ever
20   disagreed with any of the advice related to the
21   Hawkins decision that's been provided to you by
22   the board's counsel's office?
23          A        I don't recall disagreeing, no.
24          Q        Do you recall receiving a memo
25   from board counsel in May 2018 regarding the
```

```
 1                    Agostini

 2   Hawkins decision?

 3          A        I recall that we have

 4   memorandum regarding the Hawkins decision.  I

 5   don't recall what we got it in May of 2018, if

 6   it's the same memorandum.

 7          Q        Do you know if anything

 8   happened in 2018 that would have required an

 9   update to the memorandum?  Because the Hawkins

10   decision came out in 2016.  Do you know if there

11   was anything that would have caused -- for there

12   to be an updated memo to be provided to the

13   commissioners in 2018?

14          A        The only thing I can think of

15   was the -- the Montgomery case, that there might

16   have been a U.S. Supreme Court decision, but I

17   don't remember if that was that year or not.

18          Q        Earlier we were talking about

19   the commissioner binder and how you travel with

20   it and keep it in your office as a reference

21   point.  Do you keep the Hawkins memo with you so

22   that you can refer back to it if necessary while

23   making your parole decisions?

24          A        I actually do have it with me,

25   yes.
```

```
                                        Page 60
 1                     Agostini
 2    forth in the Executive Law, but I'm sure you
 3    know them since you worked on it as a -- as an
 4    analyst in the Assembly, and then now as a
 5    parole commissioner.
 6                     How do these factors of
 7    diminished culpability of youth and growth and
 8    maturity interact with the factors set forth in
 9    the Executive Law?
10                     MR. HARBEN:  Object to the form
11              of the question, and specifically what
12              factors in the Executive Law you're
13              talking about.
14                     MS. HERNANDEZ:  The eight
15              factors set forth in 259-i(c)(A)(ii).
16                     MR. HARBEN:  Okay.
17              A       Well, the institutional record,
18    the release plans, then there's a number of
19    elements in the factors that would illuminate
20    the maturity and growth since the time of the
21    offense.  I don't think those are the only
22    ways -- they're definitely not the only ways to
23    measure somebody's, you know, maturity and
24    growth at the time of the offense, but we are
25    required to consider the factors.
```

Page 61

```
 1                       Agostini
 2               And you asked where do they
 3   intersect.  So I don't think, for example, that
 4   having a deportation order necessarily has
 5   any -- as an intersection would be
 6   considerations for youth in the factors, but I
 7   would say the factors that relate to the release
 8   plans, the community resources and their
 9   institutional record, performance, the
10   rehabilitative programs, their accomplishments.
11   So those two come to mind.
12         Q        So if you determine that at the
13   time of the offense a juvenile lifer had the
14   hallmarks of youth, diminished culpability, and
15   also that the juvenile lifer has demonstrated
16   growth and maturity since the offense, are you
17   obligated to release them for parole?
18                 MR. HARBEN:  Object to the form
19         question.
20                 You may answer.
21         A        It does not mandate release,
22   no.
23                 THE WITNESS:  I am going to
24         need a restroom break soon.
25                 MS. HERNANDEZ:  We can take one
```

```
                                        Page 62
 1                       Agostini
 2           now.   That's fine.
 3                       THE WITNESS:   Thank you.
 4                       MS. HERNANDEZ:   Do you want to
 5           say ten minutes?
 6                       THE WITNESS:   That's fine.
 7           Thank you.
 8                       MS. HERNANDEZ:   No worries.
 9                       THE VIDEOGRAPHER:   This
10           concludes media number one, going off
11           record 10:56 a.m.
12                       (Recess taken)
13                       THE VIDEOGRAPHER:   We're back
14           on record 11:11 a.m.   This marks the
15           beginning of media number two.   Thank
16           you.
17    BY MS. HERNANDEZ:
18           Q       Welcome back, Commissioner
19    Agostini.
20                       I think earlier you mentioned
21    that you're familiar with the New York Executive
22    Law section 259-i; is that correct?
23           A       Yes.
24           Q       And is that the legal standard
25    that's applied when making parole decisions?
```

```
 1                        Agostini
 2   determination of whether an individual is likely
 3   to remain at liberty without violating the law?
 4   What information in the parole materials do you
 5   consider particularly relevant to this analysis?
 6          A          Their performance under
 7   custody.  Discipline would be one example.
 8   Performance in the programs.  What they say
 9   during the interview, and what their behavior
10   was prior to the offense itself, their history.
11          Q          You said that what they say
12   during the interview is relevant to your
13   analysis.  What questions do you ask at the
14   interview to get at this issue?
15          A          I think that their responses to
16   a variety of questions reveal -- are revealing
17   as to whether or not there is a likelihood that
18   they might reoffend in the same way or a
19   different way.
20                      So, for example, if they
21   minimize the crime, if they are making excuses,
22   if they are trying to avoid responsibility and
23   hold other people responsible and it wasn't
24   them, I might think that they're lacking in some
25   level of insight or understanding of the bigger
```

```
                                        Page 72
 1                      Agostini
 2   picture, how their actions impact others, at the
 3   role that they did play, and so that lack of
 4   insight or understanding could be concerning.
 5           Q        Did you receive any guidance on
 6   how to determine risk of recidivism, or is it up
 7   to your judgment?
 8           A        I think it's mostly up to my
 9   judgment, based on the materials that I'm
10   provided and required to consider.
11           Q        Is your opinion --
12           A        It's not just a wild opinion
13   pulled out of thin air.
14           Q        Is one of the pieces of
15   information you consider when applying the first
16   legal standard about the reasonable probability
17   of remaining at liberty without violating the
18   law the COMPAS report?
19           A        It's one tool, yes.
20           Q        Is disciplinary history while
21   incarcerated a factor that goes into your
22   analysis of the standard?
23           A        That's another piece of it,
24   yes.
25           Q        And that's because you think
```

```
 1                    Agostini
 2    that generally, if somebody who had difficulty
 3    following the rules inside prison would have
 4    difficulty complying with the law once they
 5    leave prison; is that right?
 6            A       It's certainly possible.
 7            Q       When looking at the
 8    disciplinary history, do you weigh differently
 9    disciplinary infractions committed shortly after
10    incarcerations versus closer to the date of the
11    hearing?
12            A       Yes.
13            Q       And is that true for juvenile
14    lifers as well?
15            A       Yes.
16            Q       Do you consider the
17    disciplinary infractions that happened shortly
18    after incarceration as a factor weighing against
19    release for juvenile offenders?
20            A       If it were a serious
21    infraction, it could.  Depends what it was and
22    how long ago it was.  But generally I consider
23    more recent discipline rather than the very
24    first discipline when they first got here and
25    were still quite young.  But it depends what it
```

Page 95

Agostini

1
2       some facts and less time on others.  Each
3       factor, most of them have several elements in
4       them.
5              Q       In the cases of juvenile
6       lifers, are there some factors that are more
7       important or more helpful in making your
8       decisions with respect to parole to juvenile
9       lifers?
10             A       I think their release plans are
11      very important.  I think their accomplishments,
12      their growth, what they've done, what they've
13      achieved, all speaks to their growth and
14      maturity, how they've utilized their time.  So
15      those factors are particularly important.
16                     They are all important, I will
17      consider every one of them.  Most juvenile
18      lifers will not have been in a temporary release
19      program.
20             Q       As a parole board commissioner,
21      do you have a discretion to consider other
22      factors than the ones listed here?
23             A       Yes.
24             Q       And what are some of the
25      factors beyond this list that you can consider

Page 96

```
 1                    Agostini
 2   when making your parole decisions?
 3        A       Remorse, for example.  Insight.
 4        Q       And is it ever appropriate to
 5   deny release based on just one of these factors?
 6        A       Yes.
 7        Q       And what about the inverse, is
 8   it ever appropriate to grant release based on
 9   one of these factors?
10        A       Well, release has to be granted
11   if you meet the standards, so meeting any one
12   factor alone does not necessarily mean that
13   you've met all three factors if, for example,
14   you have a life sentence.
15        Q       Okay, let's look at factor
16   number five, "Any current or prior statement
17   made to the board by the crime victim or the
18   victim's representative."
19                Do you see that?
20        A       (Nodding)
21        Q       Why is this factor relevant to
22   determining whether or not individuals should be
23   released on parole?
24        A       Well, if it's in the law, that
25   would be one reason why it's relevant; we must
```

Page 97

1                        Agostini

2      consider that.

3            Q        What standard does it go to?

4            A        What standard does factor

5      number five go to?

6            Q        Um-hum.

7            A        I think it can speak to the

8      second and third standard.

9            Q        Is it ever appropriate to deny

10     parole based solely on the fact that the victim

11     opposes release?

12           A        It could be.

13           Q        In what circumstances?

14           A        In what circumstances would it

15     be appropriate to deny somebody's release based

16     on --

17           Q        Solely on the fact that there's

18     victim opposition.

19           A        We might find the statements

20     provided by the victim to be compelling and

21     persuasive that the person's release at this

22     time might not be compatible with the welfare of

23     society or might deprecate the offense so as to

24     undermine respect for the law.

25           Q        But you would agree with me

```
                                         Page 98
 1                     Agostini
 2   that whether or not the victim made a statement
 3   to the board does not bear on whether the parole
 4   applicant has been rehabilitated, meaning has no
 5   disciplinary record or low COMPAS score or has
 6   achieved educational and vocational
 7   accomplishments?
 8                     MR. HARBEN:  Object to form.
 9        A        I would agree that the
10   statements of victims don't necessarily have
11   bearing on the rehabilitation of the person.  I
12   think that's what you said.  And if it is, I
13   would agree with you.
14        Q        It's possible that the victim
15   or the victim representative may not have spoken
16   or been -- even been in the same room as the
17   inmate, the parole inmate, since the sentencing;
18   correct?
19        A        Correct.
20        Q        Is that something you take into
21   account when reviewing victim opposition?
22        A        Yes.  Not all victim statements
23   are opposition, just so you know, but we --
24   definitely, I think more often than not, they
25   have not seen or spoken to the incarcerated
```

```
 1                        Agostini
 2   person since sentencing, or since the offense.
 3              Q       So let's move on to factor
 4   number seven, "The seriousness of the offense
 5   with due consideration to the type of sentence,
 6   the length of the sentence, and recommendations
 7   of the sentencing court, the district attorney,
 8   the attorney for the inmate, the pre-sentence
 9   probation report, as well as consideration of
10   any mitigating and aggravating factors and
11   activities following arrest prior to
12   confinement."  Let's break those out a little
13   bit.
14              A       Okay.
15              Q       Is this the same assessment of
16   seriousness as under the deprecate standard, or
17   something different?
18                      (Court reporter clarification)
19              A       I don't know, I would have to
20   think about that.  Is the seriousness of the
21   crime -- can you say the question again?
22              Q       So factor seven refers to the
23   seriousness of the offense, and lists a bunch of
24   things you have to consider with respect to
25   seriousness of the offense.  And I'm wondering
```

```
                                             Page 100
 1                          Agostini
 2    whether you conduct the same assessment of
 3    seriousness here as you do under the deprecate
 4    standard, where you're taking into account the
 5    seriousness of the crime, that it would under --
 6    deprecate and undermine the law.
 7            A        Well, I think that factor
 8    seven, all the factors in general, inform the
 9    standards, so they do all intersect in that way.
10            Q        So you do conduct the same
11    assessment of seriousness with respect to this
12    factor as you do with respect to the deprecate
13    standard?
14            A        I'm trying to understand what
15    you're thinking.  I'm trying to understand that.
16    I mean, if it's -- if it's the one offense, it
17    is the same offense that we are considering,
18    so -- yes, I guess the answer is yes.
19            Q        I guess -- does "seriousness"
20    take on different meanings whether you're
21    looking at the standard or you're looking at
22    this factor?
23            A        I suppose it could take on
24    different meanings.
25            Q        In what sense?
```

```
                                        Page 102

 1                          Agostini

 2          A          Yes.  It would also go to the

 3    first one and the second one.

 4          Q          Okay.

 5          A          There's also, I believe, in

 6    factor seven, the person's history.

 7                     So, for example, we have people

 8    who may be in for a burglary or a robbery, and

 9    if I'm considering the specific characteristics

10    of this offense that they're in for, but we may

11    also consider the fact that it is their sixth

12    burglary or robbery.  So there is -- the pattern

13    and the history, which I think is also part of

14    factor number seven, we consider that as well

15    when we are trying to determine whether or not

16    this person's release would be compatible with

17    the welfare of society or if it would tend to

18    deprecate the offense so as to undermine respect

19    for the law.  So that's kind sort of a

20    general -- I think that's what I mean in

21    general; that if you have somebody who has a

22    pattern of behavior, such as multiple robberies,

23    multiple burglaries, multiple rapes, something

24    like that, that is something that we consider

25    with the standard, and that may be different
```

Page 103

1                         Agostini
2      than just the specific, this one case that we're
3      talking about now.
4               Q       Okay.
5                       An inmate cannot be
6      automatically denied for parole based on the
7      seriousness of their crime; correct?
8               A       Well, there's nothing automatic
9      about the process or the decision making, but
10     they can be denied based on the seriousness of
11     the offense.
12              Q       Well, I guess I wasn't
13     specific.
14                      Can an inmate be denied parole
15     only on the basis of their crime, the nature of
16     their crime alone?
17              A       If the nature of that -- if the
18     nature of that crime and consideration
19     surrounding it result in him or her not meeting
20     one of those standards, then, yes.
21              Q       Is the same true for juvenile
22     lifers?
23              A       I think it's possible that it
24     can be.  But we really make -- we make decisions
25     based on each case.  And this is like a real

1                    Agostini
2    generalized question, is it ever possible.  So
3    I'm imagining that, yes, it is possible, but we
4    make the decision based on the individual case,
5    the individual person, individual circumstances.
6    I mean, that's what we're trying to understand,
7    exactly, you know, what happened, who were you
8    then, who are you now, who might you be in your
9    future, what are you planning.  So the decision
10   is based on the individual case.  But is it
11   possible that a juvenile lifer could be denied
12   based on the seriousness of the offense, that
13   that offense would -- would come -- you know,
14   result in a conclusion that they don't meet one
15   of the standards?  I mean, I think that's
16   possible.
17           Q       Generally, how heavily do you
18   weigh the nature of the crime when you're
19   assessing the standards?
20                   MR. HARBEN:  Sorry, that broke
21           up, I couldn't hear it.
22                   MS. HERNANDEZ:  I said, "How
23           heavily do you weigh the nature of the
24           crime when you're assessing the
25           standards."

Page 105

1                           Agostini

2           A         I think it's different in

3    different cases.  The more serious the crime,

4    the more heavily it may be weighed; the more

5    years that have past, the less heavily it might

6    be weighed.  So I think there are variables.

7           Q         Let's look at recommendations

8    of the sentencing court.  Why would that be

9    relevant to determining whether or not an

10   individual should be released on parole?

11          A         It is relevant because the

12   parties at the sentencing hearing have a lot of

13   information that was current at that time, and

14   there can be things that are said at sentencing

15   that are illuminating, that are helpful, that

16   are not helpful.

17                    It may be the intent of the

18   judge that the person get out at their earliest

19   opportunity, it may be the intent of the judge

20   that the person never get out.

21                    The incarcerated person, him or

22   herself, might have spoken at sentencing, might

23   have spoken very sincerely and in depth, made

24   remarks to the court, to the families.  They may

25   not have.  They may have cursed out the judge

```
                                          Page 106
 1                      Agostini
 2   and spoken profanely at sentencing.
 3                     There can be mitigating factors
 4   that their attorney brings up and points out.
 5   There might have been an error in the
 6   pre-sentence report that their attorney brings
 7   up, points out, asks for it to be struck.
 8                     So there can be a lot of
 9   information about activity after arrest, before
10   sentencing that will turn into incarceration,
11   that were provided to the person that they
12   didn't succeed in and that results in the
13   sentence.  So there can -- there can be a lot
14   gleaned from the sentencing minutes; some
15   helpful, some not helpful; some favorable, some
16   not favorable.
17        Q       But it would be fair to say
18   that the sentencing court would not be in a
19   position to assess whether the parole applicant
20   has been rehabilitated after the sentencing;
21   right?
22        A       Totally agree with you.
23        Q       So let's look at the
24   recommendations of the district attorney.
25                     Can you explain to me why this
```

1                          Agostini

2     the discipline to see that it's a lot of

3     Tier IIs for smoking and sleeping through the

4     count versus a lot of Tier IIIs for violent

5     conduct and assault, you know, on inmate or

6     staff, so it will still have the same high score

7     or low score, but you've got to look in the --

8     in the record to see what it's referring to, and

9     then ask about it, what happened.

10            Q       Okay, let's look at one last

11    entry.  If we see "Reentry substance abuse," it

12    says "9, highly probable."

13                    Is this something that can be

14    addressed through a parole case plan?

15            A       It can.

16            Q       So would this be a reason to

17    deny parole, a high score for reentry substance

18    abuse?

19            A       It can.  And I don't think the

20    issue is so much the score.  If the person is

21    getting high regularly and recently in prison,

22    that alone can be sufficient to raise concern

23    about whether or not there's a reasonable

24    probability they're going to remain at liberty

25    without once again violating the law.  I don't

```
                                    Page 152
1                       Agostini
2    need the score on the COMPAS to generate that
3    concern or justify the concern.
4                    Having said that, somebody can
5    have a high score and they can be in for years
6    and have no tickets for substance use or
7    possession or alcohol intoxing, and then I would
8    disagree with the high score.  If I don't see
9    anything in the record, then I don't know why
10   they necessarily have a high score.  Just
11   because they used years ago doesn't mean they'll
12   use again.  So I have to look in the record for
13   more information.  But certainly people can have
14   treatment in the community.
15            Q     Do you look at COMPAS scores
16   for each parole applicant who you make a parole
17   decision for?
18            A     Yes.
19            Q     We've talked about the
20   regulations, the law, the COMPAS reports, but I
21   actually haven't asked you yet about what your
22   actual week looks like.
23                    Can you tell me a little bit
24   about what your week looks like in terms of your
25   work?
```

```
                                          Page 153
 1                       Agostini
 2          A          Absolutely.
 3                      So Mondays I come to the
 4    office; I work in the Albany office.  And if the
 5    panel I'm going to work on is in the Albany
 6    office, and I'm here all day -- the files, since
 7    the pandemic, arrive on Mondays -- and then I
 8    start going through everything once they get
 9    here, once they're delivered.
10                      Tuesdays and Wednesdays tend to
11    be the interview days.
12                      If I'm not assigned to Albany,
13    if I'm working out in Buffalo or Syracuse or
14    some other place, I leave the office in the
15    afternoon and begin going to wherever it is that
16    I'm going.
17                      I try to get to whatever office
18    it is on Mondays and start looking at my files
19    on Mondays.  So I do like to do that.  So
20    usually they come in the early afternoon, and --
21    the only place I don't get to usually by early
22    afternoon is Buffalo, it's the longest drive,
23    but do I get to the Buffalo office on Mondays.
24                      So Mondays, look at files,
25    drive to whatever place or stay here.  Tuesdays
```

Page 246

1              Agostini

2      Q      Okay.

3              On the same page, line 17 to

4  the next page, 4, you discuss Mr. Brown's risk

5  assessment score.

6              Is this COMPAS?

7      A      Yes.

8      Q      Does COMPAS matter more, less

9  or the same for juvenile lifers?

10     A      I think it's the same.  I'm not

11  aware that there's a difference.

12     Q      I'm going to return to page 22.

13             You reference the amount of

14  certificates in support that Mr. Brown has.  How

15  do these things affect your decision making

16  process?

17     A      For me it's a favorable -- it

18  affects it favorably when people have done more

19  than the required programs, which are not that

20  many programs that's required of them, and so

21  some people go above and beyond.

22             So in this case I see he got a

23  Bachelor of Science from the Niagara Consortium,

24  it says here he has a lot of certificates, so I

25  would think that's a good thing.  Looks like he

Page 247

                            Agostini

1

2    had done some work on outside -- outside of the

3    grounds.  So those are -- those are good things.

4    Those are favorable considerations.

5            Q       Then if we turn to page 25,

6    that's the decision, and Mr. Brown was denied

7    parole.

8                    You can read the decision

9    before I ask you about it.

10                   (Pause)

11           A       Okay, I've read through it.

12           Q       So it says that you denied

13   parole because Mr. Brown's release remains

14   incompatible with the welfare of the community,

15   "which still suffers from the lives you stole."

16                   Could you explain what you mean

17   by that?

18           A       That I think we came to the

19   determination that his release was not

20   compatible with the community where he had

21   committed those offenses, into which he would

22   return.

23           Q       And what was the basis for

24   that?

25           A       I'm imagining I must have had

```
 1                    Agostini
 2    some victim impact and community opposition.  I
 3    don't remember this specific case, but that's
 4    what I would think from reading this.
 5                    And it's two people that he
 6    killed, I think at different times, not in
 7    one -- in one robbery.  In reading this here,
 8    I'm thinking this was two different people
 9    killed at separate times.
10         Q         So would it be fair to say that
11    the denial of parole was because of the nature
12    of the crime?
13         A         I think that would be fair to
14    say.
15         Q         And did Mr. Brown's age at the
16    time of the offense fit into your decision at
17    all?
18         A         I'm sure it did.
19         Q         And do you believe that your
20    decision is consistent with your obligations
21    under Hawkins?
22         A         Sorry, I scrolled back up to
23    the top, I'm trying to get back to the decision.
24                    (Pause)
25         A         I think it comports.  I could
```

```
                                    Page 249
 1                      Agostini
 2   certainly have added more.
 3           Q       What is your basis for thinking
 4   that it comports with Hawkins, or the
 5   requirements of Hawkins?
 6           A       Because I think that this was
 7   discussed during the interview.
 8           Q       And by "this" you mean his age,
 9   youth?
10           A       The age and the childhood and
11   the circumstances of his life and that led to
12   the crime.
13           Q       It's your understanding that
14   it's sufficient just to, during the interview,
15   consider the hallmarks of youth to be compliant
16   with the Hawkins decision; is that correct?
17           A       I think it needs to be in --
18   the consideration for minor offenders needs to
19   be in the interview and in the decision.
20                   I don't think the decision
21   needs to go on at great length on it, but it
22   needs to be in there, which I think it is in
23   this case, and I think it's also in the
24   interview, from the little bit I saw here.
25           Q       Would you agree with me that
```

Page 281

1

2                    C E R T I F I C A T E

3

4          I, HELEN MITCHELL, a Registered

5     Professional Reporter and Notary Public, do

6     hereby certify:

7          I reported the proceedings in the

8     within-entitled matter, and that the within

9     transcript is a true record of such proceedings.

10         I further certify that I am not related, by

11    blood or marriage, to any of the parties in this

12    matter and that I am in no way interested in the

13    outcome of this matter.

14         IN WITNESS WHEREOF, I have hereunto set my

15    hand this 12th day of November, 2021.

16

17

18    _____

19              HELEN MITCHELL, RPR

20

21

22

23

24

25