**EXHIBIT 2**

Page 1

```
1    UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF NEW YORK
3    -------------------------------------x
4    CARLOS FLORES, LAWRENCE BARTLEY,
     EDGARDO LEBRON, ANTONIO ROMAN,
5    DEMETRIUS BENNETT, L'MANI DELIMA,
     DONTAE QUINONES, and SHAROD
6    LOGAN, on behalf of themselves and all
     Others similarly situated,
7                   Plaintiffs,
8        -against-          CASE NO.
                            18-CV-02468(VB)(JCM)
9    TINA M. STANFORD, as Chairwoman of
     the New York State Board of Parole;
10   and WALTER W. SMITH, as Commissioner
     of the New York State Board of Parole;
11   JOSEPH P. CRANGLE, as Commissioner of
     the New York State of Parole; ELLEN
12   E. ALEXANDER, as Commissioner of the
     New York State Board of Parole; MARC
13   COPPOLA, as Commissioner of the New
     York Board of Parole; TANA AGOSTINI,
14   as Commissioner of the New York State
     Board of Parole; CHARLES DAVIS, as
15   Commissioner of the New York State
     Board of Parole; ERIK BERLINER, as
16   Commissioner of the New York State
     Board of Parole; OTIS CRUSE, as
17   Commissioner of the New York State
     Board of Parole; TYECE DRAKE, as
18   Commissioner of the New York State
     Board of Parole; CARYNE DEMOSTHENES,as
19   Commissioner of the New York State
     Board of Parole; MICHAEL CORLEY, as
20   Commissioner of the New York State
     Board of Parole; CHANWOO LEE, as
21   Commissioner of the New York State
     Board of Parole; SHEILA SAMUELS, as
22   Commissioner of the New York State
     Board of Parole; ELSIE SEGARRA, as
23   Commissioner of the New York State
     Board of Parole; and CARLTON
24   MITCHELL,as Commissioner of the New
     York State Board of Parole,
25                   Defendants.
```

Page 2

1    (continued from page 1)

2

3              VIDEOTAPE DEPOSITION OF

4                 ELLEN ALEXANDER

5            VIA ZOOM VIDEOCONFERENCE

6                October 15, 2021

7                   9:00 a.m.

8

9                    * * *

10

11        Remote videotape deposition of

12    Ellen Alexander, held virtually via

13    Zoom Teleconference, hosted from

14    Veritext Legal Solutions, pursuant to

15    notice, before Maureen Ratto, Certified

16    Court Reporter, License No. XI01165,

17    Registered Professional Reporter,

18    License No. 817125, and Notary Public.

19

20                   * * *

21

22

23

24

25

```
 1                    ELLEN ALEXANDER
 2    laws, regulations and case law and I use
 3    my understanding of that to try and
 4    define those terms but, you know, these
 5    terms are terms of art. I know they
 6    possibly are used in other statutes
 7    around the country. I can't cite them but
 8    these are terms of art. Some of them are
 9    difficult to define. So I could tell you
10    that I think there is discretion built
11    into the system, a tremendous amount of
12    discretion built into the system.
13        Q.    Okay. Now, you mention that
14    when you look at the factors and you were
15    looking at -- when you say "factors", are
16    you referring to I through 8, little i(c)
17    -- little i through 8, are those the
18    factors that you are referencing?
19        A.    Yes. They're easier to read in
20    the regulation and the statute but
21    they're pretty much the same.
22        Q.    Okay. Are you required to give
23    any particular weight to any one of those
24    eight factors?
25        A.    No, we are not.
```

1                      ELLEN ALEXANDER
2          Q.    Are there any factors beyond
3     this list that you understand you are
4     required by law to consider?
5          A.    Well, certainly the class that
6     we look at now, I am required to look at
7     other factors for those individuals.
8          Q.    When you say "the class", are
9     you talking about the juvenile lifers?
10         A.    Yes. Yes.
11         Q.    So for that cohort for
12    juvenile lifers there are additional
13    factors that you are required to
14    consider?
15         A.    Yes. Yes.
16         Q.    What are those factors?
17         A.    Well, the factors are listed
18    in 8002.2(c), the guiding principles, and
19    I would look at those.
20         Q.    Okay. Do you have discretion
21    to weigh those factors -- give those
22    factors any weight you so choose?
23         A.    I believe, yes. I certainly
24    have to consider them, but the statute
25    didn't tell me how much weight to give

Page 42

                    ELLEN ALEXANDER

1

2   them but I have to consider them, I

3   believe.

4        Q.   Okay. So for clarity of the

5   record, let's mark 8002.2, tab 3, please

6   and we can put it on the screen for just

7   a minute so we know we're talking about

8   the same thing.

9             (Alexander Exhibit 2, copy of

10        8002.2 Parole Release

11        Decisionmaking was received and

12        marked on this date for

13        identification.)

14        Q.   This should be in your marked

15   exhibits folder and I think you have in

16   front of you anyway; is that right, Ms.

17   Alexander?

18        A.   That is correct.

19        Q.   Okay. So when we talk about

20   the additional factors you must consider

21   for juvenile lifers, is that (c) here

22   where it says Minor Offenders, are those

23   the factors that you must take into

24   account?

25        A.   Yes. I mean, they are called

1                    ELLEN ALEXANDER
2    -- in the text they're called guiding
3    principles, but I believe because it
4    references back to the Executive Law that
5    I must consider them, I must consider the
6    diminished capacity and culpability and I
7    must really look at the growth and
8    maturity since that time.
9           Q.    Okay. And can those -- those
10   things are essentially treated the same
11   as the other factors that we just looked
12   at, right?
13          A.    In my mind, yes.
14          Q.    So you can give no weight to,
15   for example, the diminished culpability
16   of youth; is that right?
17          A.    No. I wouldn't say no weight.
18   I have to give it some weight but it's in
19   my discretion to determine what weight.
20          Q.    Okay. Is it within your
21   discretion to accord no weight to any of
22   the factors?
23          A.    In my mind, personally, that
24   is not an option for me.
25          Q.    So all the factors get some

```
 1                    ELLEN ALEXANDER
 2    could make you question whether the
 3    person has been rehabilitated.
 4          Q.    What type of knowledge?
 5          A.    Well, if it's a family member
 6    or they have reached out while they have
 7    been in prison or have participated in
 8    something that, you know, is
 9    extraordinary that would leave the victim
10    with discreet knowledge that
11    rehabilitation is not complete.
12          Q.    So they would have to have
13    more contemporaneous knowledge, not about
14    the crime -- you're referring to
15    contemporaneous knowledge about the
16    offender?
17          A.    I would say that's --
18          Q.    Okay.
19          A.    -- much more factual and
20    necessary.  But if something happened
21    nine years ago and the person is up for
22    the minimum on a nine to life sentence,
23    that victim may have information which
24    may be more time relevant. I don't know.
25    I'm just talking in generalities. I am
```

```
 1                 ELLEN ALEXANDER
 2    not talking about specifics.
 3         Q.    Okay. May you under the
 4    statute deny release to a juvenile lifer
 5    even if that person demonstrates maturity
 6    and rehabilitation subsequent to their
 7    crime?
 8         A.    I believe I have the ability
 9    to do that, yes.
10         Q.    And have you done that? It's
11    okay.
12         A.    I don't know. I don't -- I
13    don't know.
14         Q.    Is it ever appropriate to deny
15    parole based the seriousness of the crime
16    alone?
17         A.    I don't think so.
18         Q.    Is the standard -- I know the
19    standard has to undermine respect for the
20    law.  But in your understanding of the
21    standard would it essentially be the same
22    if it said release would deprecate the
23    seriousness of the crime?  Functionally,
24    are those the same things?
25         A.    It can be functionally the
```

```
 1                    ELLEN ALEXANDER
 2    same thing. I think as a society we want
 3    to strive that people respect our laws,
 4    because I think it's an important
 5    societal norm. So I think those phrases
 6    should be linked. I'm not sure I answered
 7    that as crisply as I should have.
 8         Q.     I'm trying to figure out what
 9    work respect for the law is doing, given
10    that we have no surveys or any
11    information about broadly public -- to
12    inform us about whether release would
13    undermine respect for the law. So what
14    work is that doing in this -- in this
15    standard? Is it essentially just for
16    extra verbiage?  Is it the same thing as
17    deprecate the seriousness of the crime?
18              MR. HARBEN:  Object to form.
19         A.     I think seriousness -- I read
20    it more holistically, that I want people
21    to have respect for our laws and I think
22    the more serious the crime is and more
23    heinous the crime is, if it's not
24    recognized in some way, I think it does
25    undermine our societal fabric. So I think
```

```
 1                    ELLEN ALEXANDER
 2    sensitive to but I didn't have the
 3    regulations or some of the knowledge I
 4    have now to back it up.
 5                Even from my earliest cases,
 6    you know, I dealt with people who were,
 7    let's say 40-years-old and committed a
 8    crime when they were 17 or 18, and they
 9    grew up in prison and I tended to look at
10    what happened there. But has my practice
11    evolved since 2012? Absolutely.
12         Q.    Okay. Who is this mentor you
13    referenced?
14         A.    Christina Hernandez.
15         Q.    What did it mean to you when
16    she said someone grew up in prison? How
17    is that relevant to your analysis?
18         A.    I think it was code for me to
19    start exploring their growth and maturity
20    and what had changed for them in prison.
21    I mean, it wasn't as clear as the
22    diminished culpability of youth or
23    measuring the growth and maturity, but it
24    was delving a principle that I held dear
25    to my questioning and decisionmaking.
```

1                    ELLEN ALEXANDER

2        Q.     Okay. Do you know whether the

3    U.S. Constitution imposes any obligations

4    on you with respect to parole decisions

5    for juvenile lifers?

6              MR. HARBEN:   Objection, calls

7         for a legal conclusion.

8        A.     I have a general sense that

9    there have been U.S. Supreme Court cases.

10   I understand that someone should not be

11   given a life sentence without the

12   opportunity for parole as a minor. I

13   think there has maybe been some cutback

14   with that on the conservative court but I

15   have used my principles not really on

16   what the U.S. Supreme Court has said but

17   what has been codified in regulation here

18   as determined by Hawkins.

19       Q.     Okay. So are you familiar with

20   the legal case Graham V Florida?

21       A.     I know the name. I'm not

22   intimately familiar with it. It's been

23   many many years since I've read it.

24       Q.     Okay. What about Miller versus

25   Alabama?

1                ELLEN ALEXANDER

2        A.    Same answer. I remember the

3    name but I don't know the exact holdings.

4        Q.    Okay. And what about

5    Montgomery versus Louisiana?

6        A.    That would be the same answer.

7        Q.    Okay. Do you recall receiving

8    any training or guidance on

9    constitutional standards when you were

10   appointed to the board?

11       A.    Constitutional in terms of all

12   releases?

13       Q.    No. In terms of juvenile

14   lifers.

15       A.    When I was appointed?

16       Q.    Yeah.

17       A.    No, I don't recall that.

18       Q.    Okay. Did you ever?

19       A.    We had training after Hawkins

20   came down.

21       Q.    Okay. How did you come to

22   learn that the Hawkins decision had come

23   down?

24       A.    I believe legal counsel

25   advised us.

1               ELLEN ALEXANDER

2        Q.     Okay. What is your

3    understanding of what Hawkins requires of

4    you as a commissioner?

5        A.     It requires us to examine the

6    person at the time they were an offender

7    when they were young, to go through their

8    family and work and school history and

9    whether they were influenced by people

10   who were older; did they have an intact

11   family? We;re they subject to other sorts

12   of pressures of being a follower and

13   having a lack of structure?  And then,

14   more importantly in my mind, is to

15   measure that's used to see whether they

16   can appreciate the risk perhaps or why

17   the crime took place? But to me it's

18   always the flip side which needs to be

19   explored; since that time have they

20   developed the growth and maturity to not

21   be that person they were at 16 or 15; do

22   they appreciate the risk; do they

23   appreciate the harm?

24        Q.     So the inquiry into family and

25   work and school is intended to assess

1               ELLEN ALEXANDER
2    follow the rules. That's a mature
3    teenager.
4         Q.    Okay.
5         A.    They still may not appreciate
6    all the risks or be able to fully assess
7    it because their brain hasn't fully
8    assessed, but they're clearly more mature
9    than someone who has not taken care of
10   their parents or they're individuals who
11   are roaming the streets. So there is a
12   distinction there for me to form a
13   starting ground.
14        Q.    I understand how this is
15   relevant to your evaluation of current
16   maturity in rehabilitation from the
17   starting point.  But are you -- are you
18   saying that when you evaluate a teenager
19   who committed a crime and at the time of
20   the crime they were doing things like
21   taking care of younger siblings and
22   exhibiting responsibility, that that
23   person, because they were able to be
24   responsible to take care of their younger
25   sibling, is also more culpable for their

```
 1              ELLEN ALEXANDER
 2    crime because they're more mature than
 3    someone who is the same age but not
 4    exhibiting those responsible
 5    characteristics?
 6         A.    I would say as a general
 7    principle, maybe yes. It's sort of like
 8    your earlier question about the
 9    difference between a 13-year-old and a
10    17-year-old. I'm just trying to gauge
11    where they were.
12         Q.    Okay. How did you come to the
13    understanding that Hawkins requires you
14    to make these inquiries into family, work
15    and school life?
16         A.    Memo from legal counsel and
17    training.
18         Q.    Do you try to follow the
19    advice of counsel?
20         A.    I do.
21         Q.    Do you follow the advice of
22    counsel in drafting parole decisions,
23    denials and grants?
24              MR. HARBEN:  Object to form.
25         A.    I don't exactly know what you
```

```
 1                    ELLEN ALEXANDER
 2    mean. I'm sorry.
 3          Q.    Do you follow -- has counsel
 4    ever given you advice on how to draft a
 5    parole decision to comply with the law?
 6               MR. HARBEN:  Object to form.
 7          A.    I've had discussions with
 8    legal counsel because I have a background
 9    as being an inhouse counsel.  So I may
10    have a higher level of respect of the
11    role that they play in the organization
12    and I enjoy talking to them and trying to
13    do a better job.
14               I'm not sure I'm answering
15    your question.
16          Q.    I'm asking, do you generally
17    follow the advice of counsel?
18          A.    I do. I do.
19          Q.    Okay.
20          A.    But obviously I come to this
21    job with my own sense of self and worth
22    and I try and weave everything together.
23          Q.    We looked at earlier a
24    provision of the statutory law that
25    requires you to render your decisions in
```

```
 1                    ELLEN ALEXANDER
 2               MR. HARBEN:  Object to form.
 3        A.    First of all, I need to accept
 4   the verdict as a Parole Commissioner.
 5        Q.    Okay. Can you accept a verdict
 6   and also accept that the person might not
 7   have any recollection of ever having
 8   committed the crime?
 9        A.    Both can be true, yes.
10        Q.    Okay. Right. So if they don't
11   ever recollect committing the crime, it
12   would hard to provide insight into a
13   crime that they don't ever remember
14   having committed, right?
15        A.    I think that's a logical
16   truism, yes.
17        Q.    Okay. Well, Mr. Pedersen died
18   in custody so you won't have to address
19   him.
20               All right. I'd like to go to
21   talk a little bit about your application
22   of risks and needs and COMPAS.
23               Kathryn can you pull up tab 7,
24   please?
25               (Alexander Exhibit 8,
```

1                    ELLEN ALEXANDER

2          flowchart of Parole Board process

3          was received and marked on this

4          date for identification.)

5          Q.     While we're waiting for that,

6     Commissioner Alexander, do you have --

7     were you ever provided a manual for

8     essentially how to conduct your job?

9          A.     A manual? I don't believe so.

10    I mean, we did have extensive training

11    when I first joined the board.

12    Commissioner Sharkey, Commissioner

13    Coppola and I, you know, had training

14    with Mr. Tracey, who was the board

15    counsel. We talked to other

16    commissioners.

17              I don't remember the material

18    that we had and I'm actually moving out

19    of my house and have gotten rid of all

20    that material. So I don't know what I

21    reviewed.

22         Q.     Okay. Do you have a binder

23    potentially called a Commissioner Binder

24    that contains instructive information for

25    you?

```
                                        Page 303

 1                    ELLEN ALEXANDER
 2        A.     We have a binder that was
 3    provided to us by counsel. That wasn't
 4    when I started. That was a more recent
 5    initiative, I guess.
 6        Q.     Okay. Do you recall the year
 7    that you were provided that binder?
 8        A.     I don't. I know it was when
 9    new commissioners came on, so it would
10    either be 2017 or 2019, but I don't
11    recall which date that happened. I have
12    always -- I've always done my own
13    research and kept statutes and
14    regulations with me so I can refer to
15    them and memos from attorneys without
16    anybody providing me with anything.
17        Q.     Okay. I'd like to turn to page
18    ending 5688 of this binder. Sorry. This
19    is some tabs from a Commissioner Binder.
20             Do these look familiar to you?
21    I know the pages are all redacted but
22    does this look familiar to you, this
23    flowchart?
24        A.     It doesn't ring a bell with
25    me, but I wouldn't deny that I have seen
```

Page 322

```
1              C E R T I F I C A T E
2              I, MAUREEN M. RATTO, a
3      Registered Professional Reporter, do
4      hereby certify that prior to the
5      commencement of the examination, ELLEN
6      ALEXANDER was sworn by me to testify
7      the truth, the whole truth and nothing
8      but the truth.
9              I DO FURTHER CERTIFY that the
10     foregoing is a true and accurate
11     transcript of the proceedings as taken
12     stenographically by and before me at
13     the time, place and on the date
14     hereinbefore set forth.
15             I DO FURTHER CERTIFY that I am
16     neither a relative nor employee nor
17     attorney nor counsel of any of the
18     parties to this action, and that I am
19     neither a relative nor employee of such
20     attorney or counsel, and that I am not
21     financially interested in this action.
22
23
24     _____
       MAUREEN M. RATTO, RPR
25     License No. 817125
```