**EXHIBIT 22**

Page 1

1
2    UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
3    Case No. 18-CV-02468 (VB)(JCM)
     -----------------------------------------X
4    CARLOS FLORES, LAWRENCE BARTLEY, DEMETRIUS
     BENNETT, L'MANI DELIMA, EDGARDO LEBRON,
5    ANTONIO ROMAN, DONTAE QUINONES and SHAROD
     LOGAN, on behalf of themselves and all
6    others similarly situated,
                       Plaintiffs,
7       - against -
     TINA M. STANFORD, as Chairwoman of the New
8    York State Board of Parole; WALTER W.
     SMITH, as Commissioner of the New York
9    State Board of Parole; JOSEPH P. CRANGLE,
     as Commissioner of the New York State
10   Board of Parole; ELLEN E. ALEXANDER, as
     Commissioner of the New York State Board
11   of Parole; MARC COPPOLA, as Commissioner
     of the New York State Board of Parole;
12   TANA AGOSTINI, as Commissioner of the New
     York State Board of Parole; CHARLES DAVIS,
13   as Commissioner of the New York State
     Board of Parole; ERIK BERLINER, as
14   Commissioner of the New York State Board
     Of Parole; OTIS CRUSE, as Commissioner of
15   the New York State Board of Parole; TYECE
     DRAKE, as Commissioner of the New York
16   State Board of Parole; CARYNE DEMOSTHENES,
     As Commissioner of the New York State
17   Board of Parole, MICHAEL CORLEY, as
     Commissioner of the New York State Board
18   of Parole; CHANWOO LEE, as Commissioner of
     The New York State Board of Parole; SHEILA
19   SAMUELS, as Commissioner of the New York
     State Board of Parole; ELSIE SEGARRA, as
20   Commissioner of the New York State Board
     Of Parole; and CARLTON MITCHELL, as
21   Commissioner of the New York State Board
     Of Parole,
22                   Defendants.
     -----------------------------------------X
23                   December 2, 2021
                     9:10 a.m.
24
25   (Continued on next page.)

Page 2

1

2              Remote video-teleconference

3    deposition via Zoom of MICHELE STALEY,

4    before SHARON PEARCE, RDR, CRR, CRC, NYRCR, a

5    Registered Diplomate Reporter, Certified

6    Realtime Reporter, Certified Realtime

7    Captioner, and Notary Public of the State of

8    New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              STALEY
 2     A.    I am not aware of anyone that
 3  was.
 4     Q.    When is the first time that you
 5  personally did any work that related to
 6  COMPAS?
 7     A.    I'm guessing -- and again, this
 8  is thinking back quite a few years --
 9  probably 2014 is when we started -- I
10  started being involved to a greater
11  degree.  I became aware of it after the
12  merger because our office had
13  responsibilities for reporting on parolees
14  based on their supervision level, which
15  was determined by COMPAS.  So that would
16  have been in, say, 20 -- early 2012 is
17  when I became knowledgeable about it.
18     Q.    Okay.  And is it your
19  understanding that early 2012 is the time
20  when DOCCS implemented the use of
21  so-called reentry COMPAS?
22     A.    That is my recollection.  It was
23  early 2012.
24     Q.    Why did DOCCS implement the use
25  of reentry COMPAS in early 2012?
```

```
 1                    STALEY
 2      A.    So, again, I'm not -- you know,
 3  this is out of my area of expertise.  But
 4  my understanding is that it was designed
 5  to be a tool to help assign parolees to
 6  caseloads based on the level of
 7  supervision that they required.  So it was
 8  a way to determine whether a parolee would
 9  need a higher level of supervision or a
10  lower level of supervision, and it was a
11  way to put people in categories based on
12  that, to assist with staff resource
13  allocation.
14      Q.    And did you also learn in the
15  2012 timeframe that reentry COMPAS is used
16  in making parole release decisions?
17      A.    I don't believe I was aware of
18  that at that point.
19      Q.    Okay.  Do you understand now
20  that reentry COMPAS is used in making
21  parole release decisions?
22      A.    My understanding is that the
23  COMPAS information is one of many criteria
24  that are used in parole board
25  decisionmaking, but I can't speak to how
```

```
 1                    STALEY
 2   exactly it's utilized.
 3        Q.    Okay.  If I've understood you
 4   right, you began to do some work as it
 5   related to COMPAS in 2012 but then started
 6   to do more work around 2014?  Is that
 7   right?
 8        A.    '14 or '15.  Yes.
 9        Q.    And what kind of work did you
10   start doing as it related to COMPAS in
11   2014 or '15?
12        A.    So there were -- there were
13   discussions that were starting within the
14   department regarding the -- sort of the --
15   I don't want to say -- well, just the
16   number of questions that were involved in
17   the COMPAS reentry instrument.  It has a
18   lot of questions, and it takes a long time
19   for staff to administer.
20             So there were some discussions
21   about -- with DCJS about trying to use
22   existing state data to sort of get at the
23   criminal history portion of the risk
24   assessment instead of using -- instead of
25   the requirement for DOCCS staff to read
```

1                    STALEY

2      A.     I do not know.

3      Q.     Do you know whether the state

4  considered developing a needs instrument

5  in-house as ended up being done with the

6  DCJS risk algorithm?

7      A.     I am not aware of whether that

8  was -- any discussion of that at that

9  point.

10      Q.     How does reentry COMPAS differ

11  from reception COMPAS?

12      A.     Without looking at the specific

13  questions and scales, I can't tell you

14  specifically.  However, one key difference

15  is that the re -- well, there are a couple

16  of key differences.  The reentry version

17  is focused on looking at scales that

18  relate to how a person will do after their

19  release from custody.  And so part of that

20  is an absconder scale that's included in

21  the reentry version as well as -- oh, in

22  addition, there's a prison misconduct

23  scale that's included.  There are probably

24  other difference, but those are the key

25  ones that I'm aware of.

STALEY

```
1                    STALEY
2        Q.    And we'll talk more about this,
3   I'm sure, later in the day.
4              But is it the case that New York
5   State worked with Northpointe to make
6   certain modifications to the reentry
7   COMPAS?
8        A.    Yes.
9        Q.    And is it your understanding
10  that the New York State reentry COMPAS is
11  a unique instrument that's used only in
12  New York State?
13       A.    That is my understanding.
14       Q.    How about the reception COMPAS?
15  Did New York State work with Northpointe
16  to make modifications to the reception
17  COMPAS?
18       A.    I don't know.
19       Q.    Do you know whether the
20  reception COMPAS uses models that
21  Northpointe also uses with other
22  jurisdictions around the country?
23       A.    My understanding is that it's
24  similar to other jurisdictions, but I
25  don't have firsthand knowledge how it
```

```
 1                    STALEY
 2  compares with other jurisdictions.
 3      Q.    Why did New York State make
 4  modifications to the reentry COMPAS but
 5  not the reception COMPAS?
 6            MR. HARBEN:  Object to form.
 7      Q.    Let me re-ask the question this
 8  way.
 9            Why did New York State make
10  modifications to reentry COMPAS?
11            MR. HARBEN:  Object.  Object to
12      form.
13      Q.    You can answer.  Go ahead.
14      A.    So I was not involved in the --
15  that process.  I can't really speculate as
16  to -- as to why they made changes to the
17  standard instrument.
18      Q.    All right.  So from early 2012
19  through the present, so for almost ten
20  years now, DOCCS has been using reentry
21  COMPAS; right?
22      A.    Yes.
23      Q.    Is it your understanding that
24  DOCCS has been using the same model at the
25  same time, the same underlying algorithms?
```



```
 1            STALEY

 2     A.     ████████████

 3     Q.    To the best of your knowledge,

 4  in the time period from early 2012 until

 5  the present, when DOCCS has been using the

 6  New York modified reentry COMPAS, has

 7  anyone at DOCCS been familiar with that

 8  topic?

 9     A.    With how the specific algorithms

10  are created?  I'm going to say no.

11     Q.    Okay.  So is it fair to say that

12  from the perspective of DOCCS, for the

13  last ten years, the New York modified

14  reentry COMPAS risk scores have been a

15  black box?

16     A.    I would say that that is fair to

17  say, generally speaking, yes.  Yes.  It

18  has been basically -- again, we know how

19  the three scores -- the absconder risk,

20  risk of any arrest, and risk of any

21  violence -- we know how those interact and

22  how those interacted regarding -- related

23  to the supervision level.  But as far as

24  the specific nuances, it was definitely

25  not any kind of common knowledge.  No.
```

```
 1              STALEY
 2     Q.    And when you say that DOCCS knew
 3  how the three risk scores -- the ab
 4  discounter risk, the arrest risk, and the
 5  violent felony arrest risk -- interact as
 6  it relates to the supervision level, are
 7  you talking about the step where you go
 8  from the decile that an individual gets
 9  for each of the three risk scales to the
10  parole supervision level?
11     A.    Correct.
12     Q.    Okay?
13           MR. HARBEN:  Ms. Staley, are you
14      hearing everything okay, or is it just
15      me?  Are you hearing everything
16      Mr. Ryan is asking?  It's chopping up
17      for me, but it might be on my end.
18           THE WITNESS:  I'm hearing him
19      okay.
20     Q.    All right.  But in terms of how
21  to get from the answers to the questions
22  on the COMPAS questionnaire to the risk
23  score deciles, that process, so far as you
24  know, has been a black box for DOCCS over
25  the past ten years; right?
```

1                    STALEY

2        A.     Yes.

3        Q.     Have you had any concerns about

4    that?

5        A.     There have -- have I personally

6    had concerns?

7        Q.     Yes.

8        A.     At certain points, it would be

9    helpful to have known exactly how things

10   were weighted and how they fed into each

11   other.  For example -- well, I don't

12   really have a good example.  But yes,

13   there have been points in time -- and I --

14   when it would have been helpful to have a

15   better understanding of how those -- how

16   the questions actually related to the

17   scales and the ultimate risks -- risk

18   scores.  Yes.

19       Q.     Have you or has anybody else at

20   DOCCS, to your knowledge, ever asked

21   Northpointe for that information?

22       A.     I have not personally asked.  I

23   believe it may have been asked at points

24   when there were potentially FOIL requests

25   or other types of requests.  I believe it

```
 1              STALEY
 2  has been.  It may have been asked.  But I
 3  have not personally made that inquiry, and
 4  I'm not directly aware of inquiries made
 5  to them about it.
 6      Q.    Okay.  And FOIL is the Freedom
 7  of Information Law?
 8      A.    Yes.
 9      Q.    What do you know about FOIL
10  requests relating to COMPAS?
11      A.    I don't know a whole lot about
12  them because any kind of FOIL requests for
13  COMPAS would not have come to my office,
14  because my office doesn't maintain that
15  information.  We use it, but we're not the
16  keepers of the data.
17      Q.    Okay.  Have you come to learn
18  somehow about FOIL requests that related
19  to COMPAS?
20      A.    I don't remember specifics.  We
21  have a lot.  It's quite possible I may
22  have been involved to a certain degree in
23  a FOIL request, but we have so many, that
24  it's hard for me to remember specifics.
25      Q.    Okay.  So I asked you about
```

```
 1                    STALEY
 2   whether you were aware whether anybody at
 3   DOCCS had asked Northpointe for any of
 4   this information about how their risk
 5   score algorithms worked, and you said that
 6   that might have come up in FOIL requests,
 7   if I heard you right.
 8        A.    Potentially.  Again, I don't
 9   remember specifically.
10        Q.    Okay.  And do you -- do you have
11   any actual knowledge one way or the other,
12   whether you were directly involved or not,
13   about any FOIL requests regarding COMPAS?
14        A.    I really can't think of -- I
15   can't remember off the top of my head any
16   FOIL requests involving COMPAS.
17        Q.    Okay.  And are you aware of any
18   other communications between DOCCS and
19   Northpointe over the last ten years where
20   DOCCS asked for information about the risk
21   algorithms?
22        A.    I'm trying -- it's -- I can't
23   remember specifically.  I can't remember a
24   specific -- specific request.
25        Q.    Okay.  Are you aware of any
```

```
 1                    STALEY
 2   instance in which Northpointe refused to
 3   provide information to DOCCS about how the
 4   New York modified COMPAS reentry risk
 5   scores work?
 6        A.    I don't -- again, I don't recall
 7   specifically.  It's possible that that
 8   happened, but I don't recall specifically
 9   at this moment.
10        Q.    Okay.  Have you --
11        A.    And I wouldn't have made those
12   requests myself directly.
13        Q.    Okay.  Have you had a view over
14   the last decade as to whether DOCCS was
15   entitled to get information from
16   Northpointe about how the risk score
17   algorithms for the New York modified
18   reentry COMPAS work?
19        A.    My understanding has been that
20   it was proprietary information and that
21   DOCCS or anyone else was not entitled to
22   it.
23        Q.    ████████  ███████  ███  ████████
24   ███████████████  ██████  █  ███  ████  ████████  █████
25   ███  ███████  ██████  █  ████████  ███████  ██  ████████
```

Page 55

1          STALEY

2

3

4

5

6     A.

7

8     Q.    Okay.  Because until you got

9  ready for this deposition, you believed

10 that that information was proprietary to

11 Northpointe, and you did not expect

12 Northpointe to share it with New York

13 State in that detail; right?

14     A.    That's correct.

15     Q.    Do you have an understanding

16 today as to whether the algorithms for the

17 New York modified reentry COMPAS are

18 proprietary to Northpointe?

19     A.    Well, given -- given that they

20 did give them to DOCCS, they certainly,

21 you know, intended for DOCCS to have them.

22 But I'm sure they're not releasing them

23 publicly, and it would still be

24 proprietary, as far as I understand.

25     Q.    Who is --

1                    STALEY
2      A.    I think all their reports pretty
3   much say "not for distribution" and that
4   sort of thing.
5      Q.    Who is Jennifer Bryant?
6      A.    She is the assistant director in
7   my office.
8      Q.    All right.  And so she reports
9   directly to you?
10      A.    Yes, she does.
11      Q.    And how long have you worked
12   with Ms. Bryant?
13      A.    Since 2011 when our agencies
14   merged.
15      Q.    Did she come from the New York
16   State Division of Parole?
17      A.    Yes.
18      Q.    Do you know whether Ms. Bryant
19   had any involvement before the merger of
20   the two agencies in working on COMPAS?
21      A.    My understanding is she did not
22   have involvement in working on COMPAS
23   other than in a data support role.  I
24   believe that there may have been some data
25   provided to Northpointe in order for them

Page 65

1                    STALEY

2      A.     Yes.   That's my understanding.

3      Q.     ███  ███  ████████  ██

4  ███████████  ██████  ███  ███  █████████  ██  ██████

5  ██████████  ██  █  ██████  ███  ███  ████████  ███████

6  █████████  ██████

7      A.     ██████████  ████

8      Q.     ██████  ███  █████  ██████  ██████  ████

9  ███████████  ██████████  ███████  ████

10 ███████████  ██  ██████  ██████  █████  ████████

11 ██████████████  ██████  █████  ████████  ███████

12 ██████████

13     A.     ██████  ████  █  ██████  ████████  ████████

14 ████████  █████

15     Q.     ██████  █████  ██████  ██████  █████

16 ███████████  ██  ████████████  ██████  ████  ██

17 █████████  █  ████████  ██████  █  ██████  ████  ████

18 ███████  ███████████  ██  ██████████████

19 ██████████

20     A.     ████  ██████  ██████

21     Q.     ████  █  ███  █████████  ██████  ████

22 ███  ██████████  ███  █████████  ████  ██  ████

23 █████████  █  ████████  ██████  ██████  ██████████

24 █████████████  ██████  ██████████  ██████  ████

25 ███████  ██████  █  ████████████████

1          STALEY

2  ████████████

3     A.  ████  ████ ██ ████████

4     Q.  ████ ████ ██ ████ ████ ████ ████

5  ████ ████████ █ ██ █ ████ █ ████████

6  ████ ██ ██ ████████ ████ ██████

7     A.  ████ ████████ ████ ████

8  ██████ ████ ██████ ████ ████ ██████

9  ████ ██████ ████████ ████ ████████ ████

10 ████████ ██████ ████ ████ ██ ███

11 ████ ████████ ████ ████ ████ ████ ████ █

12 ████ ████ ████████ ██ ████ ████

13 ████ ████ ██ ████████ ████ ████ ██ █

14 ████████ ████ ████████ ████ ████████ ██

15 ████ ████████ ████ ████ ████ ████

16 ████ ██████ ██ ████████ ████ ████ █

17 ██ ████████

18     Q.    Okay.  So we spoke earlier about

19 how reentry COMPAS has two different uses;

20 right?  One for helping to inform parole

21 release decisions and the other for

22 setting supervision levels for individuals

23 who are released on parole; right?

24     A.    It is -- again, I would

25 reiterate that the COMPAS information is

Page 67

STALEY

1
2  used as a -- one of many factors that is
3  considered by the Board of Parole when
4  making a release decision.  However, my
5  understanding is that the primary purpose
6  of when -- especially when this was
7  developed, was -- the primary purpose was
8  for supervision decisions for people in
9  the community on parole.
10     Q.    Who is the basis for your
11  understanding that the primary purpose
12  when reentry COMPAS was developed was for
13  setting supervision levels?
14     A.    That's my understanding because
15  of how my office has used the supervision
16  level for our reporting.  Supervision --
17  in other words, there was a certain -- my
18  understanding is that there was a certain
19  amount of parole officers staffing
20  resources.
21          And again, my understanding is
22  that the primary reason for utilizing this
23  risk instrument was to establish, amongst
24  the people on parole, who were the --
25  those that were most likely to re-offend

Page 68

1                          STALEY

2    so that parole resources could be devoted

3    more heavily to those individuals, and the

4    people that were -- that were least likely

5    expected to have a lower probability of

6    returning or re-offending would have --

7    would not need as many staff resources

8    devoted to them.  So it was a way of

9    allocating staff -- a limited supply of

10   staff resources.

11       Q.   ███ ████ ███ █ ████ ████ ████

12   ██ ████████ ███████ ██ ███ ██ ███ ████

13   █ ███ █████

14       A.   ███ ████ ████ █ ████ ████ ██ ██

15   ██ █ ███ ████ ███ ███ ████ ███

16   ███ ████ ███ ██ ████ ██ █ █████

17   █████ ██ █████ ████

18       Q.    Yeah.   And you're absolutely

19   right.   I didn't ask that in a very good

20   way.  So let me try tow ask that in a

21   better way.

22           ███ ██ ███ ████ █████ ███

23   ████ ███ ████ ████ ████ ████ ███

24   ████████ ███ ███ ████ ████ ███ ███

25   ███ ███ █████ ███ ████ ███

Page 69

1          **STALEY**

2  ██████ ████████████ ████ ████ ██████ ███ ████ ██

3  ██████

4     A.    ████   ███████  ██  ██████████

5     Q.   █████ ██  █████  ████████

6  that ████  █████  ███████  ██  ██████ █████ █████

7  ████████████  █████ ██  ████  █████ █████ █████

8  ██████████ ██ ██████ ██ █████

9     A.    █████  █████ ███ █ █████  █████

10 █████  █████  █████

11     Q.    Are you familiar with a 2011

12 statute that the legislature enacted that

13 called for the use of a risk and needs

14 instrument in making parole release

15 decisions?

16     A.    Yes.   I'm aware that that

17 legislation occurred.

18     Q.    Okay.   Is there a connection

19 between that statute and when reentry

20 COMPAS began to be used in early 2012 for

21 parole release decisions?

22     A.    I'm not aware of when the --

23 when the COMPAS information was -- began

24 to be part of the Parole Board package.

25 So I'm not really able to answer that

Page 70

1                    STALEY

2    question.

3        Q. ▮▮▮▮ ▮▮ ▮▮ ▮▮▮ ▮▮▮ ▮▮

4    ▮▮ ▮▮ ▮▮ ▮▮ ▮▮ ▮▮ ▮▮ ▮▮

5    ▮▮ ▮▮ ▮ ▮▮▮ ▮▮ ▮▮▮ ▮

6    ▮▮ ▮▮ ▮ ▮ ▮ ▮▮ ▮▮ ▮

7    ▮▮ ▮▮ ▮ ▮▮ ▮ ▮▮ ▮▮

8        A. ▮ ▮ ▮ ▮ ▮ ▮▮

9    ▮▮ ▮▮

10       Q. ▮ ▮ ▮▮ ▮ ▮ ▮ ▮

11   ▮ ▮▮ ▮ ▮ ▮ ▮ ▮

12   ▮▮ ▮ ▮ ▮ ▮ ▮▮

13   ▮▮ ▮▮ ▮ ▮ ▮ ▮▮ ▮▮

14   ▮▮ ▮▮ ▮ ▮ ▮ ▮

15   ▮▮ ▮ ▮ ▮ ▮ ▮▮▮

16   ▮▮ ▮▮ ▮▮ ▮ ▮ ▮ ▮

17   ▮ ▮ ▮ ▮▮ ▮▮

18       A. ▮▮ ▮ ▮▮ ▮

19       Q. ▮▮ ▮▮ ▮▮ ▮▮

20   ▮▮ ▮ ▮ ▮ ▮▮ ▮

21   ▮▮ ▮

22       A. ▮▮ ▮ ▮▮▮ ▮▮ ▮

23   ▮ ▮▮ ▮ ▮ ▮▮

24   ▮▮ ▮▮ ▮ ▮ ▮ ▮

25   ▮▮ ▮▮ ▮ ▮▮ ▮ ▮

Page 71



1          STALEY

Page 72

1              STALEY

6        A.

8        Q.

16            MR. HARBEN:  Object to form.

17            THE VIDEO TECHNICIAN:  And

18    Counsel, in about a few minutes, I'm

19    going to have to reset the video, so

20    just giving you a heads up.

21            MR. RYAN:  Thank you.

22            MR. HARBEN:  We're going to have

23    to jump away at 11:00 for a little

24    while, because we have a conference in

25    this case.

```
 1                    STALEY
 2   ███████████████  ████████  ████  ██████
 3   ████████████  ██████████  ██  ██████████  ████
 4   ████████████  ████  ██  ██████  ██████████
 5   ██████████████  ██████████  ██████████
 6            MR.  HARBEN:   Object  to  the
 7       characterization  of  the  ███████
 8   ████████████  ████  ██  ████  ██  ████████████
 9       Q.    You  can  answer,  Ms.  Staley.
10       A.    Can  you  repeat  the  question,
11   please?
12       Q.    ████████  ████████  ██████████  ██████
13   ██████████  ██  ██  ██████  ██  ████
14   ██████████████  ██  ████  ██████████████  ████████
15   ████  ██████████  ████████  ████  ██████████████
16   ████  ██████████████  ██  ██  ██████  ████████  ██
17   ████████  ██  ████
18            MR.  HARBEN:   Object  to  form.
19       Q.    ████  ██  ██  ██████  ████████████
20   ██████  ████████  ████████
21            MR.  HARBEN:   Object  to  form.
22       Mischaracterizes  the  document.
23       Q.    Are  you  able  to  answer  that,
24   Ms.  Staley?
25       A.    So  --
```

Page 88

```
 1              STALEY
 2         MR. HARBEN:  Same objection.
 3    A.    -- to my --
 4         MR. HARBEN:  You can answer, but
 5    I'm objecting to the way he's
 6    characterizing this document.
 7         THE WITNESS:  Okay.
 8    A.    ███ ██ ████████ ██ ██████ ███
 9  ██████ ████ ██ ████ ████ ██████
10    Q.    ██████ ██ ██ ██ ████████ ██ ███
11  █████████ ██ ███ ██ ███ ██████ ███████
12  ██████ █████ ██████ ████ █████ ███ ██████
13  ███ ████████
14    A.    ██
15    Q.    Okay.
16    A.    ████ ███ ██████
17    Q.    ██ ██ ████ ████ ██ ██ ████
18  ███████████ ████ ██████ ███ █████████████
19  █████ █████ █████████ █ █████████ ████ ██████
20  █████ █████ ██████ ██ ██ ██████ ██████
21  ████████ ██████ ██████ ████ ███ █ █████
22  ██████ ██████
23    A.    ████ ██ ████████
24    Q.    ██████ ██ ████ ██ █████ ████ ████
25  ██████ ████ ██ ██████ ██████ █████ █████
```

Page 89

1                    **STALEY**

2     ████████████████

3              MR. RYAN:  So this, Evan, is

4        Tab 1 in our binder.  So Exhibit 5,

5        we'll mark a document called ████ ████

6        ████ ████ █ ████ ████

7        ████ ████ ████ ████

8        ████ ████ ████ ████ ███

9        ██ ████ █ ████ █ ████████

10       ████ ████

11             (Staley Exhibit 5, ███ ███

12       ████ ████ █ ████ ████

13       ████ ████ ████ ████

14       ████ ████ ████ ████ ████

15       ████████████ was hereby marked for

16       identification, as of this date.)

17       Q.    And if you could just let us

18    know, Ms. Staley, when that's popped up in

19    the Exhibit Share.

20       A.    Okay.  It has popped up.

21       Q.    Okay.  And if you could just,

22    you know, look at the cover page and the

23    table of contents, again, is this one of

24    the reports that you reviewed in

25    preparation for your deposition today?

Page 90

1              **STALEY**

2       A.    Yes.

3       Q.    ████  ████  ██  █  █  ███

4  ████████  ████  ███  █  ██  ██████  ██

5  ████  █████  ████  █████  ████  █  ███

6  ████  █████  ████  ███  █████  ██  ██

7  █████  █

8       A.    ████  ████  █  █████████

9       Q.    ████  ██  █████  ██████  ██  ██

10  ████  ████  ████  █  █████  █████  █

11  █████████  █  █  ████████  █  ███

12  ██████  █████  ████  ████  ███████

13  █████  █████  █████  █████  █████  ████

14  █████  █████  ████  █████  ██  ████  ████

15  █████  █████

16       A.    ████████  █  ██████████  ████

17       Q.    Okay.  So then if you could

18  turn, please, to page 8 of Exhibit 5.  ██

19  ████  █  ████  ████  ████

20       ████  ███  ███  █████  ████  ██  ████

21  ██  ███  ████

22       A.    ████

23       Q.    ████  ██  ██  ████  ████████

24  ████████  █████████  ██  ████  ████  █████

25  ████  ██  ██  ████████  ████████  ████████

Page 91

1        **STALEY**

2 ▮▮▮▮▮▮

3    A.    ▮▮▮

4    Q.    ▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮ ▮▮ ▮▮▮

5 ▮ ▮▮ ▮▮▮ ▮▮▮ ▮▮▮▮ ▮▮▮

6    A.    ▮▮▮

7    Q.    ▮▮▮ ▮▮ ▮▮▮ ▮ ▮▮ ▮▮ ▮▮▮

8 ▮▮▮▮ ▮ ▮▮▮ ▮▮ ▮▮▮ ▮▮▮ ▮▮▮

9       ▮▮ ▮▮ ▮▮ ▮▮▮

10   A.    ▮▮▮

11   Q.    ▮▮ ▮ ▮▮▮ ▮▮▮▮▮ ▮▮▮

12 ▮▮ ▮▮ ▮▮▮▮ ▮▮▮▮ ▮ ▮▮▮

13 ▮▮▮▮

14   A.    ▮▮▮

15   Q.    ▮▮▮ ▮▮ ▮▮▮ ▮▮ ▮▮ ▮▮▮

16 ▮▮▮ ▮ ▮▮▮▮▮ ▮ ▮▮ ▮▮ ▮▮▮

17 ▮▮▮ ▮ ▮ ▮ ▮ ▮ ▮▮▮ ▮▮▮

18 ▮▮▮▮

19   A.    ▮▮▮ ▮▮▮ ▮▮▮

20   Q.    ▮▮▮ ▮▮▮ ▮▮ ▮▮▮▮ ▮▮

21 ▮▮▮▮ ▮ ▮▮ ▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮

22   A.    ▮▮▮

23   Q.    All right.  So then if we turn

24 to the following page of this document,

25 page 9.



Page 92

1                    **STALEY**

2

3

4        A.

5        Q.

6

7

8

9        A.

10       Q.

11

12

13

14

15       A.

16       Q.

17

18

19

20

21

22       A.

23

24

25       Q.      Okay.   And so is it your

Page 94

```
 1              STALEY
 2   ████  ████
 3      A.   ████ ██ ██ ████████
 4      Q.   ████ ██ ██ ████ ███
 5   ███████████ ██ ████ ████ ███ ████ █
 6   ████ ███ ████ ███ ███ ████
 7   ████ ████ ████ ██ ███ ████
 8   ███ ██ ████ ██ ███ ███ ████ ████
 9   █████ ████ ████
10      A.   █ ██ ████ ████ ████ ███
11   █ ████ ███ ████ ███ ████ ███ █
12   ████
13      Q.   ████ ███ ██ █ ███ ██
14   ████ ███ ████ ███ ████ ██ ███
15   ████ ███ ████ █ ████ █████
16      A.   ███
17      Q.   Do you see that?
18      A.   Yes.
19      Q.   ████ ████ ████ █ █████
20   █ ████ ██ ████ ████ ███ █████
21   ████
22      A.   ███
23      Q.   ████ ██ ██ █ ████ ███ ██ ███
24   ████ ██ ████ ████ ████ ████
25   ██████ ███ █████ ███ ██ ████ ███
```

Page 95

STALEY



1

2

3

4    A.

5    Q.

6

7

8    A.

9    Q.

10

11

12    A.

13    Q.

14

15

16

17    A.

18

19    Q.

20

21    A.

22    Q.

23

24

25    A.



```
 1              STALEY
 2      identification, as of this date.)
 3             MR. RYAN:  This is, Evan, the
 4      next document in our binder.  So this
 5      is a document entitled ██████  ██████  ██████
 6      ████████  ██  ██████  ██████  ██████
 7      ██████  ██████  ██████  ██████
 8      ██████  ██████  ██████  ██████  ██ █
 9      ██████  ██████  ██████  ██████  ██████
10      ██████  ████████  ██████  ██████
11      Q.    And let us know, please,
12  Ms. Staley, when you've got Exhibit 6.
13      A.    Okay.  I have access.
14      Q.    All right.  And is Exhibit 61 of
15  the documents that you reviewed in
16  preparation for this deposition?
17      A.    Yes.
18      Q.    ██████  ██  ██  ██████  ██████
19  ██████  ██████  ██ █  ██████  ██ ██ ██ ██
20  ██████  ██████  ██████  ██████  ██████
21  ██████  ██████  ██████  ██████  ██████
22      A.    ██████  ██  ██████
23      Q.    ██ ██ ██ ██████  ██████  ██ ██████
24  ██████ █ ██  ██████  ██████  ██████
25  ██████  ██  ██████  ██████  ██████
```



1              STALEY

2  ███████  ██████  ██████  ██████  ██████  ██████

3  █████████  ███████  ███████  ██████  ██████

4      A.     ██████  ████  ██  █████████████

5      Q.     █████  ██████  █████  ███████  ███████

6  ████  ████████  ██████  █████  █████████  ███  ██████  ███████

7  █████████  █████  ██████  ████████  ██████  ██████

8      A.     ███  ████  █████  █████  ███████  ██  █████

9  █████████  ███  ████  █████████  ██████  ██████  ████

10 ███  ████  ███████

11     Q.     Do you believe that anybody at

12 DOCCS knows why New York State Division of

13 Parole staff made this request?

14     A.     I don't believe anyone that's

15 there currently has an understanding about

16 that.

17     Q.     Do you know who the New York

18 State Division of Parole staff were who

19 made this request of Northpointe?

20     A.     No, I do not.

21     Q.     ██████  ██████  █████  ████  ████  ██████

22 ████  ███████  ██████  ███████  ████████  █

23 █████████  ███████  ███████  ██████  ███████

24     A.     █████

25     Q.     █████  ███  █████  █  █████████  ███  █████



Page 102

```
 1                  STALEY
 2   ████████  ████████  ████████████  █
 3      Q.  ████  █  ████  ████████████  ████
 4   ██████████  ████████  ██████  █  ████  ████████
 5   ██████  ████████  █  ████  ████  ████  ██████████  █
 6   ██  █  ████  ████  ████  ████  ████████
 7      A.  █  ████████████  ██████  ████  ████  ████
 8   ██████████  ████
 9      Q.  ████  ████  ████  ████  ████  █
10   ██████████  ████  ████  █  ████  ██████  ██████
11      A.  ████
12      Q.  ████  ████  ████  ████  ████
13   ████
14      A.  ████████  ████  ██████  ████  █
15   ████  ████████  ██
16      Q.  ████  ██  █  ████  █  ████  ██████
17   █  ██  ████  ████  █  █  ████  █  ████
18   ██  ██  ██████  ██████  ██████  ██  ██████
19   █  ████████  ████████  ████████  ██████  █
20   ██████████  ████  ████  ████  █  ██████  █
21   ██████  ████  ██████
22      A.  ████
23          MR. HARBEN:  We're on page 6
24      now?
25          MR. RYAN:  Page 2 of Exhibit 6.
```

```
 1                    STALEY
 2      It's page 86902.
 3      Q.    What is a stepwise survival
 4   modeling approach, Ms. Staley?
 5      A.    It's -- it's not something I use
 6   in my everyday workplace, and I haven't
 7   studied this since I was in graduate
 8   school.  But my general understanding is
 9   it's an approach that allows you to put in
10   various factors into an analysis model,
11   and stepwise means you put a different
12   factor in each step of the process to see
13   how much predictive capability each factor
14   adds or each variable adds.
15      Q.    ███████ ██ ██ ██ ██ █ ████
16   █ ████ ████ █ █ █ ████
17   ████████ ███ ██ ██ ████
18   ██████ ███ █ ███ ██ █████
19      A.    █████ █ █ ████
20      Q.    ████ █ ██████ ██████
21      A.    ████ ██ █ ██ ██ ████
22   █████ ████
23      Q.    █████ ███ █ ████
24   ██████████ ███ ███ ████
25   ████ ████ ███████ ██ ████ ████
```

Page 104

1        **STALEY**

2   ████ █ ████ █ ████ ████ ████

3   █ ██ ██ ████ ██ ██ ██ ████

4   ████ ████ ████

5      A.   ████ █ █ ██████ █ ████

6   ██ ██ ██

7      Q.   ████ █ ████ ██████ ████

8   ████ ████ █ ██ ████ ████

9   █████ ██ ████ ████ █ █ ████ █████

10  ████

11     A.   ████ ████ ████ ██

12  ████

13     Q.   Are you familiar with the term

14  "overfitting"?

15     A.   I have heard the term.  Yes.

16     Q.   And what does "overfitting"

17  mean?

18     A.   I believe it's where you try to

19  fit a model to a population that it may

20  not have been developed with, that might

21  not fit as it would have -- it might not

22  fit as well as one would expect or hope.

23  But again, it's not something I use

24  routinely in my work life, so I could be

25  mischaracterizing that.

Page 105

1               STALEY

2      Q.     Is overfitting when a model is

3   developed based on a particular dataset

4   and it's then picking up noise or

5   arbitrary characteristics from that

6   dataset leading to an apparently higher

7   correlation than would apply if the model

8   were applied to a new dataset?

9      A.     That -- that sounds correct to

10  me.  Yes.

11     Q.     ███ ███ ███ ███ ███ ███ ███

12  ███ ███ █ ███ ███ ███ ███ ███

13  ███ █████ ███ █ ███ █

14  ███ █

15     A.     █ ███ ███ ███ ███ █ ███ ███

16  ███

17     Q.     ███ ██ ███ █████ ███ ███

18  ███ █████ █ ███ ███ ███ ████

19  ███ ███ ███ ███ ███ ███ ███

20  ███ ███ ███ █ ██ ███ ███

21  ███ ███ █ ██ ███ ███ █ ███ █

22  ███ ███ ███

23     A.     ███ ██ █ █████ ███

24     Q.     If you could turn, please, to

25  page 5.

Page 106

```
 1            S T A L E Y

 2      A.    Okay.

 3      Q.  ████ ██ ██ ██ ██ ███ ████ █ █

 4  ████ ██ ████ ███ █ ████ ███ ████ ██

 5  ███ ████ ██ ███ ███ ███ ████ ████

 6  █████ ██ ███ ███ ████ ████

 7      A.  ███

 8      Q.  ███ ███ ████ █ ████ ████ ███

 9  ███ ███ ███ ████ ████ ███ ██ ███

10  █████

11      A.  ███

12      Q.  ███ ███ ████ █████ ███

13  ███ ███ ███

14      A.  █ ████ ██ ████ █ ███

15  ████ ██ ███ ████ ██ ███

16  ████ ██ ██ ███ ██ ████ █

17  ████ ███ ████ ███ ████ ███

18  ███ ████ ██ ███ ███ ███ ██

19  ███ ██ ██ ███ ███ ██ ██

20  █████ ██ ███ ██ ██ ███ ████

21  ███ ███ ███ █ ███ ███ ███ █

22  ███ ███ ██ ███ ███ ██████

23  ██ ███ ████ ████ ██ ███ ███

24  ███ ████ ███ ██ █ ███ ████ █████

25  ███ ███ ███ █ █████ ███ ███
```



Page 107



1            STALEY

2

3        Q.

4

5

6

7        A.

8

9

10        Q.

11

12

13

14

15        A.

16

17

18

19

20

21

22

23

24

25        MR. RYAN:   That's a fair

```
 1              STALEY
 2       question, Jeb.  Let me ask the
 3       question both ways.
 4       Q. ████ ███ ██ ████ ██ ████ ███
 5  ███████ █████████ ██ ███████ ██ ███
 6  ████ █
 7       ████ ██ ████ ██████ ██ ████
 8  ████████ █████████ ██ ████ ████ ███ █
 9  █████ ██████ █████ ██ █████ ████ █████
10  ████ █
11       A. ████ ██ ██ ██████ ██ ████
12  █████ ██████ ██ ████
13       Q. ████ ███ ████ ██ ███ █████
14  █████ █████ █████ ████ ████ ████ ████
15  █████ ████ ██████ ████████ ██████████
16  █ █████ ████ █████
17       A. ████ ███ ██ ████ █████████ █
18  ████ ██ █ ████ ██ ████ █████ ███ █
19       Q. ████ ███ ████ ████ ████ ███
20  ██████ ██ ████ █████ ██ ███████████
21  ████████ ██████ ███ █████ ████ █████ █
22  █████ █ ██ █████ █████ ██ ████████████
23      ████ ███ █████ █████ ██ ████ █████
24  ████████████ ████ █ ██ █████ ██████ ██ ████
25  ████ ████ █████
```



Page 110

1             STALEY

2    Q. ████████ ██ ██ ██ ██ █ ██████

3 ██ ████ ████ █ ████ ████ ██████ ██

4 █████ █████ ████ █████ █ █████ ████

5 ████ ███ ███ ████ ██ █ ████ ██████

6 ██ ██ ████ █ ██ █████ ██ ████

7 ████

8    A. ████

9    Q. ███ ██ ██ ██████████

10 ████ ███ ███ ███ ████ ███ ███

11 ████ ██ ██ ████ ████ ██ ███ ███

12 ████ ██ ██ ████ █████ █████

13    A. ████

14    Q. ███ ██ ██ ██ ██████ ████

15 ██ ████ ████ ████ ██ ████ ███

16 ██ ██ █ ███ ██ ██ ██████

17 ██████

18    A.    Give me a moment to review.

19          (Witness perusing document.)

20          MR. HARBEN:  Can I take a pause?

21    Because my doorbell is ringing and I

22    don't know what it is.

23          MR. RYAN:  Yes.  That's fine.

24          THE VIDEO TECHNICIAN:  The time

25    is 12:15.  We are off the record.

Page 111

```
 1              STALEY
 2          (Recess)
 3          THE VIDEO TECHNICIAN:  The time
 4      is 12:16.  We are on the record.
 5  BY MR. RYAN:
 6      Q.   ████  ████  ███  ████  ████
 7  ████  ██████  ████  ████  ██  ████  █████
 8  ████  ██████  ███  ███  ███████  ██  ██████ █
 9  ████  ███  ███  █████  ██  ██  ██  ██  ████
10  ██████  ██████
11      A.   █ ███  █████  ███  █ █  █████  ███
12  ██████  ███  ████  ██████  ████  ██████
13      Q.   ████  ███  ███████  ██████  █
14  ██████  ████  ██████  ████  ████
15  ██████  █  █████  █████  ████████
16  ██████  █████  █  ███████  ███  ███  █████
17  ███  ██████  ███  ███  ████  ██████  █████ █
18  █ ████
19      A.   ████  ███  ████  ██████  ████
20  ████  ████  ██████  ████
21      Q.   Okay.  So if you could then
22  turn, please, to page 15 of Exhibit 6,
23  Bates number ending in 86915.
24      A.   Yes.
25      Q.   ███  ███  ███  ████  █  ███████  ███
```



Page 129



Page 130



1          STALEY

2
3
4     A.
5     Q.
6
7
8     A.
9     Q.
10
11
12
13    A.
14    Q.
15
16
17
18
19
20    A.
21    Q.
22
23
24    A.
25

Page 131



STALEY

3    Q.

10    A.

12    Q.

20    A.

22    Q.

25    A.



```
 1                    STALEY
 2  gave -- does that mean that if we've got
 3  two groups of people, one who recidivate
 4  and one who don't recidivate, and we
 5  randomly select somebody from the
 6  recidivating group, that there's a
 7  70 percent chance that that person's risk
 8  score will be higher than the risk score
 9  of someone we randomly select from the
10  non-recidivating group?
11       A.    Again, I'm not comfortable
12  speculating on that.  It's been too long
13  since I've had -- I've worked with them
14  regularly.
15       Q.    ███████  ████  ████  ████  ████  ████  ████
16  ████  ████  ████  ████  ████  ██  ██  ██  ████  ████
17  ████  ████  █  ███████████  ███████████
18  ████████
19       A.    ████████  ████  ████  ████
20  ████████  ████████
21       Q.    Okay.  But you would agree with
22  me that a high area under the curve does
23  not mean that COMPAS is good as predicting
24  whether a particular individual is going
25  to re-offend.
```

```
 1                     STALEY
 2      A.      That is -- that's correct.
 3      Q.      All right.  Now, we've been
 4  talking a lot about these risk scores,
 5  these three risk scores that are included
 6  in New York State reentry COMPAS.  There
 7  are also a whole variety, a dozen or more,
 8  needs scales; right?
 9      A.      Yes.
10      Q.      And is it your understanding
11  that those needs scales were developed to
12  try to capture needs during a parole
13  supervision period?
14      A.      That is my understanding.
15      Q.      All right.
16      A.      Yes.
17      Q.      There's no necessary correlation
18  between the score on a particular needs
19  scale and the likelihood that somebody
20  will re-offend, is there?
21      A.      I'm not sure that I can -- I'm
22  not sure that I can answer that.  I mean,
23  based on -- I don't know.
24      Q.      Okay.  Let me see if I can ask
25  it a different way which is clearer.
```

Page 152

```
 1            STALEY
 2       Do you agree with me that
 3  Northpointe developed the three risk
 4  scores to try to measure correlation
 5  between the risk score and the particular
 6  outcome at issue, one of those three
 7  outcomes, but that is not why Northpointe
 8  developed the needs scores?
 9       A.    I really can't speculate about
10  exactly why the needs were developed or
11  what the intention was.
12       Q.    Okay.  And let me just maybe ask
13  it one other way.
```



Page 154

STALEY



```
                                        Page 155
 1                    STALEY

 2    ████ ███ █████████ █████ ████████

 3       Q.   █████ █ ██ ██████ █ ███

 4    █████ █████ █████ █████ ██ █

 5    ███████████ █████ ████████ ████ ████

 6    ████ █████ ████ ███ ██ ████████ ██

 7    ███████ ██████

 8       A.   █████ ██ ██ ████████

 9       Q.   All right.  Let's look at

10    another document.

11            MR. RYAN:  This will be Tab 1E

12       in the binder, Evan.  So this will be

13       Exhibit 9.  And ████ █ █████ █████

14       ████ █████ ████ █████ █ ████

15       ███ ████████ ██████

16            (Staley Exhibit 9, ██ ████

17       ████ █████ ██████ ██ ████ ████

18       ████████████ was hereby marked for

19       identification, as of this date.)

20       Q.   And while this document is being

21    loaded, let me ask you, Ms. Staley, do you

22    know Catherine Jacobsen from DOCCS?

23       A.   Yes.

24       Q.   Who is Ms. Jacobsen?

25       A.   She is now retired.  She was an
```

Page 156

```
 1              STALEY
 2  assistant commissioner for program
 3  services who oversaw COMPAS while she was
 4  in that position.  She then became a
 5  superintendent.
 6      Q.    Okay.  And so your understanding
 7  is that she was knowledgeable about
 8  COMPAS?
 9      A.    Yes.
10      Q.    Okay.  So do you now have
11  Exhibit 9 in your Exhibit Share?
12      A.    Yes, I do.
13      Q.    ███ ██ ██ ██ ██ ██ ███ ██
14  ███ ██ ███ ██ ██ ██ ███
15  ██ ███ ██ ███ █████
16  █████ ██ ██ ██ ██ ██ ████
17  ██ ███ ████ ██ ██ ███
18  ███ ██ ███ ██ ██ ███
19        ██ ██ ██ ███
20      A.    ██
21      Q.    Who is Mr. O'Brien?
22      A.    He is the director of operations
23  for community supervision at DOCCS.
24      Q.    Got it.  Okay.
25            And do you see that Ms. Jacobsen
```

Page 160

1              STALEY

2

3      A.

4      Q.

5

6           Who is Ms. Kelderhouse?

7      A.    I don't recall her position, but

8    she was -- she is one of the people over

9    the years that we have worked with at

10   Northpointe.  She would have been one of

11   the people on the regular calls -- the

12   regular steering committee calls.

13     Q.    And is it your understanding

14   that Equivant is another name for

15   Northpointe?

16     A.    Yes.

17     Q.

18

19

20

21     A.

22     Q.

23

24

25

Page 161





Page 162

STALEY

Page 163

1          S T A L E Y

2

3     A.

4     Q.

5

6

7

8

9     A.

10

11    Q.

12

13

14

15

16

17

18

19

20    A.

21    Q.

22

23

24

25

Page 164

1        STALEY

2   ████ ████ ████ █████ ██ ███ ██████ ██

3   ███ ██████ █████ ███████ █████ ████ ██████

4   ██████████ ██ ███ ██████

5        A.        ████

6        Q.      Who is Mike?

7        A.      That would have been Mike

8   Buckman, who was the former director of

9   policy analysis for the Division of Parole

10  prior to the merger of the Division of

11  Parole and DOCCS.  He has since retired.

12       Q.      Okay.  And director of policy

13  analysis, was that a name for something

14  that's similar to your group today?

15       A.      Yes.  It was essentially the

16  research office for the Division of

17  Parole.  And when the department merged

18  with the division, that office merged with

19  my office.

20       Q.      Got it.  Ms. Bryant then came

21  over from that office.

22       A.      Correct.

23       Q.      And did Mike Buckman continue to

24  work at DOCCS after the merger of the two

25  agencies?

Page 168



Page 169



Page 170

1    STALEY

2    ████████  ████████  ██████████  ██████  ██████

3    ██████████  ██████  ██████ █ ████  ██████████

4    ████████████  ████████  ██████  ██████  ██████

5    ██████████  ██████  ██████  ████████████  ████████

6    ████  ██████  ██████  ██████████████  ████████

7       A.    ██  ████████  ████████  ████████

8    ██████████████  ██████  ██████████  ██████████  ██████  ████████████  ██████

9    ████  ████  ████  ████████  ████  ██████  ██████████  ████████

10       Q.    Okay.  All right.  I'm done with

11   this document.

12            Let me just find my question

13   here.

14            Are you aware that the Board of

15   Parole has a regulation about periodically

16   validating a risk assessment instrument?

17       A.    No, I am not aware of that.

18       Q.    Okay.  And you're not aware of

19   any periodic validation that's been done

20   on the New York State reentry COMPAS;

21   right?

22       A.    I am not aware of one, no.

23       Q.    All right.  And the next

24   document will be Exhibit 12.

25            MR. RYAN:  And this is Tab 12 in

Page 171

1              STALEY

2      the binder, Evan.  ████  ██ █

3   ████  ████  ████  ████  ████  ████

4   ████  ██  ██████████  

5         (Staley Exhibit 12, ██  ████

6   ████  ████  ██████  ████  ████  ████

7   ████████████        was hereby marked for

8      identification, as of this date.)

9      A.    Okay.

10     Q.    ████ █ ██ █ ██ █ ████ ████

11  ██ ████ ████ █ ██ ████ █ ██ ████

12  ████ ████ █ ████ █ ██ ████ ████ █

13  ████ ████ ██ ██ ████ ████

14  ████ ██████ ██ ████ ████

15         ██ ██ ████ ████

16     A.    ██

17     Q.    Do you know Mary Vann?

18     A.    Yes.  She's a former assistant

19  commissioner for program services at

20  DOCCS, currently a superintendent.

21     Q.    ████ ████ ██ ████ ████ █

22  ████ ████ █ ██████ ████ ████ ██

23  ████████ ████ ██████ ██ ████ ████

24  ████ ████ ██ ████ ██████

25     A.    ██

Page 172



Page 173

1        **STALEY**

2

3

4    Q.

5

6

7

8

9

10   A.

11

12

13   Q.

14

15

16

17

18

19

20   A.

21

22

23

24

25

Page 174

1                    STALEY

2      Q.  ▓▓▓ ▓▓ ▓▓▓ ▓▓▓
3   ▓ ▓▓ ▓▓▓ ▓▓ ▓▓ ▓ ▓▓▓
4   ▓▓▓▓ ▓▓ ▓▓ ▓▓▓ ▓▓
5   ▓▓▓ ▓ ▓▓▓ ▓▓ ▓▓ ▓▓ ▓▓
6   ▓▓ ▓▓ ▓ ▓▓ ▓ ▓ ▓▓▓
7   ▓▓ ▓▓ ▓▓ ▓ ▓▓ ▓ ▓
8   ▓▓▓ ▓▓

9      A.  ▓ ▓ ▓▓ ▓▓ ▓▓
10  ▓▓▓ ▓ ▓▓ ▓ ▓ ▓▓ ▓
11  ▓▓ ▓▓

12     Q.  ▓▓ ▓ ▓▓ ▓▓
13  ▓ ▓ ▓▓ ▓▓▓ ▓ ▓ ▓▓
14  ▓▓ ▓▓ ▓ ▓▓ ▓▓
15  ▓▓▓ ▓ ▓▓ ▓ ▓▓
16  ▓ ▓▓ ▓▓ ▓▓ ▓ ▓
17  ▓▓ ▓▓ ▓ ▓▓ ▓▓ ▓
18  ▓ ▓▓ ▓ ▓ ▓▓ ▓▓ ▓
19  ▓▓▓ ▓▓ ▓ ▓

20     A.  ▓ ▓▓ ▓▓ ▓▓
21  ▓ ▓ ▓▓ ▓ ▓ ▓▓ ▓

22     Q.   Okay.  So let's go back to
23  the -- this was in Exhibit 1, which is the
24  list of 30(b)(6) topics on the last page
25  of Exhibit 1.

```
                                          Page 175
1                    STALEY
2       A.      Okay.
3       Q.      So Topic 1, "DOCCS' selection of
4   COMPAS," do you have any information on
5   that topic that we have not discussed
6   already?
7       A.      No.
8       Q.      Topic 2, "The search criteria
9   employed by DOCCS for a risk/needs tool."
10           If I understand right, you don't
11  have any information on that topic; is
12  that right?
13      A.      That's correct.
14      Q.      Okay.  Let's just skip 3 and 4
15  for a moment, because I'm going to come to
16  those in a few minutes.
17           Topic 5 is "Customization of
18  COMPAS for New York State"; right?
19      A.      Yes.
20      Q.      Okay.  And we've obviously spent
21  some time today talking about that topic.
22           Do you have any information
23  about the customization of COMPAS for New
24  York State that we've not talked about
25  already today?
```

Page 188

STALEY



STALEY

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Page 190

1              **STALEY**

2    ██████ ████████████ █████████ ████ ████ ████

3    ████ ███████████

4       Q.   ██████ ██████ █████████ █ █████ ████████

5    ██████ █████████████ ████ ████ ████████████████

6       A.   ██████ ████████ █████ █████ ███████ ███

7    ██████

8       Q.   ██████ █████ ██████ ██████ █████

9    ██████████ ███████ ████████ █

10   ██████████████ ████████ ████ █ ████ ████████

11   ████████ ████ ████████ █████ ████████ ███

12   █████ ████ ████████ █████ █████ █████████

13   ████████████ ████████ ████ ████████ █████ █████

14   ████ █ ████████ █████ ████████ █████

15   ████████████

16      A.   ████ █ █████ ████████ █ █████ █████

17   ██████ █████████ ████████████ ████ █████ █████

18   ████████████ ████ █████████ ████ ████ ████████

19   ██████

20      Q.    Has DOCCS ever tried to do a

21   study of that question, that is, to see

22   how consistent COMPAS scores are from one

23   assessment to the next?

24      A.    Not to my knowledge.

25      Q.    Are you aware of any study that

Page 191

STALEY

1

2  DOCCS has done to try to see what the rate

3  of staff error is in entering data for the

4  COMPAS instrument?

5      A.    Not -- not that I am aware of.

6  But again, I don't -- I'm not

7  operationally involved in the

8  administration of them.  But I'm not aware

9  of an effort like that.

10      Q.    Okay.  Is that something that

11  Ms. MacTavish would be perhaps more

12  familiar with than you?

13      A.    Potentially.

14      Q.    And you and she worked together

15  on this PowerPoint presentation to

16  executive staff here in Exhibit 13; right?

17      A.    That is -- that's what I recall.

18  Yes.

19      Q.    If we go to Tab 21 -- I keep

20  saying tab -- to Slide 21 in this

21  PowerPoint deck.  Excuse me.

22  ███ ███ ███ ████ ████ ████ ████

23  ███████ █ ████ ████ █ ██████ ████

24  ██████ ████ █████ ██████ ████

25  ███ ████ ████ ████ █████ ████

Page 192





Page 194

1          STALEY

2     Q.   ██████ ████ ████ ██████ ██████

3  ██████ ██████████ ████████ ████ █ ██████ █ ████

4  ████████ █ ██████ ████ ██████ █

5  ██████ ████████

6        ███ ████ ████ ██████ ██ ████ ██

7  ██████ ████ ████ ████ ██████ █

8  ██████ ██████ ████ ██████ ██████

9     A.   ███ ████ ██ ██████ ██

10 ██████ █ ████ █ ████ ██████ ██ █

11 ████████ █ ████ ██████ ██ ██ ████████

12     Q.    Okay.  If you're trying to use

13 the instrument to predict the risk that

14 someone will actually commit a felony

15 offense as opposed to the risk that

16 somebody will get arrested, do you agree

17 that it would be better to correlate with

18 conviction outcomes and not all arrest

19 outcomes?

20     A.    Convictions would be helpful to

21 have for that type of a scenario.

22     Q.    Let me turn to Slide 34.

23           ███ ███ ████ ████ ███ ████ ██████

24 ██████ ██ ████ ████████ ██████████

25     A.    ████

1    STALEY

2    Q.

3

4

5

6

7

8

9

10   A.

11   Q.

12

13

14

15

16

17

18   A.

19        Q.    And your understanding is that

20   DOCCS couldn't inform folks who are up for

21   parole of what the relative weighting of

22   the factors is; right?

23        A.    At the time that this was done,

24   we weren't aware that we even had

25   information that was -- that pertained to

```
 1                    STALEY
 2   this.  We didn't know that we had that
 3   information to even be sure.  So it wasn't
 4   something I thought about.
 5        Q.    Okay.  All right.  So at the
 6   time that you prepared this slide deck in
 7   2017, you didn't even know that DOCCS had
 8   the information from Northpointe to begin
 9   with; right?
10        A.    Correct.
11        Q.    And you came to learn that in
12   the last few weeks or months, as you
13   prepared to give this deposition; right?
14        A.    Yes, a shorter timeframe, but
15   yes.
16        Q.    Okay.  You learned this just in
17   the last week or two as you prepared to
18   give this deposition; is that right?
19        A.    Yes.  Fair to say.
20        Q.    But even as you sit here today,
21   it's your understanding that DOCCS would
22   not be permitted by Northpointe to share
23   these Northpointe risk algorithms with
24   parole release applicants; right?
25        A.    That is my understanding.
```

```
 1                   STALEY
 2      Q.     Okay.  To the best of your
 3   knowledge, has DOCCS ever shared these
 4   algorithms with the Board of Parole?
 5      A.     I am not aware that they've
 6   been -- I don't know.  I don't know if
 7   they've been shared with the Board of
 8   Parole.
 9      Q.     Okay.  To the best of your
10   knowledge, the algorithms in the New York
11   modified reentry COMPAS are black boxed
12   for the Board of Parole commissioners as
13   well; right?
14      A.     Again, as far as -- I have no
15   knowledge if they had any insight into
16   them.  I don't know.
17      Q.     Okay.  When you and
18   Ms. MacTavish prepared this slide
19   presentation in Exhibit 13, you believed
20   that transparency in a risk instrument was
21   generally a good thing; right?
22      A.     Yes.
23      Q.     And you thought it would be
24   better if DOCCS could provide transparency
25   into how the risk instrument works; right?
```

Page 226



1               STALEY

5      A.

6      Q.

11     A.

12     Q.

17     A.

18     Q.

25     A.

Veritext Legal Solutions
www.veritext.com
212-279-9424              212-490-3430



Page 228

1        S T A L E Y





Page 229

1          STALEY

2

3     Q.

4     A.

5

6     Q.

7

8

9

10    A.

11

12    Q.

13

14

15

16

17

18

19

20

21

22

23    Q.

24    A.

25

```
 1                    STALEY
 2      Q.    Are you aware of anyone who has
 3  been asked by their supervisor to go and
 4  try to figure out what the error rate in
 5  these COMPAS assessment forms is?
 6              MR. HARBEN:  Are you asking
 7       state-wide?  Facility-wide?  Where --
 8              MR. RYAN:  Anywhere -- I have a
 9       DOCCS 30(b)(6) witness, and I'm asking
10       about DOCCS.
11      Q.    Are you aware of anybody in
12  DOCCS who has been asked to do that,
13  Ms. Staley?
14      A.    I am not personally aware of
15  people -- anyone being asked to do that.
16  That doesn't mean it has not happened.
17  I'm just not aware of it.
18      Q.    Okay.  One of the topics on
19  which you're designated as a witness here
20  today is DOCCS' administration of COMPAS;
21  right?
22      A.    Yes.
23      Q.    Okay.  And you understand that
24  you're providing testimony on behalf of
25  DOCCS on that topic; right?
```

```
 1                    STALEY
 2       A.    I do understand that.
 3       Q.    Okay.  And as the witness on
 4  DOCCS' administration of COMPAS, you're
 5  not familiar with anybody in DOCCS being
 6  asked to study what the error rate is;
 7  right?
 8       A.    I am not familiar.
 9       Q.    At some point in time, did DOCCS
10  start providing copies of portions of the
11  COMPAS risk assessment to individuals who
12  were coming up for a parole release
13  interview?
14       A.    I'm not familiar with
15  operationally what materials are provided
16  to incarcerated individuals prior to their
17  Parole Board interview.
18       Q.    Okay.  Let me show you
19  exhibit --
20            MR. RYAN:  This will be
21       Exhibit 17.  Right?  It's Tab 21 in
22       our binder, Evan.  And this is a
23       document -- it appears to be an
24       official DOCCS directive.
25
```

```
 1                    STALEY
 2            (Staley Exhibit 17, DOCCS
 3       Directive 8500 dated August 14, 2019,
 4       was hereby marked for identification,
 5       as of this date.)
 6            MR. RYAN:  Here we go.  This is
 7       Directive No. 8500 dated
 8       August 14, 2019.
 9       A.    Okay.  I see that.
10       Q.    What is a DOCCS directive?
11       A.    Essentially, it's a policy that
12  provides guidance for various, many, many
13  policies in the department.
14       Q.    And do you see that the title of
15  this directive is "COMPAS Assessments/Case
16  Plan"?
17       A.    Yes.
18       Q.    Are you familiar with Directive
19  No. 8500?
20       A.    Not -- no.
21       Q.    Do you know whether there are
22  any other DOCCS directives that relate to
23  COMPAS?
24       A.    No, I do not.
25       Q.    Do you know who the individual
```

Page 239

```
 1              STALEY
 2  assessment is a tool developed primarily
 3  to assist community supervision in the
 4  allocation of parole supervision
 5  resources."
 6            Do you agree with that?
 7       A.    Yes.
 8       Q.    So would you agree, then, that
 9  the COMPAS reentry risk and needs
10  assessment was not developed primarily to
11  assist the Board of Parole in making
12  parole release decisions?
13       A.    That's -- my understanding is it
14  was primarily developed to assist with the
15  allegation of parole supervision
16  resources.
17       Q.    And indeed, is it your
18  understanding that when the COMPAS reentry
19  tool was developed, it wasn't even
20  contemplated that it would be used to help
21  guide parole release decisions?
22       A.    I can't speculate, since I
23  wasn't involved at that time.
24       Q.    All right.  But you're not aware
25  of any consideration of that use of COMPAS
```

Page 240

```
 1              STALEY
 2  reentry when it was developed; right?
 3      A.   I am not aware of it being
 4  intended for any other use at the time it
 5  was developed.
 6      Q.   Any other use other than the
 7  allocation of parole supervision
 8  resources; right?
 9      A.   Correct.
10      Q.   ████ ██ ██ ██ ██ ██
11  ████ ████ ██ ██ ██ ████ █
12  ████ ██ █ ██ ██ █ ████
13  ████ ██ ████ █ ████ ██ █
14  ████
15      A.   ██ █ ██ ██
16      Q.   ██ █ ██ ██ ██ ██ █ █
17  ████ ██ ██ ██ ████
18  ███ ██
19      A.   ██
20           MR. HARBEN:  May I interject
21      here for a moment that this appears to
22      be a document that was inadvertently
23      produced, at least in whole or
24      possibly in part, and we'll reserve
25      our right on it to request a clawback
```

Page 241

```
 1                    STALEY
 2       once I've had the opportunity to go
 3       through it further.  It's in front of
 4       the witness now, so continue.
 5            MR. RYAN:  Okay.  I don't
 6       believe it is actually privileged.
 7       But I see it does bear that ledger.
 8  BY MR. RYAN:
 9       Q.     All right.  Why don't we take a
10  quick break while I see if I have any
11  further questions, Ms. Staley.
12            THE VIDEO TECHNICIAN:  Counsel,
13       the time is 4:25.  We are off the
14       record.
15            (Recess)
16            THE VIDEO TECHNICIAN:  The time
17       is 4:27.  We are on the record.
18            MR. RYAN:  Ms. Staley, thank you
19       for your time.  Those are all the
20       questions I have for you today.
21            I will follow up with you, Jeb,
22       because I do think that there are a
23       number of 30(b)(6) topics, you know,
24       that the witness was not adequately
25       prepared on.  But, you know, there's
```

Page 251

1

2                    C E R T I F I C A T I O N

3

4      I, SHARON PEARCE, RDR, CRR, CRC,

5   NYRCR, a Notary Public for and within the

6   State of New York, do hereby certify:

7        That the witness whose testimony as

8   herein set forth, was duly sworn by me;

9   and that the within transcript is a true

10  record of the testimony given by said

11  witness.

12       I further certify that I am not

13  related to any of the parties to this

14  action by blood or marriage, and that I am

15  in no way interested in the outcome of

16  this matter.

17       IN WITNESS WHEREOF, I have hereunto

18  set my hand this 13th day of December,

19  2021.

20            *Sharon Pearce*

21   _____

22            SHARON PEARCE

23        RDR , CRR, CRC, NYRCR

24            *     *     *

25