# EXHIBIT 26

Expert Report of James Austin, Ph.D.

*Flores, et al. v. Stanford, et al.*, No. 18-cv-02468 (VB) (JCM)

September 26, 2022

CONFIDENTIAL

**Introduction**

This report contains my analysis of minor offenders (persons who committed crimes while under the age of 18 sentenced to life with the possibility of parole in New York state) as they relate to the Flores v. Stanford litigation. It focuses on the actions taken by the New York State Board of Parole ("NYSBP") in terms of its decisions to grant parole when these people known as minor offenders sentenced to life with the possibility of parole become eligible for parole under current New York sentencing statutes. For the purposes of this report this population will be referred to as "minor offenders" as the Flores litigation does not concern any person who has not received a sentence of life with the possibility of parole.

At issue is whether the NYSBP is taking sufficient consideration in its decision-making process under the applicable caselaw and its own regulations of the fact that the crimes committed by the minor offenders occurred as a minor, as well as the attendant circumstances relevant to their youth, as opposed to being an adult, which is defined as 18 years or older.

In conducting my analysis, I relied heavily on the following:

1. Expert Report of Cynthia Rudin, Ph.D. (and materials cited);
2. Expert Report of John E. Wetzel (and materials cited);
3. Expert Report of Laurence Steinberg, Ph.D. (and materials cited);
4. NYSBP interview transcripts for 60 current and formerly incarcerated minor offenders;
5. New York State Department of Corrections and Community Supervision (DOCCS) report titled 2015 Releases from Custody Three Year Post-Release Follow-Up.
6. Depositions of NYSBP commissioners

I also received from the New York State Department of Corrections and Community Supervision ("DOCCS"), which maintains data and other information on behalf of the NYSBP as well as employs parole officers who supervise parolees, the following data files to conduct statistical analysis:

1. All DOCCS releases between 2015 and September 2021 for incarcerated individuals serving life sentences with the possibility of parole;
2. All Board of Parole Minor Offender interview appearances between 2019 and 2021;
3. Minor offender still in custody as of July 2022 who have been denied parole;
4. Statistical tables that compare parole grant rates for minor offenders and adults with life sentences for 2nd Degree Murder for 2019-2021; and
5. Three-year return to prison recidivism data for minor offenders released in 2015.

**Relevant Background**

I began my career in 1970 when I was employed by the Illinois Department of Corrections (IDOC) in 1970 as a correctional counselor at the Joliet Correctional Center. In 1972, I was assigned to the position of Correctional Sociologist and worked at the Statesville Correctional Center. My

work there was to prepare reports for prisoners appearing before the Illinois Parole Board. During that time between 1972 and 1974, I completed my master's degree in sociology at DePaul University.  My thesis was on the Illinois Parole Board decision-making process.

After leaving the IDOC, I accepted a research associate position in with the National Council on Crime and Delinquency (NCCD) in 1974.  While at NCCD, I received my Ph.D. in sociology at the University of California at Davis in 1980.   I eventually became the Executive Vice President of NCCD until I left in 1998 to accept the position of Research Professor and the Director of the Institute for Crime, Justice, and Corrections at The George Washington University (GWU) Department of Sociology.

I left GWU in 2002 to form my own research non-for-profit organization called the JFA Institute, which I am currently affiliated with.

I have conducted many studies of correctional programs and policies.  But most relevant to this analysis is my work in developing and/or evaluating adult parole board decision-making practices.  That work has also entailed developing risk assessment instruments for parole boards. These studies have included the Maryland, Kentucky, Nevada, Texas, U.S. Parole Commission, Arkansas,  and Pennsylvania. I have also conducted validation studies of several risk assessment instruments including the LSI-R and COMPAS. In this litigation I am being compensated at the rate of $250 an hour.

**Statistical Analysis of the NYSBP Decision-Making Process**

The central comparisons to be made are those minor offenders  and similarly situated adults who are also eligible for parole.  Virtually all of the minor offenders have been convicted of 2nd degree murder, so the relevant comparisons between minor and adult lifers is limited to adults convicted of 2nd degree murder.

Minor (and adult) offenders eligible for parole release are interviewed by a panel, typically consisting of three NYSBP members, although sometimes two. This is a non-adversarial process.

Table 1 and 2 show the Parole Board grant rates of minor offenders and adults convicted of 2nd degree murder.  In general, the number of people appearing before the NYSBP is declining.  And there is a systemic higher grant rate for the minor offenders as compared to the adults convicted of 2nd Degree Murder. For example, in 2021, minor offenders were granted parole 48% of the time, while adults were granted parole 42% of the time, a 12.5% difference in release rates**.**  The higher minor offender parole rate is driven by higher initial and re-appearance rates (see Appendix).

**Table 1.  Board of Parole Interview Results for Adult Lifers Convicted of 2nd Degree Murder**

|  | Cases | Postponed | Cases Heard | Granted | Grant rate |
|---|---|---|---|---|---|
| 2019 | 978 | 116 | 862 | 336 | 39% |
| 2020 | 785 | 82 | 703 | 269 | 38% |
| 2021 | 782 | 109 | 673 | 286 | 42% |
| Total | 2,545 | 307 | 2,238 | 891 | 40% |

**Table 2. Board of Parole Interview Results for Minor offenders**

|  | Cases | Postponed | Cases Heard | Granted | Grant rate |
|---|---|---|---|---|---|
| 2019 | 125 | 17 | 108 | 44 | 41% |
| 2020 | 114 | 18 | 96 | 42 | 44% |
| 2021 | 91 | 10 | 81 | 39 | 48% |
| Total | 330 | 45 | 285 | 125 | 44% |

The current overall 48% grant rate and the higher 53% initial (non-LCTI) rate means that the vast majority of the minor offenders will be released either at their first or second interview following their PED. Specifically, with a 48% parole rate, 78% of the minor offenders will be released at either their first or second interview and nearly 90% will be released after three interviews.

Moreover, based on my review of interviews and parole release decisions concerning the subject population, minor offenders are often given short "holds" (less than the allowable 24 months) after a release denial, which is how long they will need to wait before their next interview. This may result in an applicant being granted parole in the same calendar year in which they were denied parole, which may happen if the hold is, for example, only six months.

In terms of time served and sentence lengths, minor offenders have shorter periods of imprisonment and serve shorter prison terms, but they also have shorter minimum sentences. The age at release is also significantly lower, which is significant given the strong correlation between age and recidivism rates demonstrated by generally accepted research in the field.  This would suggest that minor offenders typically pose a somewhat higher risk of recidivism at their interviews and at release as compared to the adult 2nd Degree Murders simply due to their younger age at release.[1]

Relative to time past parole eligibility date ("PED"), while the average time is nearly the same for both groups, minor offenders have a lower median time past PED. Overall, there is no significant

---

[1]     https://bjs.ojp.gov/library/publications/2018-update-prisoner-recidivism-9-year-follow-period-2005-2014, Sweeten, Gary Sweeten, Alex R. Piquero and  Laurence Steinberg. "Age and the Explanation of Crime, Revisited".  Journal of Youth Adolescence (2013) 42:921–938.

differences between minor offenders and adults convicted of 2nd degree murder outside of median time past PED. Collectively these statistical data suggest there are few statistical differences between how similarly convicted people of 2nd degree murder are being considered by the Board of Parole.

However, at this time I have not evaluated this data specifically to determine if the enactment of the Minor Offender regulations in September 2017 and the 2016 Hawkins decision resulted in any differences and data from 2015 and early 2016 may alter this analysis. Furthermore, I have not yet analyzed this data to determine whether data from 2021, for example, involving a Board more accustomed to applying minor offender criteria to their decision (and a Board comprising many different members than were present in 2015 – 2017), alters this analysis. Complete data from 2022 has not yet been made available to me.

**Table 3. Differences Between Minor Offenders  with Murder 2nd and JO Murder with Adult 2nd Degree Murder on Key Attributes -- 2015-September 2021 Releases**

|  | Adult | Minor[2] | Difference |
|---|---|---|---|
| 2015-September 2021 Releases | 2,067 | 346 |  |
| Days Past PED |  |  |  |
| Average | 1,748 | 1,750 | +2 |
| Median | 956 | 668 | -288 |
| State Time (mos.)[3] |  |  |  |
| Average | 302 | 272 | -32 |
| Median | 292 | 278 | -14 |
| Average Age at latest DOCCS Admission[4] | 29 yrs. | 20 yrs. | -9 yrs. |
| Average Age at Release | 53 yrs. | 41 yrs. | -12 yrs. |
| Average Age at Crime | 26 yrs. | 17 yrs. | -9 yrs. |
| Aggregate Minimum Sentence (mos.) |  |  |  |
| Average | 267 | 235 | -32 |
| Median | 300 | 240 | -60 |

[2] For comparability, there were 7 additional minor offenders released during this time period that were excluded because their crimes of conviction were not Murder 2nd or JO Murder 2nd

[3] This represents time in the DOCCS only and excluded jail time and time served at OCFS prior to admission to DOCCS. It is limited to people who were continuously in DOCCS custody since admission to DOCCS (1,922 adult and 330 minor offenders).

[4] Median statistics are not reported for the three age variables as they were statistically equivalent to the mean.

**Qualitative Review of Board of Parole Interviews**

To get a more detailed review of the Board's decision-making process, defendants provided me with the transcripts of 15 cases recently reviewed by the NYSPB in 2021 that I requested (Table 4). These cases are separated into initial, LCTI, and re-appearance interviews. The LCTI is an interview for some individuals who were eligible for early release (up to 6 months before the expiration of the minimum term) by earning time associated with the achievement of certain specified educational or programming accomplishments provided they have not received a recommended loss of good time sanction within five years.[5] One individual waived his appearance before the Board.

**Table 4.  Detailed Review of Parole Board Interview Transcripts - 2021**

| Case # | Interview Type | Age | COMPAS Level (Risk of re-arrest recidivism) | Decision | Current Status |
|--------|----------------|-----|---------------------------------------------|----------|----------------|
| 11A3271 | Initial | 29 | | Denied – 24 mos. | In Custody |
| 99A1492 | Initial | 42 | | Open Date | Released |
| 03A3503 | Initial | 38 | | Denied – 18 mos. | In Custody |
| 97A5672 | Initial | 43 | | Open Date | Released |
| 96B1343 | LCTI | 43 | | Denied to PED | Released |
| 12A4897 | LCTI | 30 | | Denied to PED | In Custody |
| 01A1205 | LCTI | 40 | | Open Date | Released |
| 01A3103 | LCTI | 40 | | Open Date | Released |
| 08G1219 | LCTI | 32 | | Denied to PED | Released |
| 98A2305 | Re-Appear | 42 | | Open Date | Released |
| 92A5571 | Re-Appear | 48 | | Open Date | Released |
| 97A6725 | Re-Appear | 42 | | Open Date | In Custody |
| 00B0211 | Re-Appear | 40 | | Open Date | Released |
| 10A2362 | Re-Appear | 33 | | Open Date | Released |
| 99A2121 | Re-Appear | 47 | | Denied --24 mos. | In Custody* |

I reviewed each case and can make the following observations:

1. Generally, each interview begins with a review of the crime that precipitated the current sentence;
2. This is followed by a discussion of the prisoner's family background, peer relationships and a discussion of aspects of their youth at the time of the offense;

---

[5] 7 NYCRR § 290.2

3. This is followed by a review of the incarcerated individual's disciplinary conduct, participation in rehabilitative programs and the parole release plan;
4. A review of the COMPAS results; and:
5. An exploration of the individual's insights and remorse about the crime.

Typically, there are at least two Commissioners conducting the interview with the lead interviewer conducting most of the interview, although most are conducted by three commissioners.  In the parole denials there was explicit acknowledgement that the Commissioners in making their decision were taking into account the fact that the crime was committed while the offender was a juvenile.

The questioning on the current crime revealed that, in general, the murder was not pre-planned. Often, but not always, it involved a dispute or confrontation with other gang members, who were also armed.  Access to guns was often common for protection purposes as many of the offenders in these cases were affiliated with a gang. In other cases, there was no gang confrontation involved in the crime (other family members or acquaintances).

The family and adolescent backgrounds of these people are also reviewed for all of these interviews. Typically, they showed a highly dysfunctional history where the offender was typically raised  by a single female parent who also have history of addiction/substance abuse and brushes with the law.  In some cases, the father was also imprisoned while the youth was being raised by the single parent.  The income level of the family was typically low, which often contributed to involvement in illegal and frequently drug selling activities.

In terms of rehabilitative services, many of these cases have completed  a number of educational and self-improvement programs. Reasonable parole plans existed where the offender had secured promises of residency and employment upon release. On the other hand, several of these cases had significant discipline including violence.

For this sample of cases, six (40%) had their review result in a denial, while the other nine (60%) were granted an "Open Date". Two of the six denials were LCTI early parole consideration cases. All but five of the 15 cases have since been released including one subsequently granted release by the Board.  When a denial was made, it resulted in either a fixed time period to the next review or denial to the PED (in the case of an LTC interview). All but three cases with a completed COMPAS were assessed as a low risk to be re-arrested under the COMPAS risk instrument.  There were a few cases where the person had a low risk of being re-arrested, but posed a medium risk for being re-arrested for a violent crime.

For those cases that were denied parole, they tended to have a disciplinary history as noted by the Commissioners, a questionable release plan, and the severity of the murder, among other things.  So, it's fair to say the primary reason for denial is not just COMPAS's assessment of risk to the public    Clearly, the facts and circumstances of the crime and the commissioner's assessment of whether the individual poses a continued risk to the public were the key factors underlying their decision.  In such cases the Commissioners would typically make the one of the

two following conclusions regarding whether release would satisfy on of the standards required under New York State law:

1. "When considering all relevant factors, to grant your release at this time would so deprecate the seriousness of your offense as to undermine respect for the law", or
2. Release "is incompatible with the welfare of society and will deprecate the seriousness of his crime as to undermine respect for the law."

New York law requires commissioners to determine that a release *will not* deprecate the seriousness of the offense as to undermine respect for the law and that a release not be incompatible with the welfare of society. N.Y. Exec. Law § 259-i.

The  finding that most of these people are assessed as low risk is not surprising.  As reported by DOCCS and many other studies prisoners who are convicted of murder generally have low recidivism rates.[6]  This is largely due to the three facts:  1) the crime was often somewhat spontaneous and not preplanned, 2) the length of imprisonment is long and 3) the age at the time of release is typically much older than other prisoners.  Age at the time of release is one of the most important predictors of criminal conduct and in particular, violent crime.[7]

I also reviewed additional interview transcripts of 50 minor offenders who were eligible for parole and remained in custody as of July 1, 2022 due to a denial of release by the NYSBP.[8] Those interview transcripts generally follow in form the 15 transcripts previously discussed.

**Review of Expert Report by John  E. Wetzel**

Mr. Wetzel basically argues that the NYSBP is placing too much emphasis on the crime that resulted in the life sentence and not enough emphasis on two factors:

1. The rehabilitative efforts undertaken by the offender; and,

2.  The fact that the offender was under the age of 18 when the crime was committed.

He argues for a parole board decision-making system that he helped implement in Pennsylvania which he directed that included specialized training of Parole Board members on the special

---

[6] Plaintiff's expert, Dr. Wetzel, cites a national 30% rearrest rate for individuals on parole who were convicted of murder. My analysis of New York data indicates that minor offenders have a very low three-year return to prison rate compared to  other released incarcerated individuals (10% versus 33%). (A return to prison is not the same as rearrest, of course, many persons may be rearrested and ultimately not return to prison.)

[7] https://bjs.ojp.gov/library/publications/2018-update-prisoner-recidivism-9-year-follow-period-2005-2014, Sweeten, Gary Sweeten, Alex R. Piquero and  Laurence Steinberg. "Age and the Explanation of Crime, Revisited".  Journal of Youth Adolescence (2013) 42:921–938.

7

status of "juvenile lifers". In particular, how the environment these people were exposed to negatively affected their brain development, exposure to traumatic events, negative peer influence, negative/lack of parental controls, and other early adolescence developmental factors that negatively impacted their decision-making processes which contributed to the commission of the murders they were sentenced for. As such, juvenile lifers who appear before the Pennsylvania Parole Board are presumed to be granted parole unless there are current factors (e.g., current violent behavior, failure to complete rehabilitative programs, etc.) that negate parole being granted.

As shown in Table 5, the Pennsylvania Parole Board has granted release to 67% of those it refers to as juvenile lifers[9], which at first blush would appear to be higher than the per-interview release rate for minor-offenders in New York. However, it should be noted that these statistics do not reflect annual interview data but cumulative statistics that reflect a period which began in 2016 in response to the determination that their mandatory life without parole sentences were unlawful.

For individuals sentenced for convictions after June 24, 2012, the Pennsylvania General Assembly enacted legislation restricting the mandatory application of life without parole sentences to juveniles.  Thus, the 405 juvenile lifers that have been interviewed since 2016 are not comparable to the annualized parole grant rate for the New York minor offenders.[10] They could represent a large number of persons becoming eligible for parole over a compressed period of time, some of whom had many years of good behavior and who had served very long terms of incarceration. Many of these individuals could have been granted parole years earlier if they had been eligible.

**Table 5.  Pennsylvania Parole Board Juvenile Lifer Interview Decisions as of August 31, 2022**

| Attribute | Number |
|---|---|
| Total Juvenile Lifer Population | 521 |
| Interviews Conducted | 405 |
| Paroles Granted | 270 |
| Parole Grant Rate | 67% |
| Refusal Rate | 33% |

[9] Pennsylvania's juvenile lifer category is comprised of those individuals who were sentenced to life without parole for crimes committed as minors – a mandatory result under that state's law. Thus, its interview process involved only to those juvenile lifers who were mandatorily sentenced to life without parole,  successfully petitioned for a resentencing under the PCRA (Post Conviction Relief Act) and were resentenced to receive parole eligibility. ("'Juvenile Lifers': From Re-sentencing to Reentry", Office of Victim Advocate, Department of Corrections and the Pennsylvania Parole Board, March 2020, available at https://www.parole.pa.gov/Information/publications/Pages/default.aspx)

[10] "'Juvenile Lifers': From Re-sentencing to Reentry", Office of Victim Advocate, Department of Corrections and the Pennsylvania Parole Board, March 2020, available at https://www.parole.pa.gov/Information/publications/Pages/default.aspx

Source: https://www.parole.pa.gov/About%20PBPP/juvenilelivers/Pages/Statistics.aspx

At this time, I do not have comparable data on the age of the releasee, the annualized grant rate and time incarcerated prior to release for the Pennsylvania individuals who were considered for parole over the past few years. Nor do I have data regarding their sentences and other information that I have concerning New York subjects. Accordingly, it is not possible to accurately compare Pennsylvania's recent release rates under its new procedures to New York's release rates. Nor is it possible to determine if the Pennsylvania reforms if adopted in New York would produce higher parole grant rates.

It should also be noted that New York with a smaller prison population (34,405 as of January 1, 2021) than Pennsylvania (39,194 as of June 2022), has a lower minor offender population than the Pennsylvania juvenile lifer population (334 versus 521).  In terms of incarceration rates per 1,000  prison population, the New York minor offender rate is 9.7 versus the Pennsylvania higher juvenile lifer rate of  13.3.

**NYSBP Preparation**

Mr. Wetzel references a few examples of interviews from several years ago (including a deceased commissioner from 2014) that he infers show a systemic lack of preparation for reviewing cases for parole.

There is one major methodological issue with this critique.  It is not possible to reach any conclusion regarding a lack of preparation by simply reviewing transcripts from a few isolated cases.  The only proper way to do this to randomly select a sufficiently sized sample of current parole (2021 or 2022) interviews and then observe both the preparation and interview process. One would also have to interview the Commissioners who were reviewing the sampled cases to hear first-hand their description of how they prepared for the case.

For example, Mr. Wetzel cites to Commissioner Agostini's statement at the April 4, 2018 interview of Lawrence Bartley that she will "continue to go through all" of his files as an example of Board in its totality denying minor offenders of "meaningful opportunity at release." Of interests is the fact that Commissioner Agostini voted to parole Mr. Bartley and he was released.

Similarly, Mr. Wetzel criticizes Commissioner Coppola with respect to Mr. Roman's September 19, 2018[11] interview for not remembering a small detail about one of the many documents reviewed as another example of minor offenders systematically having a "meaningful opportunity at release." He too was, granted parole release after that interview.

Indeed, while making a blanket claim of "haphazard preparation," Mr. Wetzel only references one minor incorrect statement in a case where parole was denied by any current commissioner.

---

[11] Mr. Wetzel cites other dates for the interview, all of which are incorrect.

Regardless, even if a Commissioner may have been confused about certain matters in an applicant's file, given the thousands of interviews that are conducted, this comes as no surprise that there may be a few instances of confusion among the more than a dozen active Commissioners over the course of several years. Individuals can have memory lapses even on some specifics when highly prepared.  My review of the 2021 transcripts saw little if any disagreement between the minor offender and the commissioner(s) on the specifics of the offense, institutional conduct, COMPAS risk assessment, and parole plans.

It is my understanding that much of the criticism of the NYSBP from Mr. Wetzel is also based on outdated information concerning the staffing and caseload of the NYSBP that may have existed 5 – 20 years ago. It is my understanding that the current number of interviews conducted is significantly lower than during that period, in part because the New York State prison population is significantly lower now. The depositions of current commissioners indicated that they feel that they are able to properly review the necessary materials and be prepared for interviews.

I do not disagree that it would be helpful to provide minor offender parole files to commissioners electronically a week in advance of a parole interview. This would provide commissioners a better opportunity to review those materials sufficiently in advance of an interview at a time they see fit.

Mr. Wetzel proposes a number of additional procedural changes such as more focus on rehabilitation and parole plans and the availability of counsel at parole interviews. My understanding is that DOCCS staff does not normally take a position on rehabilitation (which itself would be potentially highly subjective) and counsel are not present because they are not intended to be adversarial proceedings and the commissioners want to hear the words of the applicant, not arguments of counsel. Counsel is available to assist in providing submissions prior to the interview. The other changes suggested could be beneficial in some instances such as prioritized services for the minor offender population especially as they approach their PED, as long as it does not result in denial to other parts of the prison population.

**Review of Expert Report by Cynthia Rudin, PhD.**

Dr. Rudin's report takes to task the efficacy of the COMPAS risk assessment instrument, which is considered by the Board of Parole in its decision-making process.[12] It is my understanding that the COMPAS assessment is not binding and Commissioners are only required to explain if they disagree with certain findings in the COMPAS assessment if it is a basis for a parole denial.

---

[12] The COMPAS Re-entry instrument is always mentioned in NYSBP interview transcripts. The history of the instrument is documented in Dr. Rudin's report.

In terms of overall recidivism, DOCCS periodically issues a recidivism report that tracks a cohort of all prisoners released in a given year for three years. The most recent report covers prisoners released in 2015. Table 15 on page 37 shows the three year return rates by the four COMPAS Supervision Levels for releases to community supervision in 2015 and for 2013-2015. That table shows a strong statistical association between the COMPAS supervision levels and the overall return rate and the rate based solely on parole violations. However, there is little if any association between COMPAS supervision levels 1, 2 and 3 and the return rate for a new commitment, which means the COMPAS instrument is not predictive of whether a New York prison releasee will receive a new felony conviction that results in a new prison sentence. That is likely due to the low "base rate" for that variable (only 8%) as opposed to the parole violation rate (37%).

I also calculated the recidivism rates of minor offenders also released in 2015 (Table 6). As expected, their overall recidivism rate is very low (10% versus 33%) with all but one person being returned for a new prison commitment. That one person was returned for the new crime sexual abuse. Further, all prison releases who had been convicted of murder (including the minor offenders) have very low return rates and extremely low return to prison for a new commitment.

It is noteworthy that there is a statistical association between the COMPAS risk/supervision level and how close a person is release to his/her PED. People who are released at or before their PED have lower risk levels than people released many months after their PED (reflected various risk levels (Table 7). Although the numbers are small, this is further evidence the Commissioners are taking into account the COMPAS risk levels when considering parole release – especially if the COMPAS risk level is not low for committing a new violent crime.

**Table 6. Three Year Return Rates for 2015 Releases to Community Supervision**

|  | Releases | Total Returned | New Commitment | Parole Violation |
|---|---|---|---|---|
| Total | 20,776 | 8,744 | 1,831 | 6,913 |
| % returned |  | 42.1% | 8.8% | 33.3% |
| All Minor offenders | 60 | 7 | 1 | 6 |
| % returned |  | 11.7% | 1.7% | 10.0% |
| All Murders[13] | 319 | 42 | 3 | 39 |
| % returned |  | 13% | 1% | 12% |
| All Other Releases | 20,716 | 8,737 | 1,830 | 6,907 |
| % returned |  | 42.2% | 8.8% | 33.3% |

**Table 7. Minor Offender Releases by Days After PED By COMPAS Supervision Level - 2015**

---

[13] Includes minor offenders

| COMPAS Supervision Level | 626+ Days Past PED | At or Before PED |
|---|---|---|
| Releases | 30 | 19 |
| Level 1 | 20% | 0% |
| Level 2 | 20% | 5% |
| Level 3 | 7% | 11% |
| Level 4 | 53% | 84% |

I concur with some, but not all aspects of Dr. Rudin's three major opinions regarding areas of COMPAS that could be improved. Those that I concur with are as follows:

1. The risk assessment tools and results are not transparent to either the Board of Parole or the individual appearing before the Board;
2. The COMPAS Re-entry risk model was designed to determine parole supervision level and not parole board decision-making;
3. The New York COMPAS Re-entry risk model used by the NYSBP has not been re-tested or re-validated since its development in or around 2008;
4. The COMPAS Re-entry model contains many subjective scoring items that have not been sufficiently tested for their inter-rater reliability;
5. The COMPAS Re-entry model has not been tested for its potential racial bias for New York subjects (although Northpointe has circulated material explaining why there is no bias);
6. The numerous COMPAS interview questions and sub-risk categories may make the assessment process potentially over-complicated and potentially subjective based on the person providing data; and,
7. The COMPAS model may overemphasize static factors and not place enough emphasis on dynamic factors.

This is not to say that COMPAS is not valid, but that it can be improved upon for purposes of supervising people under probation or parole supervision and as a tool for generating non-binding parole release recommendations.

Overall, I agree that there is room for improvement in the instrument should it continue to be used by the NYSBP. Despite her critiques, Dr. Rudin fails to report that even under the COMPAS Re-entry model, the vast majority of minor offenders appearing before the Board of Parole are being scored as low risk. This is because these people often have minimal to non-existent juvenile criminal histories, are older and have typically served relatively long sentences, were typically convicted of a situational, impulsive, unplanned murder, have completed various risk reduction programs, and have good recent institutional conduct records. All of these factors are strongly associated with low recidivism rates. As a result, only a very small group of minor offenders are given high risk scores.

Adopting a more viable and validated risk assessment system will, however, likely not alter the current Board of Parole grant rates because minor offenders are typically being classified as low risk.

**Dr. Laurence Steinberg**

I received Dr. Steinberg's expert report and four articles that were either authored or co-authored by Dr. Steinberg.  These materials go into detail about how the brains of adolescents are not as fully developed as their adult counterparts and are lacking in the overall maturity and impulse control. The research also showed that adolescents are more influenced by their peers in making potentially risky decisions often leading to delinquent behavior in their early developmental years but that such propensities diminish over time as they brains mature.  In general, he concludes that "adolescents are different from adults"

These major findings are not in dispute. The one article written solely by Dr. Steinberg that his and other studies have led to several court decisions that have led to the abolition of the death penalty or a sentence of life without the possibility of parole for minor offenders (under the age of 18).

He does not specifically comment or advocate for current Parole Board practices (either nationally or for New York in particular). In his expert report he concludes as follows:

> "Certainly, there is no scientific evidence to suggest that a meaningful psychological or neurobiological distinction can be drawn between individuals who are nearly 18 years old and those who are between 18 and 20. Thus, for the very same reason that the Supreme Court found mandatory life with parole to be unconstitutional in cases involving defendants under the age of 18, this sentence should be viewed as excessive among defendants who are between 18 and 20." Page 21

> "In my opinion, the research I reviewed in this report clearly indicates that the age of a person, both at the time of the instant offense, and at the time of potential release from incarceration, should be taken into account by parole boards." Page 21.

He suggests the legislature raise the age for a minor or juvenile offender from under 18 to 20, and, that parole boards *take into account* (emphasis added) the age at the time of the crime and the age of potential release.  He does not specify how much these two ages (age at crime and age at release) should be accounted for in making a release decision.

Further, my reading of the Supreme Court decisions suggests it has not made a distinction between brain development of persons under age 18, versus 18-20 year old persons or 30 year or older persons in terms of mitigating one's responsibility in committing a murder.  This despite the neuro-science evidence that there are statistical correlations between brain development, age, and criminality.

13

While California does provide some deference to persons who were under 26 when they committed the offenses in question in terms of scheduling parole appearances and other procedural matters, the release rate for minor offenders in California was somewhat lower than in New York.[14] Moreover, in New York, the average age for the adult offender population was 26 when they committed their crime of conviction. Giving special deference to persons who were 18 − 25 would effectively result in most persons who commit 2nd Degree murder receiving special deference, a major policy change that would require legislative action.

**Analysis of Minor offenders  Denied Parole Who Remained in Custody on July 1, 2022**

While there were 334  minor offenders in custody as of July 1, 2022, only 50 remained in custody due to a denial of parole by the NYSBP.  Currently there are only 50 in custody. This is really the key group to focus on as it reflects the Board of Parole's current decision-making process and release criteria.  This group is virtually all males who are largely Black, White and Hispanic (Table 8).  They have typically been incarcerated since the age of 16 or 17 for an average of 24 years. And they, on average, are several years past their original Parole Eligibility Dates (PED).

A variety of factors explain why this group has been denied parole. Some have poor disciplinary records while in prison, while others according to the Board, have not demonstrated appropriate insight or remorse to the murders, and some have committed murders that are regarded as more heinous that others such as murders with child victims or murders involving the sexual assault of elderly victims.

---

[14] "A Stone of Hope: Legal and Empirical Analysis of California Juvenile Lifer Parole Decisions," Kristin Bell, Ph.D., J.D., Harvard Civil Rights-Civil Liberties Law Review (2019), p, 474, n. 112; Creating Meaningful Opportunities for Release: Graham, Miller and California's Youth Offender Parole Hearings, Beth Caldwell, N.Y.U. Review of Law & Social Change (2016), p. 269.

**Table 8.  Attributes of Minor Offenders in Custody on July 1, 2022 Who Had Been Denied Parole (excludes those who received an open date but had not yet been released)**

| Attribute | |
|---|---|
| Total | 50 |
| Gender | |
| Male | 49 |
| Female | 1 |
| Race/Ethnicity | |
| White | 11 |
| Black | 25 |
| Hispanic | 11 |
| Other | 3 |
| Age | |
| Current Average Age | 43 yrs. |
| Current Median Age | 43 yrs. |
| Age at Time of Crime | |
| Ave Age | 16 yrs. |
| Median Age | 17 yrs. |
| Total Time Incarcerated* | |
| Ave. Time | 23 yrs. |
| Median Time | 24 yrs. |
| Time Past PED | |
| Ave. Time | 70 mos. |
| Median Time | 37 mos. |
| Time Until Next Interview** | |
| Ave. Time | 229 days |
| Median Time | 215 days |

\* Total Time Incarcerated represents time at DOCCS since last admission plus jail time.
\*\*This calculation excludes individuals whose next parole board date had not yet been updated on the data file.

**Summary of Opinions**

1. There are some statistical differences between how minor offenders and adults convicted of 2nd degree murder are being considered by the Board of Parole. These include a higher grant rates for minor offenders, shorter periods of state incarceration, and shorter days past the PED for people released. This suggests that the status of being a minor offender by itself (i.e., with distinguishing between minor offenders on the basis of qualities such as their institutional record, prior criminal record, current age, or the unique circumstances of their early development as a youth in relation to the murder) has some impact, but is not a primary factor for granting or denying parole.

2.  The Board of Parole grant rates for Minor offenders have increased since 2019 and the total number of minor offenders in custody has been decreasing.

3.  Based on the current initial grant rate of 53% and the 47% re-appearance rate of 47%, 75% of the minor offenders will be released at either the initial or second interview.  By the third interview nearly 90% will be released and typically within 2-3 years of their PED. This estimate has been confirmed by examining minor offenders who in 2016 who were past their PED dates.  As of this date, 90% have been released.

4.  By no means is this population deprived of a "meaningful opportunity" at parole release. To the contrary, they are receiving a meaningful opportunity. Placing greater emphasis on the person's status as a minor offender, which would increase the grant rates, may reduce their length of incarceration by 1- 2 years.

5.  The Board of Parole interview process includes an appropriate review of the individual's early adolescent developmental period as well as the person's involvement in the murder, prison conduct, completion of rehabilitative programs, risk of recidivism, and re-entry plans with regard to housing, employment and continued rehabilitative treatment.

6.  However, while prison discipline was cited as a factor supporting denial in several of the 15 interview transcripts, a broader review of the additional interview transcripts referenced here shows that in most cases where parole is denied, the primary reason stated is the nature/severity of the murder that has been committed and not other dynamic factors such a negative prison conduct, COMPAS risk level  or completion of rehabilitative programs. If commissioners believe the circumstances surrounding the crime make them believe an applicant is more likely to be a danger when released an explanation of their reasoning would be beneficial.

7.  Commissioners reference the COMPAS Re-Entry instrument in making parole release decisions (as required by NYSBP regulations) and higher (worse) COMPAS risk scores typically correspond to higher denial rates and/or delays in granting release after the PED, but I did not see evidence that commissioners believed high COMPAS scores were inaccurate and still denied parole.  That is because the COMPAS scores did not compute anyone as high risk to be re-arrested, or commit a violent crime.

8.  While the COMPASS Re-entry risk assessment instrument is generally statistically valid, it is problematic as a tool to assist in  Board decision-making regarding Minor Offender unless it undergoes a re-testing and validation on the Minor Offender population.

9.  Further, adopting a more relevant, reliable, and validated instrument will have little impact on the use of the COMPAS Re-entry model by the Board since any valid risk instrument will assess the vast majority of the minor offenders as low risk. The one risk area that might

**Appendix**
**Detailed Parole Hearing Results  2021**
**Adults and Minor offenders – 2nd Degree Murder**

**Parole Board Interviews**
**2021**

Individuals Serving a Life Sentence for a Murder 2 Conviction Committed at the Age of 18 or Older

| Interview Type | Decision | | | | | Total |
|---|---|---|---|---|---|---|
| | Granted | CPDO Granted | Denied | Approval Rate* | Postponed | |
| Initial | 58 | 13 | 95 | 43% | 32 | 198 |
| Limited Credit Time | 38 | 0 | 23 | 62% | 15 | 76 |
| Reappearance | 160 | 14 | 278 | 38% | 62 | 514 |
| Medical | 3 | 0 | 1 | 75% | 0 | 4 |
| Total | 259 | 27 | 397 | 42% | 109 | 792 |
| *Special Consideration* | 24 | 5 | 39 | 43% | 6 | 74 |
| *Executive Clemency* | 5 | 0 | 0 | 100% | 0 | 5 |
| | | | | | | |

The 756 interviews with a granted or denied decision occurred among 716 individuals.

*The approval rate reflects the percent granted release among interviews that resulted in a decision, either granted or denied.

The source of this data are files created on January 4, 2022 from the Guidelines data system where Parole Board interviews and decisions are recorded by DOCCS facility staff.

18

**Parole Board Interviews**
**2021**

Individuals Serving a Life Sentence for a Crime Committed Under the Age of 18

| Interview Type | Decision | | | | | Total |
| --- | --- | --- | --- | --- | --- | --- |
| | **Granted** | **CPDO Granted** | **Denied** | **Approval Rate\*** | **Postponed** | |
| Initial | 8 | 0 | 7 | 53% | 1 | 16 |
| Limited Credit Time (LCT) | 2 | 0 | 4 | 33% | 2 | 8 |
| Reappearance | 27 | 1 | 31 | 47% | 7 | 66 |
| Medical | 1 | 0 | 0 | 100% | 0 | 1 |
| **Total** | **38** | **1** | **42** | **48%** | **10** | **91** |
| *Special Consideration* | *4* | *0* | *14* | *22%* | *0* | *18* |
| *Executive Clemency* | *1* | *0* | *0* | *100%* | *0* | *1* |

| |
| --- |
| The 100 interviews with a granted or denied decision occurred among 89 individuals. |
| On January 1, 2021, there were 388 individuals under custody with a life sentence for a crime committed under the age of 18.  Among those 388 individuals, 114 had a parole eligibility date during or prior to 2021. |
| \*The approval rate reflects the percent granted release among interviews that resulted in a decision, either granted or denied. |
| The source of this data are files created on January 4, 2022 from the Guidelines data system where Parole Board interviews and decisions are recorded by DOCCS facility staff. |

impede a parole release decision is the risk of a violent crime as several minors are scoring as "medium" risk.

**Recommendations**

1. It would be beneficial for the NYSBP to adopt a different risk assessment instrument that places at least equal emphasis on dynamic versus static risk factors. At a minimum, the current COMPAS Re-entry risk model needs to be fully evaluated in terms of its inter-rater reliability and validity.
2. Parole "holds" of minor offenders should generally be 12 months in absence of unusual circumstances, with an emphasis on  improving disciplinary conduct, release plans, programming or completing a risk reduction treatment program. This will allow the NYSBP to consider improvements in behavior and other relevant factors closer in time to when they may occur.
3. Parole Commissioners should undergo regular workshops on the relationship of early adolescent development to subsequent violent behavior and other developmental issues.
4. It would be beneficial if Parole commissioners interviewing minor offenders received their files electronically at least a week before interviews to allow additional opportunities to review them in detail.

9/26/2022

17

# James Austin, Ph.D.

## MAJOR POSITIONS HELD

| | |
|---|---|
| 2003 – Present | *Founder, The JFA Institute*, Washington, D.C. |
| 1999 -2003 | *Research Professor and Director, Institute for Crime, Justice, and Corrections*, Department of Sociology, The George Washington University, Washington, D.C. |
| 1982 - 1998 | *Executive Vice President* National Council on Crime and Delinquency San Francisco and Washington, D.C. |
| 1974 - 1982 | *Research Associate* National Council on Crime and Delinquency San Francisco |
| 1970 - 1974 | *Correctional Sociologist* Illinois Department of Corrections Joliet, Illinois |

## EDUCATION

| | |
|---|---|
| B.A. | 1970, Wheaton College, Wheaton, Illinois, Sociology |
| M.A. | 1975, De Paul University, Chicago, Illinois, Sociology |
| Ph.D. | 1980, University of California, Davis, California, Sociology |

## RELEVANT PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2019 – present | *Director*, Cost benefit analysis of the Los Angeles County Jail System to determine how best to lower the county jail population to allow closure of the Men's Central jail facility (funded by Los Angles County Auditor-Controller). |

| | |
|---|---|
| 2019 – present | Director, implementation of an objective jail classification system for the Alameda County Sheriff (funded by Alameda County). |
| 2015 – present | *Director,* MacArthur Foundation Safety and Justice Challenge in which JFA is responsible for working with 20 local counties to design and implement plans to lower current jail populations by 15-30%. |
| 2012 - present | *Director,* Orleans Parish Prison Population Projections and Jail Reduction Strategic Plan (City of New Orleans). |
| 2016 – 2019 | *Director,* Maryland Department of Public Safety and Correctional Services, Technical Assistance (Open Society Institute-Baltimore). |
| 2015 | *Director*, Court Services and Offender Supervision Agency  (CSOSA) Best Practices Evaluation. (CSOSA). |
| 2014 - 2018 | *Director,* Validation study of the San Francisco Adult Probation Risk and Needs Assessment System (COMPAS), San Francisco County. |
| 2005 – 2014 | Director, Design and Evaluation of the Maryland Department of Public Safety and Corrections (MDPSC) Risk and Case Management System (Parole, Probation and Prison).  MDPSC and Open Society Institute-Baltimore. |
| 2014 - 2015 | Master Jail Plan, Sonoma County. |
| 2011 – 2016 | Monitor, Consent Decree, Walnut Group Correctional Facility, Mississippi Department of Corrections (adult and juvenile populations) |
| 2010 – 2014 | Consultant. Technical Assistance on Solitary Confinement in Maryland, New Mexico, and Illinois. Vera Institute. |

| | |
|---|---|
| 2011 – 2015 | Director, Los Angeles County Sheriff Jail Population Projections and Impact of AB 109.  Funded by Public Welfare Foundation. |
| 2013-2014 | Evaluation of the Contra Costa Probation Department's Response to AB 109- Realignment. |
| 2012-2013 | Evaluation of Alternatives to Incarceration, San Diego County. |
| 2012 – 2013 | Evaluation of the Short-Term Technical Violation Pilot Study. U.S. Parole Commission. |
| 2012 | Co-Director. Evaluation of the Oklahoma Administrative Segregation System. Oklahoma Department of Corrections. |
| 2011 - 2012 | Consultant. Study of Colorado Administrative Segregation System. Colorado Department of Corrections and National Institute of Corrections, U.S. Department of Justice. |
| 2010 – 2011 | Co-Director, Revalidation of the Texas Pardon and Parole Board System. Texas Pardon and Parole Board. |
| 2009 – 2012 | Director, Prison Population-Justice Re-investment Initiative. Pew Charitable Trusts. |
| 2010 – 2011 | Special Consultant, Jail Population Projection Study, US Department of Justice and Orleans Paris. |
| 2008 – 2009 | Special Consultant, Administrative Segregation/Super Max Parchment Study. Mississippi Department of Corrections and ACLU |
| 1998 – 2011 | *Director,* Correctional Options Program (Bureau of Justice Assistance,  U.S. Department of Justice) |
| 2007 – 2008 | *Director*, Harris County Pretrial Services Re-Validation Risk Assessment Study. (Harris County, Texas). |
| 2006 | *Director,* Evaluation of Factors that Contribute to Halfway House Escapes, District of Columbia. (District of Columbia). |

2006                                *Director.  Evaluation of the District of Columbia*
                                    Department of Corrections Prisoner Classification
                                    System (DC DOC).

2005 – 2008                         Director, Montgomery Pretrial Services Risk
                                    Assessment Validation Study. (Bureau of Justice
                                    Assistance,   U.S. Department of Justice).

2003 – 2006                         *Director*, Assessment of Sexual Assault in the Texas
                                    Prison System. (National Institute of Justice).

2002                                *Director,* District Of Columbia, Department of
                                    Corrections: Analysis Of Inmate Population And Ten-
                                    Year Population Projection 2002 – 2012 (DC
                                    Government).

2002 – 2006                         *Director,* Parole Guidelines System Project, Maryland
                                    Parole Commission.  (Baltimore Open Society
                                    Institute).

2003 – 2006                         *Director*, Validation Study of the Alameda County
                                    Juvenile Detention Risk Assessment System
                                    (Alameda County, California).

2002—2006                           *Independent Expert,* Office of Youth Development,
                                    Louisiana Department of Public Safety and
                                    Corrections, Jointly Appointed by State of Louisiana
                                    and U.S. Department of Justice, Civil Rights Division

2003-2004                           *Director,* Evaluation and Redesign Of Systems For
                                    Berks County Pretrial and Sentenced Populations.
                                    (Berks County, PA).

2002 – 2003                         *Director*, Validation of the Pennsylvania Parole
                                    Guidelines. Pennsylvania Board of Probation and
                                    Parole. (Pennsylvania Commission on Crime and
                                    Delinquency).

2001 – 2003                         *Director,* Development of the Kentucky Parole Risk
                                    Assessment System.  Kentucky Parole and Pardon
                                    Board.

| | |
|---|---|
| 1998 – 2004 | *Monitor*, Georgia Juvenile Justice Corrections System, Jointly Appointed by State of Georgia and U.S. Department of Justice, Civil Rights Division. |
| 1997 - 2002 | *Director*, National Technical Assistance Program for External Prison Classification Systems (Oregon, Wisconsin, Virginia, Tennessee, Texas, Oklahoma, and Montana) (National Institute of Corrections) |
| 1996 - 2002 | *Director,* National Technical Assistance Program for Internal Prison Classification Systems (Washington State, Oregon, Missouri, South Dakota, Connecticut, Colorado, and Florida) |
| 1996 - 1999 | *Director*, National Survey of Juveniles in Adult Correctional Facilities (Bureau of Justice Assistance), GWU. |
| 1996 - 1999 | *Director,* National Multi-Site Boot Camp Evaluation (Adult and Juvenile) (National Institute of Justice), GWU. |
| 1995 - 1999 | *Director*, Evaluation of "Three Strikes and You're Out" Laws in California and Nationally, (National Institute of Justice), NCCD |
| 1996 - 1999 | *Director*, National Survey of Privatization in Corrections (adult and juvenile facilities) (Bureau of Justice Assistance), NCCD. |
| 1992 - 1997 | *Director*, Correctional Options Evaluation (National Institute of Justice and Bureau of Justice Assistance), NCCD |
| 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Youth Services Agency (YSA) operations, classification system, staffing levels, physical plant, mental health, information services and program services, (National Institute of Corrections, Bureau of Prisons), NCCD |
| 1992 - 1997 | *Director*, National Structured Sentencing Evaluation (Bureau of Justice Assistance), NCCD |
| 1995 - 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Corrections operations, |

5

classification system, staffing levels, and physical plant, including, comprehensive cost analysis of long-term options for the Lorton Complex, (National Institute of Corrections, Bureau of Prisons), NCCD

| | |
|---|---|
| 1991 - 1997 | *Director*, Design and Implementation of the New York City Department of Corrections Objective Jail Classification System (Consent Decree, New York City Department of Corrections), NCCD |
| 1991 - 1995 | *Director*, Philadelphia Prison System Classification and Population Projections Project (Consent Decree, City of Philadelphia), NCCD |
| 1991 - 1994 | *Director*, Evaluation of Jail Drug Treatment Programs (National Institute of Justice), NCCD |
| 1990 - 1993 | *Director*, Evaluation of the Los Angeles Sheriff's Boot Camp Program (National Institute of Justice), NCCD |
| 1991 - 1993 | *Director*, Design and Implementation of the Cook County Objective Jail Classification System (Cook County Sheriff's Department), NCCD |
| 1990 - 1991 | *Director*, California Assessment of the Overrepresentation of Minority Youth in Juvenile Justice (Office of Criminal Justice Planning), NCCD |
| 1988 - 1992 | *Director*, Experimental Test of Electronic Monitoring Program, Oklahoma Department of Corrections (National Institute of Justice), NCCD |
| 1987 - 1992 | *Director*, Experimental Test of the Prison Management Classification System (National Institute of Corrections and Washington Department of Corrections), NCCD |
| 1986 - 1990 | *Director*, National Jail Classification Project (NIC), NCCD |
| 1985 - 1987 | *Co-Director*, California Youth Authority Parole Risk Study (Packard Foundation and CYA), NCCD |
| 1984 - 1986 | *Co-Director*, Study of Institutional Violence at San Quentin (Consent Decree, California Department of Corrections, NCCD |

6

| 1982 - 1987 | *Co-Director*, Experimental Study of Juvenile Court Probation Services, Salt Lake City, Utah (OJJDP), NCCD |
|---|---|
| 1983 - 1985 | *Co-Director*, Illinois Department of Corrections Early Release Evaluation (NIJ), NCCD |
| 1980 - 1984 | *Co-Director*, Supervised Pretrial Release Test Program (NIJ/LEAA), NCCD |
| 1981 - 1983 | *Co-Director*, Evaluation of California AB2 Bail Reform Act (OCJP), NCCD |
| 1980 | *Senior Research Associate*, California Alternatives to Incarceration Study (State Legislature), NCCD |

## SPECIAL APPOINTMENTS

| 2006 – 2007 | Expert Panel on Adult Offender and Recidivism Reduction Programming, California Department of Corrections and Rehabilitation |
|---|---|
| 2003 | Advisory Committee, The Little Hoover Commission Report on California Prison System |
| 1999- 2003 | Chair, National Policy Committee, American Society of Criminology |
| 1987 - 1994 | Trustee, Robert Presley Institute of Corrections Research and Training |
| 1991 | Governor's Task Force on Prison Crowding, State of Nevada |
| 1988 | Governor's Task Force on Corrections, State of Oregon |
| 1981, 1986 | National Academy of Sciences, National Panels on Sentencing and Prison Overcrowding |

## EXPERT WITNESS/LITIGATION

| | |
|---|---|
| 1987 - 1989 | Office of the Special Masters, <u>Ruiz v. Lynaugh</u>, Evaluation of the TDC Classification System and Inmate Violence |
| | Appointed by Court to produce evaluation report of classification system to determine if inmate violence had been reduced. |
| 1989 - 1991 | U.S. Department of Justice, Civil Rights Division, <u>U.S. v. State of Florida: Florida Department of Corrections, et al.</u>, Case No. TCA 86-7330 (N.D. Fla) |
| | Expert Witness Retained by Plaintiffs to determine whether women should be excluded from certain post positions in the DOC. |
| 1990 - 1991 | King County (Seattle, Washington) District Attorney's Office, <u>Hammer v. King County</u> |
| | Expert Witness Retained by Defendants to determine if minority staff was being discriminated against. |
| 1990 - 1991 | Office of the Attorney General, State of Texas, <u>Lamar v. Collins</u> |
| | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate. |
| 1991 | Office of the Attorney General, State of Texas, <u>Alberti v. Sheriff of Harris County, et al.</u>, No. CA-H-72-1094 |
| | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate. |
| 1991 - 1992 | U.S. Department of Justice, Civil Rights Division, <u>U.S. v. The Parish of Orleans Criminal Sheriff's Office</u> |
| | Expert Witness Retained by Plaintiffs to determine the appropriateness of excluding females from certain post positions within the jail. |
| 1991 - 1994 | <u>Calvin R. vs. Illinois Department of Corrections</u>. Consent Decree. |

Appointed by Court to produce evaluation of classification system and to implement internal classification system to reduce inmate violence.

1995 <u>International Fidelity Insurance Co. et al. v. Charles Nobel et al:</u> In the United States District Court of the Southern District of Texas, Houston Division.

Expert Witness Retained by Defendants to determine the Failure to Appear rates for defendants released on surety bond versus O.R.

1995 <u>Sandra Herrera, et al., v Pierce County, et al.</u>

Retained by Plaintiffs to evaluate whether inmates were being properly classified and housed in the local jail.

1995 - 1996 <u>Montoya v. Gunter, et al.</u>

Retained by Defendants to determine whether inmate who was killed while incarcerated had been properly classified and housed.

1995 - 1997 <u>Inmates A,B,C and D v. Illinois Department of Corrections</u>
Consent Decree

Appointed by Court to produce evaluation of the level of control of housing and job assignments by gangs.

1995 - 2002 <u>USA v. Michigan</u> and <u>Cain v. Michigan</u> Consent Decrees

Expert witness retained by Defendants to help Department of Corrections reach compliance with court order regarding classification system.

1996 <u>Rentschler v. Carnahan et al.</u>

Retained by Defendants to evaluate the impact of crowding at the Colorado maximum security prison.

1997 <u>Carlos Morales Feliciano v. Pedro Rossello Gonzales</u>
Consent Decree

9

Retained by Special Master to conduct a comprehensive assessment of the inmate classification system that was designed and partially implemented by the Administration of Corrections.

1998 - 1999        Southern Ohio Correctional Facility (Civil Action No. C-1-93-436).

Retained by the Ohio Department of Rehabilitation and Correction to serve as an expert witness on classification issues as they pertain to the Lucasville riot.

1998 - 1999        Busey et al. v.  Corrections Corporation of America

Retained by CCA to develop an objective classification system for the Youngstown facility and have all inmate's properly classified according to the classification criteria. No expert report, deposition or court testimony.

1998 - 2000        Holloway, et al., v. King County

Retained by plaintiff's counsel to examine the validity of client's claims that sexual harassment of female correctional officers by male inmates was being encouraged by male correctional officers and departmental policy. Declaration and deposition.

2001            Gartrell et al., v. Ashcroft et al.

Retained by plaintiffs to examine if BOP inmates placed in Virginia Department of Corrections are unnecessarily having their expression of religious freedoms unnecessarily restricted? Report submitted but no deposition or court testimony.

2001 - 2005        Austin, et al., v. Wilkinson, et al.

Retained by defendants to examine the classification process used to assign inmates to the Ohio State Penitentiary – a high maximum security prison. Expert report but no deposition or testimony.

10

| | |
|---|---|
| 2008- present | <u>Plato and Coleman v. Schwarzenegger.</u><br><br>Retained by plaintiffs to develop plan to depopulate the California Prison Population. Reports submitted and deposed by defendants, two expert reports submitted and court testimony. |
| 2013 - 2014 | <u>Coleman v. Brown</u><br><br>Expert declaration, deposition and court testimony in support of plaintiff's motion regarding mentally ill inmates in segregation. |
| 2012 | <u>Louis Henderson, et al., v. Kim Thomas</u><br><br>Expert declaration and testimony on behalf of plaintiffs on the appropriateness of segregating inmates based on HIV status (Alabama). Court ruled in favor of plaintiffs. |
| 2016 - 2019 | <u>Mark Duke, et al.,  vs. Jefferson S. Dunn</u><br><br>Expert declaration on behalf of plaintiffs on proper classification of inmates at the St. Clair prison facility (Alabama). Stipulated agreement designated Dr. Austin as expert for the DOC to implement reforms. |
| 2016 - present | <u>Stephen Rudisill v. Charles Ryan</u><br>Appointed as expert to monitor stipulated agreement where the Arizona Department of Corrections agrees to desegregate their inmate population in housing and program assignments. |
| 2019 | <u>Orange County (California) Jail DOJ Investigation</u><br>Retained by the U.S. Department of Justice Civil Rights Division to conduct an evaluation of the Orange County Jail Inmate Classification System. |

# MAJOR PUBLICATIONS

## <u>Books</u>

| | |
|---|---|
| 2011 | <u>It's About Time: America's Imprisonment Binge</u> (with John Irwin), 4th Edition, Cengage, Publishing. |

1993                          <u>Reinventing Juvenile Justice</u> (with Barry Krisberg),
                              Beverly Hills, CA: Sage Publications.

1978                          <u>The Children of Ishmael: Critical Perspectives on
                              Juvenile Justice</u> (with Barry Krisberg),

**<u>Articles</u>**

2010                          "Reducing America's Correctional Populations", 2001.
                              Justice Research and Policy, Vol, 12, No. 1, pp,1-32.

2009                          "Prisons and the Fear of Terrorism."  August 2009.
                              Criminology and Public Policy. Vol., Issue 3: 641-649.

2009                          "Beyond Supermax Administrative Segregation:
                              Mississippi's Experience Rethinking Prison
                              Classification and Creating Alternative Mental Health
                              Programs." 2009. Criminal Justice and Behavior. Vol.
                              36, No. 10: 1025-1037.

2006                          "How Much Risk Can We Take?  The Misuse of Risk
                              Assessment in Corrections."  2006.  Federal
                              Probation. Vol. 70, No. 2: 58-63.

2004                          Richards, Stephen C., James Austin, and Richard S.
                              Jones. 2004. "Thinking About Prison Release and
                              Budget Crisis in the Blue Grass State." Critical
                              Criminology: An International Journal, Vol. 12, No.3:
                              243-263.

2004                          Richards, Stephen C., James Austin, and Richard S.
                              Jones. 2004. "Kentucky's Perpetual Prisoner
                              Machine: It's All about Money." Review of Policy
                              Research, Vol. 24, No. 1 (at press).

2003                          "Why Criminology Is Irrelevant", <u>Criminology and
                              Public Policy</u>, Vol. 2, No.3: 557-564

2003                          "Three Strikes Laws", in <u>Current Controversies in
                              Criminology,</u> Ronald Weitzer, ed., Prentice Hall:
                              Upper Saddle River, NJ.

2003                          "The Use of Science to Justify The Imprisonment
                              Binge", <u>Convict Criminology</u>, Jeffrey Ian Ross and
                              Stephen C. Richards, eds., Wadsworth: Belmont, CA.

2003        "Its About Time:  America's Imprisonment Binge", <u>Punishment and Social Control</u>, Aldine De Gruyter: New York, NY.

1999        "Are We Better Off? Comparing Private and Public Prisons in the United States", <u>Current Issues in Criminal Justice</u>. Vol. 11 (2): 177-201.

1999        "The Impact of 'Three Strikes and You're Out'", <u>Punishment and Society</u>, Vol 1(2): 131-162.

1998        "The Limits of Prison Drug Treatment", <u>Corrections Management Quarterly</u>, Vol. 2, Issue 4, Fall 1998, pp. 66-74.

1996        "The Effect of 'Three Strikes and You're Out' on Corrections" in <u>Three Strikes and You're Out: Vengance as Public Policy</u>, David Shichor and Dale K. Sechrest, eds., Sage Publications: Thousand Oaks, CA.

1996        "Are Prisons A Bargain? The Case of Voodoo Economics", <u>Spectrum</u>, Spring 1996, pp. 6-24.

1995        "The Overrepresentation of Minority Youths in the California Juvenile Justice System:  Perceptions and Realities" in <u>Minorities in Juvenile Justice,</u> Kimberly Kempf Leonard, Carle E. Pope, and William H. Fyerherm, eds., Sage Publications: Thousand Oaks, CA.

1994        "Three Strikes and You're Out: The Likely Consequences".  <u>St. Louis University Public Law Review</u>, 14, 1, pp. 239-258.

1993        "Classification for Internal Purposes: The Washington Experience" (with Chris Baird, and Deborah Nuenfeldt), <u>Classification: A Tool for Managing Today's Offenders</u>, Laurel, MD: American Correctional Association.

1993        "Objective Prison Classification Systems: A Review", <u>Classification: A Tool for Managing Today's Offenders</u>, Laurel, MD: American Correctional Association.

| | |
|---|---|
| 1986 | "Using Early Release to Relieve Prison Crowding: A Dilemma in Public Policy," <u>Crime and Delinquency</u> (October):404-501 |
| 1986 | "Evaluating How Well Your Classification System Is Operating," <u>Crime and Delinquency</u> (July):302-321 |
| 1985 | "Incarceration in the United States:  The Extent and Future of the Problem," <u>The Annals</u> (March):15-30 |
| 1983 | "Assessing the New Generation of Prison Classification Models," <u>Crime and Delinquency</u> (October):561-576 |
| 1982 | "Do We Really Want to Get 'Tough on Crime'?" <u>Corrections Today</u>, Vol. 44, No. 6:50-52 |
| 1982 | "Bail Reform in California:  The Passage of AB2" (with E. Lemert), <u>Pretrial Services Annual Journal, 1982</u>, Vol V:4-23 |
| 1982 | "Review of Fatal Remedies:  The Ironies of Social Intervention" (Sam D. Seiber) in <u>Crime and Delinquency</u>, Vol. 20, No. 4:639-641 |
| 1982 | "The Unmet Promise of Alternatives to Incarceration" (with B. Krisberg), <u>Crime and Delinquency</u>, Vol. 28, No. 3:374-409 |
| 1982 | "Promises and Realities of Jail Classification," <u>Federal Probation</u>, Vol. 46, No. 1:58-67 |
| 1981 | "Wider, stronger, and different nets:  the dialectics of criminal justice reform" (with B. A. Krisberg), <u>Journal of Research in Crime and Delinquency</u>, Vol. 18, No. 1:165-196 |
| 1980 | <u>Instead of Justice:  Diversion</u>, Ph.D. Dissertation, University of California, Davis |

## Awards

| | |
|---|---|
| 2009 | Recipient of the Marguerite Q. Warren and Ted B. Palmer Differential Intervention Award, American |

|          | Society of Criminology, Corrections and Sentencing Division |
|----------|-----------------------------------------------------------|
| 1999     | Recipient of the Paul Tappin award for outstanding contributions in the field of criminology, Western Society of Criminology |
| 1991     | Recipient of the Peter P. Lejins Research Award, American Correctional Association |